**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

REC MARINE LOGISTICS, LLC   CIVIL ACTION
                                         NO. 19-11149
VERSUS
DEQUINCY R. RICHARD         SECTION: 1(3)

JUDGE LANCE M. AFRICK
MAGISTRATE DANA M. DOUGLAS

Video Deposition of REC Marine
Logistics, LLC, taken on December 30, 2019,
commencing at 10:15 a.m. and concluding
at 2:20 p.m., at the offices of REC Marine
Logistics, LLC, 810 Crescent Avenue, Lockport,
Louisiana.

**2**

1  APPEARANCES:
2
3  SALLEY & ASSOCIATES
4  BY:  FRED E. SALLEY, ESQ.
5  77378 Highway 1081
6  Covington, Louisiana 70434
7      Attorney for the Plaintiff
8
9  SPAGNOLETTI LAW FIRM
10  BY:  ERIC J. RHINE, ESQ.
11  401 Louisiana Street
    8th Floor
12  Houston, Texas 77002
13      Attorney for the Defendant
14
15
16
17
18
19
20
21  REPORTED BY:
22  Trina M. Graves
    Certified Court Reporter
23
24
25

**EXHIBIT 2**

**3**

1            I N D E X
2
3                     PAGE
4
5  Title                    1
6  Appearances              2
7  Stipulations             4
8  Examination by Mr. Rhine         5
9  Examination by Mr. Salley      250
10  Reporter certificate          255
11
12        EXHIBIT INDEX
13
14  Exhibit number 1 - Logs         18
15  Exhibit number 2 - Not. of Deposition  20
16  Exhibit number 3 - Motion Filed       71
17  Exhibit number 4 - Answer            99
18  Exhibit number 5 - Counterclaim     117
19  Exhibit number 6 - Interrogatories  129
20  Exhibit number 7 - Interrogatories  129
21  Exhibit number 8 - Accident Report  132
22  Exhibit number 9 - Memorandum       208
23  Exhibit number 10 - Boat Logs       221
24  Exhibit number 11 - Personnel File  236
25

**4**

1          S T I P U L A T I O N
2
3      It is stipulated and agreed by and between
4  counsel that the deposition of REC Marine
5  Logistics, LLC is hereby being taken in
6  accordance with Fed.R.Civ.P. 30(b)(6), of the
7  Federal Rules of Civil Procedure for
8  all purposes in accordance with law;
9      That the formalities of filing, reading,
10  signing and certification are hereby waived;
11      That all objections, except those as to
12  the form of the question and/or responsiveness
13  of the answer, are hereby reserved until such
14  time as this deposition or any part thereof
15  may be used in evidence.
16
17          * * * * * * * *
18
19      TRINA M. GRAVES, Certified Court Reporter,
20  in and for the State of Louisiana, officiated
21  in administering the oath to the witness.
22
23
24
25

**5**

1 BLAINE RUSSELL, 226 CASCADE DRIVE, THIBODAUX,
2 LOUISIANA, AFTER FIRST BEING DULY SWORN IN THE
3 ABOVE-ENTITLED MATTER, DID TESTIFY ON HIS OATH
4 AS FOLLOWS:
5       EXAMINATION
6 THE VIDEOGRAPHER:
7       We're on the record.  This is a
8 30(b)(6) video deposition of REC
9 Marine Logistics, LLC, representative
10 Blaine Russell, taking place in
11 Lockport, Louisiana on December 30th,
12 2019, beginning at 10:16 a.m.
13       My name is Shelly Pousson.  I'm
14 the videographer on behalf of goDepo.
15       The court reporter is Trina
16 Graves with goDepo.
17       At this time, would counsel
18 please introduce themselves for the
19 record.
20 MR. RHINE:
21       Eric Rhine, on behalf of
22 Dequincy Richard.
23 MR. SALLEY:
24       And Fred Salley, on behalf of
25 REC Marine Logistics, LLC.

**6**

1 THE VIDEOGRAPHER:
2       Will the court reporter please
3 swear in the witness.
4 THE COURT REPORTER:
5       Would you raise your right hand.
6 Do you solemnly swear that the
7 testimony you're about to give to be
8 the truth, the whole truth, and
9 nothing but the truth, so help you
10 God?
11 THE WITNESS:
12       I do.
13 MR. SALLEY:
14       Before we start, let me make one
15 objection.  The Second -- the Third
16 Amended Notice of Deposition is not
17 timely, not enough days transpired.
18 So I object to the notice.
19 MR. RHINE:
20       All right.  Well, you didn't
21 properly object to anything.  And
22 this is the first time you've
23 actually raised an issue with it.
24 You sent us a one sentence Notice of
25 Objection that failed to identify any

**7**

1 of the alleged irregularities.  So
2 frankly, I'm ignoring the objections.
3 They're not valid, and we're going to
4 proceed with the deposition.
5 MR. SALLEY:
6       Your notice --
7 MR. RHINE:
8       We're going to proceed with the
9 deposition, Fred, unless --
10 MR. SALLEY:
11       We may not.
12 MR. RHINE:
13       Okay.
14 MR. SALLEY:
15       Just hold a minute.  All I'm
16 doing is objecting.
17 MR. RHINE:
18       You're wasting time.
19 MR. SALLEY:
20       I object because it is not
21 timely.  It is not in accordance with
22 the Federal Rules of Civil Procedure.
23 But you can proceed with your
24 deposition, subject to the objection.
25 MR. RHINE:

**8**

1       Okay.  That's the first time
2 you've raised the objection.  We'll
3 go forward.
4 BY MR. RHINE:
5  Q  Can you please state your name for
6 the record?
7  A  Blaine Russell.
8  Q  Where do you live, Mr. Russell?
9  A  Thibodaux, Louisiana.
10  Q  You understand we met briefly
11 earlier.  My name is Eric Rhine.  I represent
12 Mr. Dequincy Richard in a lawsuit that was
13 actually brought by REC Marine.  Are you aware
14 of that?
15  A  I'm sorry.  Repeat that.
16  Q  I represent Mr. Dequincy Richard in a
17 lawsuit that was actually brought by REC
18 Marine.  Are you aware of that?
19  A  Yes.
20  Q  Okay.  And we're here today to take
21 your deposition as the representative of REC
22 Marine in that lawsuit?
23  A  Yes.
24  Q  Okay.  Under the full name of the
25 entity is REC Marine Logistics, LLC; is that

**9**

```
 1  correct?
 2     A   Correct.
 3     Q   If I refer to it as REC or REC Marine
 4  --
 5     A   Understood.
 6     Q   -- do you understand what I'm
 7  referring to in that?
 8     A   Yes.
 9     Q   Okay.  If at any time during your
10  deposition today you don't understand the
11  questions I ask, please just ask me to
12  rephrase.  I'd be happy to do so.  I just want
13  to make sure that you understand what I'm
14  asking you, and I ask you to fully respond to
15  my questions.
16     A   Sure.
17     Q   We've got a court reporter sitting
18  here.  So I also ask that you give verbal
19  responses.  Sometimes, we get the tendency of
20  nodding our heads or, maybe, saying "unh-unh"
21  or "huh-huh".  And that doesn't make for a
22  clear record.
23     A   Correct.
24     Q   So I just ask you to give me "yes" or
25  "no" answers or explain as needed.
```

**10**

```
 1     A   Understood.
 2     Q   If you answer a question here today,
 3  I'm going to -- I'm going to assume that you
 4  understood it.  Is that fair?
 5     A   Yes.
 6     Q   Okay.  You understand that you have
 7  been sworn, and you're under oath here today?
 8     A   Yes.
 9     Q   The same as if you were down in front
10  of the jury in New Orleans and testifying in
11  federal court?
12     A   Yes.
13     Q   It's not a marathon.  If you need to
14  take a break, stretch, coffee, whatever, just
15  ask; and I'll be happy to do so.
16     A   Appreciate it.
17     Q   What's your date of birth,
18  Mr. Russell?
19     A       /69.
20     Q   Can you please state your address for
21  the record?
22     A   226 Cascade Drive, Thibodaux,
23  T-H-I-B-O-D-A-U-X, Louisiana 70301.
24     Q   How long have you lived in Thibodaux?
25     A   Thirty years.
```

**11**

```
 1     Q   Do you have any intent to move from
 2  that address --
 3     A   No.
 4     Q   -- in the near future?
 5     A   Three or four months.  I'll be in
 6  Thibodaux, though.
 7     Q   Okay.  Do you know the address you
 8  intend to move to?
 9     A   308 Cedar Tree Drive in Thibodaux,
10  70301.
11     Q   What's the extent of your education,
12  sir?
13     A   BS in economics in business.
14     Q   Where did you obtain that?
15     A   Centenary College in Shreveport,
16  Louisiana.
17     Q   What year did you graduate?
18     A   '91.
19     Q   Have you had any education after the
20  degrees that you received from Centenary
21  College?
22     A   Some graduate classes at Nicholls
23  State, MBA.
24     Q   Did you receive a degree from
25  Nicholls State?
```

**12**

```
 1     A   No.
 2     Q   Are you still taking those classes
 3  or --
 4     A   No.
 5     Q   Have you ever gone to any technical
 6  or trade schools?
 7     A   No.
 8     Q   Okay.  Do you hold any licenses,
 9  other than a driver's license?
10     A   No.
11     Q   Who are you -- excuse me.  Who are
12  you currently employed by?
13     A   REC Marine Logistics, LLC.
14     Q   How long have you been employed by
15  REC Marine?
16     A   I think eight years.
17     Q   Are you employed by any other company
18  currently?
19     A   No.
20     Q   Have you ever been employed by Gulf
21  Offshore Logistics?
22     A   No.
23     Q   Have you ever been employed Offshore
24  Transport Services?
25     A   No.
```

**3 (Pages 9 to 12)**

**13**

1    Q    Have you ever held any executive
2  positions with either Gulf Offshore Logistics
3  or Offshore Transport Services?
4    A.   No.
5    Q    What is your title with REC Marine?
6    A    Operations manager.
7    Q    What does that entail, just on a
8  day-to-day basis?
9    A    Personnel, dealing with personnel,
10 just everyday operation of other vessels.
11   Q    Okay.  How many vessels does REC
12 Marine operate?
13   A    We operate about 40.  I believe it's
14 40 now.
15   Q    And are you the manager of all 40 of
16 them?
17       MR. SALLEY:
18           Objection.
19       MR. RHINE:
20           You can answer.  From time to
21       time, Mr. Salley will object.  But --
22       THE WITNESS:
23           Understood.  Yeah.  I guess,
24       some, more than others, I guess I
25       should say, some vessels more than

**14**

1       others.  Because they're broken down
2       by different owners, as far as the
3       company structure goes.
4  BY MR. RHINE:
5    Q    Are there other operations managers
6  within the company?
7    A    No.
8    Q    Okay.  So as far as operations and
9  oversight of the personnel on the vessels, you
10 are the most senior person at REC Marine that
11 handles that?
12   A    Correct.
13   Q    And you handle that for all 40 of the
14 vessels, but it just depends on which vessel
15 as to what your involvement or work is?
16   A    Correct.
17   Q    Are you based out of a particular
18 office?
19   A    Yes.  In Raceland.  I don't know the
20 address.  That's sad, but I don't know what
21 the address is.
22   Q    Okay.  Whose office is it?
23   A    I -- I believe now it's owned by REC
24 Chaddock, REC Marine Logistics.  The sign says
25 different, but I believe it's owned now by REC

**15**

1  Chaddock.
2    Q    What does the sign say?
3    A    I think it says "Gulf Offshore
4  Logistics" still.  I really don't know that,
5  either.
6    Q    When you refer to "REC Chaddock",
7  you're referring to, I think, his full name is
8  Ronald E. Chaddock?
9    A    Correct.
10   Q    I assume that R-E-C and REC Marine
11 came from his initials?
12   A    That's correct.
13   Q    It's his nickname, "REC," I guess?
14   A    That's it.
15   Q    Okay.  How long have you been based
16 out of that Raceland office?
17   A    Three and a half years.
18   Q    Okay.  And in three and a half years,
19 it's had a Gulf Offshore Logistics sign out
20 front of it?
21   A    Correct.
22   Q    Okay.  Did the -- do you know who
23 owns Gulf Offshore Logistics?
24   A    That company is dissolved.
25   Q    When was it dissolved?

**16**

1    A    Around three and a half years ago.
2    Q    Do you know who owned it prior to its
3  dissolution?
4    A    Joel Broussard.
5    Q    Does Mr. Broussard have any
6  involvement with REC Marine?
7    A    No.
8    Q    Has he ever worked for REC Marine?
9    A    No.
10   Q    Is he an owner of REC Marine?
11   A    No.
12   Q    Was Gulf Offshore Logistics sold at
13 some point to Ronald Chaddock?
14   A    No.  I believe all the vessels were
15 sold to Harvey Gulf, and I don't know the
16 inner workings of when things were sold to REC
17 Chaddock.  I don't know.
18   Q    Okay.  You believe that the
19 vessels -- strike that.  Were all of the 40
20 vessels that are currently operated by REC
21 Marine at one point owned and operated by Gulf
22 Offshore Logistics?
23   A    No.
24   Q    Were they operated by Gulf Offshore
25 Logistics?

**4 (Pages 13 to 16)**

**17**

1    A   No.
2    Q   Were some of those 40 vessels
3 operated by Gulf Offshore Logistics?
4    A   Correct.
5    Q   Do you know how many?
6    A   Maybe, six or seven.
7    Q   So at some point, those six or seven
8 vessels, you think, went to Harvey Gulf and
9 then, found their way to REC Marine?
10     MR. SALLEY:
11        Objection.
12     THE WITNESS:
13        No.  A majority of the vessels
14     that were owned by Joel Broussard
15     were sold to Harvey Gulf, and Rick
16     brought our vessels that REC Chaddock
17     owned to that office from the
18     previous office.  And there are other
19     owners of some other vessels that we
20     operate.
21 BY MR. RHINE:
22    Q   Okay.  Who is the owner of the DUSTIN
23 DANOS?
24    A   Todd Danos.  I think he is the sole
25 owner, I think.

**18**

1    Q   Do you know what legal entity is the
2 owner of the vessel?
3    A   I don't know if it's Danos Deepwater.
4 I don't know if it's Danos Deepwater.  That's
5 vessels I don't do a lot with.
6    Q   Okay.
7    A   So I don't -- maybe, Danos Deepwater.
8    Q   Okay.  What do you have in front of
9 you?
10    A   That's a couple of logs.
11    Q   Can I see it?
12    A   Sure.
13    Q   I'm just gonna go ahead and mark this
14 as Exhibit 1 to this deposition, just so we
15 have a record of what you brought here.
16    A   Understood.
17     MR. RHINE:
18        And Fred, we don't have
19     stickers.  But I'm gonna use this
20     reddish pen to mark them --
21     MR. SALLEY:
22        You have a pen.
23     MR. RHINE:
24        -- if that's okay?
25     MR. SALLEY:

**19**

1        You have a pen.  It works.
2 BY MR. RHINE:
3    Q   I'll hand that to you.  If you need
4 it for anything, let me know.  I'll be happy
5 to let you review stuff I'm gonna show you, a
6 number of documents today, as well.
7    A   Okay.
8    Q   Have you been the operations manager
9 at REC Marine for all eight of your years?
10    A   Yes.
11    Q   Where did you work prior to working
12 for REC?
13    A   Marine-wise or my whole life?
14    Q   Just immediately prior to REC Marine,
15 who were you employed by?
16    A   I worked -- I worked for
17 International Offshore in Larose.  And then,
18 previous to that, I worked for Crosby Tugs.
19 And previous to that, I coached men's
20 basketball of Nicholls State University.
21     MR. SALLEY:
22        Can you repeat the last part,
23     just the last --
24     THE WITNESS:
25        I coached basketball at Nicholls

**20**

1        State University prior to all of
2     that.
3     MR. SALLEY:
4        Okay.  I just didn't know
5     whether she was able to hear it.
6 BY MR. RHINE:
7    Q   Were you the head coach?
8    A   No.  Assistant, unfortunately.
9    Q   Has your title at REC Marine ever
10 changed?
11    A   No.
12    Q   I'm gonna hand you now what I've
13 marked as Exhibit 2 at the bottom right, which
14 is the Notice of Deposition for REC Marine
15 here today.
16     MR. SALLEY:
17        Let me see that one.
18     MR. RHINE:
19        I think you have a copy.  But I
20     can give you one, if needed, Fred.
21     MR. SALLEY:
22        All right.  Let me just note
23     this is the Third Amended Notice, and
24     it was changed.  This one does not
25     carry with it the perimeter of a

**21**

```
 1    legal service.  It's less than 15
 2    days.  But subject to that, he can
 3    look at it.
 4    MR. RHINE:
 5        Okay.  Well, you didn't validly
 6    object.  You didn't validly seek
 7    protection from the Court.
 8    MR. SALLEY:
 9        That's -- that's strictly your
10    opinion.
11    MR. RHINE:
12        Your objection is irrelevant,
13    Fred.  Okay.
14    MR. SALLEY:
15        And we can deal with that later.
16    MR. RHINE:
17        Well, you don't need to keep
18    asserting your objection that it
19    wasn't previously or timely raised.
20    You did that at the beginning.
21    MR. SALLEY:
22        It was timely raised.
23    MR. RHINE:
24        Okay, Fred.
25
```

**22**

```
 1    BY MR. RHINE:
 2    Q    Do you see that document, sir?
 3    A    Yes, sir.
 4    Q    Do you understand what that document
 5    is?
 6    A    Correct.
 7    Q    Can you identify it for the ladies
 8    and gentlemen of the jury?
 9    A    Third Amended Notice of Corporate
10    Deposition of REC Marine Logistics, LLC.
11    Q    And you're here today on behalf of
12    REC Marine testifying as its corporate
13    representative in this lawsuit?
14    A    Yes.
15    Q    Do you understand that?
16    A    Yes.  Yes.
17    Q    Okay.  I see you're reviewing that
18    document.
19    A    Uh-huh.  (Affirmative response.)
20    Q    There is an attachment to it which
21    includes a number of topics that you've been
22    designated to testify on.  Are you aware of
23    that?
24    A    Okay.
25        MR. SALLEY:
```

**23**

```
 1        Let me correct that.  He is
 2    presented as a witness to respond to
 3    your notice, not the sole witness,
 4    perhaps.
 5    MR. RHINE:
 6        Well, if you had other
 7    witnesses, Fred, where are they?
 8    MR. SALLEY:
 9        Just so -- just so the record is
10    clear.  You only take one at a time.
11    If you're satisfied, then, we go
12    home.
13    BY MR. RHINE:
14    Q    All right.  Sir, have you seen those
15    topics previously?
16    A    Yes.
17    Q    Okay.  Are you here today to testify
18    regarding all of the topics that are listed
19    there?
20    A    I'm assuming I am, yes.
21    Q    Well, who designated you to speak
22    about those topics?
23    A    Attorney for this.
24    Q    Did REC marine have any say in your
25    identification as its corporate
```

**24**

```
 1    representative?
 2    A    Yes.  I mean, I'm representing REC
 3    Marine.  I do for this kind of stuff.
 4    Q    I just mean who, at REC, decided that
 5    you were the one who was going to sit here
 6    today and testify on behalf of REC?
 7    A    Really, our attorney did.
 8    Q    Okay.  You understand that your
 9    answers to my questions today regarding those
10    topics will represent all of the information
11    that's available to REC Marine?
12    A    Sure.
13    Q    Okay.  Are there any other topics
14    that you do not feel that you're fully
15    prepared to testify about?
16    A    I'll answer them as we go along best
17    of my knowledge.
18    Q    Have you ever given a deposition
19    before?
20    A    Yes.
21    Q    How many times?
22    A    Five or six, maybe.
23    Q    Were those depositions ones in which
24    you were testifying on your individual behalf
25    or as the corporate representative of REC
```

**25**

1  Marine?
2      A   Corporate.
3      Q   Okay.  When was the last deposition
4  that you gave?
5      A   Two months ago.
6      Q   Okay.  What was the name of that
7  case, do you know?
8      A   I believe it was Terry Durr, D-U-R-R,
9  versus REC Marine Logistics, LLC.
10     Q   What was that case about?
11     A   A third party saying he injured his
12  back on a basket transfer.
13     Q   Mr. Durr, it sounds like, was not an
14  employee of REC Marine?
15     A   No, he was not.
16     Q   Okay.  What vessel was involved in
17  that lawsuit?
18     A   The HANNAH C., H-A-N-N-A-H, capital
19  C, period.
20     Q   Is REC Marine the owner of the HANNAH
21  C.?
22     A   Yes.
23     Q   Is REC Marine also the operator of
24  the HANNAH C.?
25     A   Yes.

**26**

1      Q   Prior to the deposition that you gave
2  in the Terry Durr case, when was the last time
3  that you were deposed?
4      A   It's been a few years back.  I don't
5  recall any exact date of that.
6      Q   Okay.  Do you remember the names of
7  any plaintiffs in your prior depositions?
8      A   No, I sure don't.
9      Q   Do you remember any of the vessels
10  that were involved?
11     A   No.  This has been scattered.  I also
12  worked at Crosby Tugs 15, 18 years ago.  So I
13  don't remember any of the other ones.
14     Q   Okay.  During your time at REC
15  Marine, is the Terry Durr deposition the only
16  one that you've had?
17     A   I had one other one, but I don't
18  remember who it was for.  That was done at our
19  office at REC Marine.  I don't recall who it
20  was for.
21     Q   Okay.  Do you remember the name of
22  the plaintiff?
23     A   I just remember he was a tugboat
24  captain.  But no, I don't remember his name.
25     Q   Do you remember his injuries?

**27**

1      A   Back.
2      Q   Was he an employee of REC Marine?
3      A   Correct.
4      Q   Did REC Marine provide maintenance
5  and cure to the tugboat captain?
6      A   I don't remember what was -- exactly
7  was done.  I really don't remember.
8      Q   Okay.  When did you first learn of
9  this deposition?
10     A   A week ago, maybe.
11     Q   Okay.  How did you learn about it?
12     A   From Fred.
13     Q   Okay.  And I don't want to know
14  anything that Fred's told you or you've told
15  Fred.  That's privileged.  I'm not trying to
16  ask that --
17     A   Sure.
18     Q   -- in any of my questions today.
19  Okay.  What did you do to prepare for the
20  deposition today?
21     A   Just read these questions right here.
22     Q   All you did to prepare was to review
23  the questions that are listed on the Exhibit A
24  to what has been marked in this deposition as
25  Exhibit 2?

**28**

1      A   Correct.
2      Q   Did you look at any other documents,
3  besides that list of topics?
4      A   No.  No, I didn't.  Fred provided
5  these.  I didn't have to.
6      Q   Did you speak with anyone at REC
7  Marine regarding the topics that are listed on
8  that exhibit?
9      A   I briefly spoke to our safety -- a
10  safety, I guess, manager.
11     Q   What is his name?
12     A   Brian Harris, B-R-I-A-N, Harris.
13     Q   What did you speak with Mr. Harris
14  about?
15     A   To review the Incident Report from
16  this alleged incident.
17     Q   So you went over the Incident Report
18  with Mr. Harris?
19     A   Well, he gave it to me.  I didn't
20  review it with him.  He just gave -- put the
21  document on my desk.
22     Q   Okay.  You asked him for a copy of
23  it?
24     A   Correct.
25     Q   Did you discuss the contents of the

**7 (Pages 25 to 28)**

**29**

1 Incident Report with Mr. Harris?
2     A   I may have briefly asked him a couple
3 of questions.
4     Q   Do you remember what questions you
5 asked Mr. Harris?
6     A   Kind of the extent of where it was
7 at.  This is something -- this is really
8 something I hadn't really been deeply involved
9 with, so just kind of get a -- an overview of
10 what allegedly happened.  That's really about
11 it.
12     Q   What did Mr. Harris tell you?
13         MR. SALLEY:
14             Objection.  Calls for hearsay.
15         THE WITNESS:
16             Just that he had taken the guy
17         to the doctor.  And he tried to
18         follow up with him the following day,
19         and there's been no more contact.
20             And that Fred has been involved ever
21         since that point.
22 BY MR. RHINE:
23     Q   Did Mr. Harris discuss anything else,
24 besides the fact that he had driven Dequincy
25 Richard to the doctor following the incident

**30**

1 and that he had tried to follow up the next
2 day?
3         MR. SALLEY:
4             Objection to requested hearsay.
5         THE WITNESS:
6             No.  That was really about all
7         we discussed.  I read the reports,
8         and that's kind of been -- I reviewed
9         the questions, and that's kind of
10         been the extent of it.
11 BY MR. RHINE:
12     Q   What reports did you review?
13     A   The report from Occupational Medical
14 Services and then, the actual Patient Tracking
15 Record and then, the Incident Report the
16 vessel sent in.
17     Q   Okay.  All of those documents are
18 contained within what we marked as Exhibit 1
19 to your deposition?
20     A   Okay.  Correct.  If that's -- yes,
21 sir.  I'll accept that.
22     Q   Who selected the documents that are
23 within Exhibit 1?
24         MR. SALLEY:
25             Let me object because the

**31**

1         documents were requested, and they
2         were selected to respond to the
3         request.
4         MR. RHINE:
5             I have no idea what that
6         objection means, Fred.  So I will
7         note your objection and move on.
8         MR. SALLEY:
9             It's an objection to the
10         question.
11 BY MR. RHINE:
12     Q   Who gave the specific -- who gave the
13 specific documents that are contained within
14 Exhibit 1 to you prior to this deposition
15 today?
16     A   Fred gave me these this morning.
17     Q   Okay.  Prior to this morning, the
18 only, I guess, document you reviewed to
19 prepare for your testimony today would have
20 been the Incident Report that was given to you
21 by Brian Harris?
22         MR. SALLEY:
23             Objection.
24         THE WITNESS:
25             Correct.  And also, the two

**32**

1         medicals from OMS.
2 BY MR. RHINE:
3     Q   Okay.  Did Mr. Harris give you those
4 two pages, as well?
5     A   Correct.
6     Q   Okay.  Did you review the deposition
7 of Captain Sam McCain?
8     A   No.
9     Q   Okay.  Did you speak with the
10 captain?
11     A   No, never have.
12     Q   You've never spoken with the captain
13 of the vessel at the time that the incident
14 occurred?
15     A   No, never have.
16     Q   Why not?
17     A   Safety would -- would do that.  And
18 that's a vessel I don't have a lot of
19 involvement with.
20     Q   Well, who has more involvement with
21 the vessel at REC?
22     A   I mean, I guess, personnel doing crew
23 changes and a port captain for that vessel.
24     Q   Did you visit with the port captain
25 prior to your deposition today?

**33**

1    A   No.
2    Q   Did you visit with any of the
3  personnel that have ever been onboard the
4  DUSTIN DANOS prior to your deposition today?
5    A   No.
6    Q   Okay.  How are you able to ensure
7  that your testimony here today is based on the
8  entire information that REC Marine holds
9  regarding those topics?
10       MR. SALLEY:
11          Objection.  The notice specifies
12       areas which are not the entirety of
13       matters which may be available.
14       THE WITNESS:
15          Can you repeat the -- can you
16       repeat the question, please?
17       MR. RHINE:
18          Can you read back my question,
19       please?
20  (WHEREUPON, THE COURT REPORTER READS BACK THE
21  PREVIOUS QUESTION.)
22       THE WITNESS:
23          Can you rephrase the question?
24  BY MR. RHINE:
25    Q   Do you understand, as the corporate

**34**

1  representative, that REC Marine has designated
2  you to testify regarding all of the
3  information that's available to REC Marine?
4       MR. SALLEY:
5          Objection.  He's required to
6       respond to your specific requests.
7       MR. RHINE:
8          Fred, and under the Federal
9       Rules of Civil Procedure, for all of
10      those topics listed, your client is
11      required to designate someone to
12      testify regarding them.  And that
13      person is supposed to testify based
14      on the entire information that is
15      available to REC Marine.
16      MR. SALLEY:
17         Counsel, that may be your view
18      of the way the law works.  But I've
19      been around a long time, and you're
20      not correct.
21      MR. RHINE:
22         All right.  The Federal Rules of
23      Civil Procedure say what I said.
24      MR. SALLEY:
25         We are correctly responding.

**35**

1       MR. RHINE:
2          Okay.
3       THE WITNESS:
4          Ask the question.  I'll answer.
5          Go ahead and ask your question.
6  BY MR. RHINE:
7    Q   How are you gonna be able to testify
8  regarding all the topics -- strike that.
9       MR. RHINE:
10         Can you just go back to my last
11      question so I can see it, please.
12         And, Fred, I just need you to
13      say "objection" from here on out.  I
14      don't need speaking objections.
15      MR. SALLEY:
16         I know what you want.  You're
17      not likely to get them in all cases.
18      MR. RHINE:
19         All right.  We'll take it up
20      with the Court afterwards, if we need
21      to.
22      MR. SALLEY:
23         I'm certainly capable of doing
24      that.
25  (WHEREUPON, COURT REPORTER AND COUNSEL DISCUSS

**36**

1  READING QUESTION BACK.)
2  BY MR. RHINE:
3    Q   Sir, REC Marine's designated you to
4  testify as the corporate representative for
5  all the topics on that Notice of Deposition.
6  Correct?
7    A   Correct.
8    Q   Okay.  But you did not contact the
9  captain, who was onboard the vessel at the
10  time of the incident.  Correct?
11   A   Correct.
12   Q   You didn't contact anyone who's ever
13  been on the vessel?
14      MR. SALLEY:
15         Let me object.  All you're doing
16      is making argument that doesn't
17      relate to the questions.  Ask him the
18      questions that you wanted answered.
19      MR. RHINE:
20         Fred, again, I don't need your
21      speaking objections.
22      MR. SALLEY:
23         I'm gonna make my speaking
24      objections because it's so annoying
25      for you to send out a long notice and

**37**

```
 1    not to ask him the questions you
 2    claim that you wanted.
 3    MR. RHINE:
 4        You should have taken --
 5    MR. REMONDET:
 6        I object to the witness because
 7    he doesn't know everything about
 8    everything.
 9    MR. RHINE:
10        You should have taken it up
11    the Court, if you had an issue with
12    it, Fred.
13    MR. SALLEY:
14        No. I don't have to take it up
15    with the Court when you think I
16    should. I take it up based on my
17    experience, not yours.
18    MR. RHINE:
19        Okay. We'll let the Court
20    decide it at a later date. Again, I
21    ask you to only object to form or
22    identify the specific objection. But
23    I don't need speaking objections
24    cluttering up this deposition
25    transcript.
```

**38**

```
 1    MR. SALLEY:
 2        I understand what you prefer not
 3    to have and don't want. I have my
 4    own choices.
 5    MR. RHINE:
 6        Okay. And I'm just asking you
 7    to abide by the Federal Rules of
 8    Civil Procedure and the Local Rules
 9    of the Eastern District of Louisiana,
10    which you're repeatedly flouting.
11    MR. SALLEY:
12        That's your opinion. Take it up
13    with the judge.
14    MR. RHINE:
15        I will, Fred. So please, again,
16    on the record, I don't need speaking
17    objections.
18    MR. SALLEY:
19        Can you stick with the questions
20    that you said you wanted answered?
21    You haven't gone into either -- any
22    of it, so far. And that's the
23    objection.
24    MR. RHINE:
25        All right.
```

**39**

```
 1        MR. SALLEY:
 2        He's not a general fact witness.
 3    BY MR. RHINE:
 4    Q   Sir, did you review any of the
 5    discovery responses in this lawsuit?
 6    A   No, I have not.
 7    Q   Did you assist in responding to any
 8    of the discovery in this case?
 9    A   The only thing that I've -- that I
10    have done regarding this case is the affidavit
11    in regards to me representing REC Marine.
12    Q   And I'm gonna ask you about that
13    affidavit later.
14    A   Sure.
15    Q   Did you respond to any of the
16    interrogatory questions that were served on
17    REC Marine?
18    A   No.
19    Q   Did you attempt to locate any of the
20    documents that were requested in response to
21    request for production?
22    A   I don't always handle that.
23    Q   Did you, in this case?
24    A   No.
25    Q   How did you ensure today that you had
```

**40**

```
 1    obtained all the information that was
 2    available to REC Marine regarding those
 3    topics?
 4    A   I looked at what you had here and
 5    just read -- read over what we have as far as
 6    the documentation with the Accident Report and
 7    the doctors' visits the one time he went to
 8    the doctor.
 9    Q   Okay. I think you said earlier that
10    REC Marine Logistics is owned by REC Chaddock?
11    A   Ronald Chaddock, correct. Ronald REC
12    Chaddock, I guess.
13    Q   Is he the sole owner?
14    A   Yes.
15    Q   Okay. And Gulf Offshore Logistics,
16    you believe, was voluntarily dissolved?
17    A   Correct.
18    Q   Was Gulf Offshore Logistics ever
19    owned by REC Chaddock?
20    A   No.
21    Q   Okay. Who is the owner of Offshore
22    Transport Services?
23    A   Todd Danos.
24    Q   What is the relationship between REC
25    Marine and Offshore Transport Services?
```

**10 (Pages 37 to 40)**

41

1    A    We operate their vessel.
2    Q    Is the -- what vessel is that, in
3  this case?
4    A    The DUSTIN DANOS.
5    Q    Is the DUSTIN DANOS the only vessel
6  that REC Marine operates on behalf of Offshore
7  Transport Services?
8    A    To my knowledge, yes.
9    Q    Does REC Marine operate other vessels
10  that are owned by Todd Danos --
11        MR. SALLEY:
12            Objection.
13    Q    -- for any other entities?
14        MR. SALLEY:
15            Objection.  Todd Danos has
16        nothing to do with the case.
17  BY MR. RHINE:
18    Q    You can answer my question.
19    A    Yes.
20    Q    Okay.  How many vessels of Todd Danos
21  does REC Marine operate?
22        MR. SALLEY:
23            Let me object because you're
24        asking him for material that has not
25        been requested.  He does not know the

42

1    legal relationship with Todd Danos
2    and any company that he may be
3    involved in.  So I'd object to your
4    trying to mislead the witness.
5        THE WITNESS:
6            I don't know, maybe, four or
7        five.
8  BY MR. RHINE:
9    Q    Sir, did you understand my question?
10        MR. SALLEY:
11            Objection.
12        THE WITNESS:
13            I believe you asked how many
14        vessels he's involved with, Todd
15        Danos, is involved with for the
16        company.
17  BY MR. RHINE:
18    Q    Yeah.  Did you understand that?
19    A    Repeat what you were -- can you --
20    Q    Did you understand my prior question
21  that you answered?
22    A    After -- after this, I don't remember
23  what the question was.
24        MR. SALLEY:
25            Do you want it read back?  She

43

1        can --
2        THE WITNESS:
3            No.  That -- that's not a
4        problem.
5  BY MR. RHINE:
6    Q    Is there a contract between REC
7  Marine and Offshore Transport Services?
8    A    Not to my knowledge, no.
9    Q    Are there any agreements between the
10  two entities?
11    A    If there is, I'm not aware of it.
12  It's something I wouldn't be involved with.
13    Q    Who would, at REC Marine, be able to
14  fully answer that question?
15    A    I'm sure Ronald Chaddock and Todd
16  Danos.
17    Q    Who was the employer of Dequincy
18  Richard?
19    A    REC Marine Logistics, LLC.
20    Q    Were all of the crew members that
21  were onboard the DUSTIN DANOS, at the time of
22  the incident, employed by REC Marine?
23    A    Correct.
24    Q    Who is in charge of safety on the
25  vessel?  By that, I mean, which of these

44

1    companies that we've talked about was in
2    charge of the safety policies that applied to
3    the vessel, at the time of the incident?
4    A    GOL, LLC manuals were onboard the
5    vessel.
6    Q    Who is GOL, LLC?
7    A    It is the, I guess, the invoicing,
8    the marketing and invoicing company.
9    Q    Who owns GOL,LLC?
10        MR. SALLEY:
11            Objection.  Only if you know.
12        THE WITNESS:
13            I think Ronald Chaddock, Todd
14        Danos, and Joel Broussard.
15  BY MR. RHINE:
16    Q    Okay.  When Captain McCain is
17  operating the DUSTIN DANOS, which company's
18  safety policies is he following?
19    A    The manual says GOL, LLC.
20    Q    Okay.  Does REC Marine also have a
21  safety manual?
22    A    No.
23    Q    Does REC --
24    A    Those were expired.  Those were
25  expired when we introduced the GOL, LLC

**45**

1  manuals.
2  Q   Okay.  When was the GOL, LLC manual
3  introduced?
4      MR. SALLEY:
5          Objection, unless you know.
6  THE WITNESS:
7      I don't know the exact --
8  MR. RHINE:
9          Stop saying, "Unless you know."
10  Just note your objection, please.
11  Stop trying to guide the witness.
12  MR. SALLEY:
13          Would you quit trying to tell me
14  how to practice law.  I will make my
15  objections as required.
16  MR. RHINE:
17          Okay.  I guess we're gonna keep
18  getting improper objections.  Is that
19  it?
20  MR. SALLEY:
21          If you think they're improper,
22  you can think they're improper.  I
23  don't think they're improper.  I
24  think your deposition is out of
25  order, because you sent me a list of

**46**

1          over 30 items.  And you haven't asked
2          about a one, so far.  Maybe, you did
3          one.  Your list has 34 items that you
4          were alleged to be wanting
5          information about.  You haven't asked
6          about but one.
7      MR. RHINE:
8          Anything else, Fred?
9      MR. SALLEY:
10          Not at present.  But when I have
11      more, I will offer it.
12      MR. RHINE:
13          I'm sure you will.
14  BY MR. RHINE:
15  Q   Okay.  When was the GOL, LLC safety
16  manual placed on the vessel?
17  A   I would say, sometime after we moved
18  to that office, maybe, the fall of -- I think
19  we moved in in '15.
20  Q   Okay.  Prior to that, did REC Marine
21  have a safety manual that was in place on the
22  vessel?
23  A   Yes.
24  Q   What changes, if any, were made to
25  safety manual when it was swapped out for the

**47**

1  one from GOL, LLC?
2      MR. SALLEY:
3          Exception.  Vague.
4  THE WITNESS:
5          That, I can't do this.  I can't
6      tell you exactly what that is.
7  BY MR. RHINE:
8  Q   Okay.  Does REC Marine have a copy of
9  the safety manual that is in place on the
10  vessel?
11  A   A GOL, LLC manual, yes.
12  Q   Okay.  Besides the GOL, LLC safety
13  manual, were there any other policies that the
14  captain and crew of the DUSTIN DANOS were
15  supposed to follow on the date of the
16  incident?
17      MR. SALLEY:
18          Objection.  Vague.
19  THE WITNESS:
20          No, I don't know.?
21  BY MR. RHINE:
22  Q   Okay.  So the sole safety guidance in
23  place on the vessel, at least, in written
24  form, was the safety manual that REC Marine
25  implemented but was written by GOL, LLC.  Is

**48**

1  that fair?
2      MR. SALLEY:
3          Objection.  Objection to form.
4  THE WITNESS:
5          That would be correct.
6  BY MR. RHINE:
7  Q   Why didn't REC Marine just issue
8  their own safety manual?
9      MR. SALLEY:
10          Objection.
11  THE WITNESS:
12          We took over.  When we became
13      involved with the company, Gulf
14      Offshore Logistics' safety manual was
15      more in depth for -- to work for
16      larger offshore companies.  And so we
17      used their manual and changed the
18      name to GOL, LLC on the manuals.
19  BY MR. RHINE:
20  Q   Why didn't you just change the name
21  to REC Marine on the manuals?
22      MR. SALLEY:
23          Objection.  That's a matter
24      that's not requested by your Exhibit
25      A.

**12 (Pages 45 to 48)**

**49**

1    THE WITNESS:
2        Some of or documentation for the
3        vessels is listed under GOL, LLC.
4    BY MR. RHINE:
5    Q   What training did REC Marine provide
6    to Dequincy Richard?
7    A   I'm not exactly sure.
8    Q   Who would know what training was
9    provided to Dequincy Richard?
10   A   Brian Harris.
11   Q   Does Mr. Harris still work for REC
12   Marine?
13   A   Yes.
14   Q   Prior to today's deposition, did you
15   ask Mr. Harris anything about the training
16   that Mr. Richard had received while working
17   for REC Marine?
18   A   No.
19   Q   Do you know, sitting here today,
20   whether or not Mr. Richard ever received a
21   copy of the GOL, LLC safety manual?
22   A   I do not know that.
23   Q   Who would know that?
24   A   Oh, I'm sorry.  Scratch that.  I was
25   thinking of the Incident Report when you said

**50**

1    that.
2    Q   Okay.  Let me reask the question,
3    then.  We'll make sure we're clear.
4    A   Okay.
5    Q   Do you know if my client, Dequincy
6    Richard, ever received a copy of the GOL, LLC
7    safety manual?
8    A   It's made available to them on the
9    vessel.
10   Q   What does that mean?
11   A   The vessel -- the book -- the vessel
12   each has a safety manual onboard, you know,
13   that they're able to read any time they feel a
14   need to.  It's at their access to review.
15   Q   Okay.  Do you know if my client ever
16   reviewed the manual?
17       MR. SALLEY:
18       Objection.
19       THE WITNESS:
20       No.  He's -- if he has, that's
21       at his discretion.
22   BY MR. RHINE:
23   Q   Does REC Marine have any policies and
24   procedures in place regarding the review of
25   the GOL safety manual?

**51**

1    A   I believe that we do for orientation.
2    Q   What are those policies?
3    A   It goes through a list of orientation
4    procedures, videos.  They sign off saying that
5    they were shown.  I don't know the exact
6    videos or documents that they sign.  I'm
7    really not involved day-to-day with that.
8    Q   Okay.  Who is involved day-to-day
9    with that?
10   A   Between personnel and safety.
11   Q   What individuals at REC Marine?
12   A   Now, it would be Mandy Melancon.  And
13   Brian Harris has done it a few times.
14   Q   Who would it have been specifically
15   at the time that Mr. Richard was --
16   A   I'm guessing Alex Griffin, who no
17   longer works for us.
18   Q   Okay.  All right.  What was Alex
19   Griffin's position?
20   A   Personnel manager.
21   Q   For REC Marine?
22   A   Correct.
23   Q   Did he work for any of the other
24   companies we're talking about?
25   A   No.  REC Marine Logistics.

**52**

1    Q   Okay.  When did Alex Griffin leave
2    the company?
3    A   Thirty days ago.
4    Q   Okay.  Was he fired?
5    A   No.
6    Q   What happened?
7        MR. SALLEY:
8        If you know.
9        THE WITNESS:
10       He took a job with another
11       company.
12   BY MR. RHINE:
13   Q   All of my questions today, if you
14   don't know, just tell me you don't know.  I'm
15   not trying to ask you information you don't
16   know.  I'm just trying to identify what you do
17   and do not know and try to get the information
18   that REC Marine is aware of.  Okay.
19   A   Understood.
20       MR. SALLEY:
21       Counsel, the problem is that you
22       listed 35 items you wanted to ask.
23       MR. RHINE:
24       Then, you should have objected,
25       Fred.

**53**

```
 1       MR. SALLEY:
 2          And you have asked no questions
 3   that relate to any but one of those.
 4       MR. RHINE:
 5          You should have objected with
 6   the Court, Fred.
 7       MR. SALLEY:
 8          So I get -- I have objected on
 9   the record.
10   BY MR. RHINE:
11    Q   Where does Mr. Griffin live?
12    A   I think here in Lockport.
13    Q   What company did he leave to go work
14   for?
15    A   Marquette Towing, I think it is,
16   Marquette Offshore, Marquette Towing.
17    Q   Did he leave on good terms?
18    A   Sure.
19    Q   He wasn't fired or anything?
20    A   No, not at all.
21    Q   Did you call Alex Griffin prior to
22   this deposition and ask him, "And what
23   documents did you go over at the orientation
24   with Mr. Richard"?
25    A   No.  I hadn't spoken with him since
```

**54**

```
 1   he left.
 2    Q   Okay.  Did you ask anyone at REC
 3   Marine what documents would have been covered
 4   at the orientation that was given to Dequincy
 5   Richard?
 6    A   No.
 7    Q   Who, at REC Marine, now would have
 8   that information?
 9    A   Regarding Dequincy or --
10    Q   Regarding Mr. Richard, specifically.
11    A   Either Brian Harris or Mandy
12   Melancon.
13    Q   Before Mr. Richard went and worked on
14   the -- well, strike that.  What day was
15   Dequincy Richard hired by the company?
16    A   No idea.
17    Q   Okay.  Let me ask it this way.
18   Before Mr. Richard went and worked for REC
19   Marine, was he required to undergo a medical
20   screening?
21    A   Yes.
22    Q   What is the purpose of that?
23    A   To make sure he's fit for duty.
24    Q   Does REC Marine require that of all
25   of its employees that are going to work
```

**55**

```
 1   offshore?
 2    A   Correct.
 3    Q   And the purpose of checking to see or
 4   confirm that someone is fit for duty is you
 5   want to confirm that they're able to perform
 6   the work that's necessary for the job?
 7       MR. SALLEY:
 8          Objection.
 9       THE WITNESS:
10          Correct.
11   BY MR. RHINE:
12    Q   Did Mr. Richard pass his
13   pre-employment physical?
14    A   I'm sure he did, if he went to work
15   on the vessel.
16    Q   Okay.  Sitting here today, are you
17   aware of anything that was discovered in his
18   pre-employment physical that would have
19   prevented home from carrying out the work on
20   the vessel?
21    A   No, not to my knowledge.
22    Q   And sitting here today, the fact that
23   he actually went out to the ship offshore for
24   REC Marine, that confirms that he had the
25   physical requirements needed to perform that
```

**56**

```
 1   work?
 2    A   He passed or company physical, yes.
 3    Q   What's your understanding as to the
 4   incident that occurred on the vessel on
 5   November 6th, 2018.
 6       MR. SALLEY:
 7          Objection.  That doesn't conform
 8       to a 30(b)(6).  You're asking for
 9       personal information.  Subject to the
10       objection, I'll let him answer it, if
11       he knows.
12   BY MR. RHINE:
13    Q   Sir, you're testifying on behalf of
14   REC Marine.  What is --
15       MR. SALLEY:
16          Objection.
17       MR. RHINE:
18          -- REC Marine's understanding as
19       to what happened --
20       MR. SALLEY:
21          It's a 30(b)(6) deposition,
22       counsel.  It has limited function,
23       and you can't turn it into anything
24       you want.
25       MR. RHINE:
```

**57**

1      You can answer my question, sir.
2  MR. SALLEY:
3      Subject to the objection, you
4  can, if you know.
5  MR. SALLEY:
6      Fred, your objection means
7  nothing.  Stop turning this into a
8  clown show.
9  MR. SALLEY:
10      Counsel, you may think that.
11  But you may be wrong.
12  THE WITNESS:
13      Based off the report, he was
14  helping the captain.  The captain was
15  assisting him tie off the boat.
16  BY MR. RHINE:
17      Q    And what happened during the process
18  of tying off the boat?
19  MR. SALLEY:
20      Objection.  He doesn't know.
21  He's reading the report.  And it has
22  nothing to do with a 30(b)(6) that
23  you filed, either one of them.
24  THE WITNESS:
25      It states he was tieing off the

**58**

1      vessel.  While walking from the, I
2  assume, it's the jump deck, he
3  tripped on the steps.
4  BY MR. RHINE:
5      Q    Other than reading the Incident
6  Report prior to your testimony today, did you
7  speak with anyone to ask what had happened on
8  the vessel?
9      A    Other than my communication with
10  Brian?
11      Q    And that communication was just to
12  get the copy of the Incident Report; is that
13  correct?
14      A    Correct.  Correct.
15      Q    What was the boat doing that day?
16  MR. SALLEY:
17      Objection.
18  THE WITNESS:
19      That, I don't know.
20  MR. SALLEY:
21      Hold on.  Hold on.  Counsel,
22  either you go to your 30(b)(6)
23  deposition, or we quit.
24  MR. RHINE:
25      Fred, it's my deposition.  I'm

**59**

1  entitled to proceed.
2  MR. SALLEY:
3      No.  It's a 30(b)(6).
4  MR. RHINE:
5      Fred, let me finish responding
6  to you, first.
7  MR. SALLEY:
8      No.  No.  I haven't finished.
9  It's a 30(b)(6) deposition, and we
10  are trying to conform to your notice.
11  You haven't asked a single question
12  about the 30(b)(6).  You asked
13  factual content questions of a
14  representative witness, and I'm tired
15  of it.
16  MR. RHINE:
17      And I'm entitled to ask about
18  the facts that REC Marine is aware of
19  related to --
20  MR. SALLEY:
21      No, you're not.  You have a list
22  of questions --
23  MR. RHINE:
24      Then, call the depo off, if
25  we're gonna keep this going.  Because

**60**

1  I'm gonna keep asking my questions,
2  and you're objecting in violation of
3  the Federal Rules of Civil Procedure.
4  MR. SALLEY:
5      And I'm gonna keep objecting.
6  I'm about to tell the witness not to
7  answer the questions that he's not
8  here because of his factual knowledge
9  and not related to your Exhibit A.
10      Now, you got to make a choice.
11  This is a representative deposition
12  --
13  MR. RHINE:
14      Fred, I know what it is.
15  MR. SALLEY:
16      -- which you scheduled.
17  MR. RHINE:
18      Fred, I know what it is.
19  MR. SALLEY:
20      Well, then, why don't you go in
21  that direction?
22  MR. RHINE:
23      Fred, I'm doing what's entitled
24  under the Federal Rules of Civil
25  Procedure.

**15 (Pages 57 to 60)**

```
 1    MR. SALLEY:
 2        No.  I don't agree.  That's your
 3    view, and I don't agree.
 4    MR. RHINE:
 5        Then, stop the depo.  Stop just
 6    interrupting and turning it into a
 7    clown show.
 8    MR. SALLEY:
 9        I may --
10    MR. RHINE:
11        All you want to do is make
12    speaking objections and turn this
13    into a ridiculous proceeding.
14    MR. SALLEY:
15        No.  Because you -- because you
16    have turned it into a non 30(b)(6)
17    deposition by intent and purpose, and
18    I object to your trying to do that.
19    You wanted a witness to respond to
20    specific questions, 35, in fact, that
21    you listed and sent, untimely, but
22    you sent them.
23        Now, you've either got to do a
24    30(b)(6) deposition, or you're gonna
25    have to quit.  Because this witness,
```

```
 1    Mr. Russell, is not a fact witness.
 2    He's here as a representative of the
 3    corporation.
 4    MR. RHINE:
 5        Anything else you want to add?
 6    MR. SALLEY:
 7        When it comes to my mind, yes.
 8    MR. RHINE:
 9        All right.  Keep interrupting,
10    Fred.
11    MR. SALLEY:
12        That's all -- that's all for the
13    moment.
14    MR. RHINE:
15        Just keep interrupting.
16    BY MR. RHINE:
17    Q    Did you ask anyone at REC Marine what
18    operations the vessel was performing on the
19    date of the incident?
20    A    No.
21    Q    Okay.  Can you identify for me what
22    Mr. Richard was doing at the time that he was
23    injured?
24    MR. SALLEY:
25        Objection.
```

```
 1    THE WITNESS:
 2        The report.
 3    MR. SALLEY:
 4        No.  Don't answer that.  That's
 5    not a part of a 30(b)(6).
 6    MR. RHINE:
 7        You're instructing the witness
 8    not to answer?
 9    MR. SALLEY:
10        I'm instructing the witness not
11    to answer that question, which is not
12    requested in your 35 numbered list of
13    specific items you want the
14    corporation to respond to.
15    BY MR. RHINE:
16    Q    Sir, are you gonna answer the
17    question?
18    MR. SALLEY:
19        No.  Objection.  Don't answer
20    it.
21    BY MR. RHINE:
22    Q    Sir, are you gonna listen to your
23    counsel's advice; or are you gonna answer the
24    question?
25    MR. SALLEY:
```

```
 1    You bet he's gonna listen to his
 2    counsel's advice.
 3    MR. RHINE:
 4        And I need him to say that,
 5    Fred, for my record.
 6    MR. SALLEY:
 7        No, you don't.
 8    MR. RHINE:
 9        Okay.  So you're instructing the
10    witness --
11    MR. SALLEY:
12        I'm instructing the witness --
13    MR. RHINE:
14        not to answer as to whether or
15    not he's not gonna answer?
16    MR. SALLEY:
17        I've instructed the witness not
18    to answer that question --
19    BY MR. RHINE:
20    Q    Are you gonna take his advice?
21    MR. SALLEY:
22        -- which has nothing to do with
23    your request for a 30(b)(6).
24    BY MR. RHINE:
25    Q    Are you going to take his advice,
```

65

1   sir?
2       A   I mean, he's my counsel.  So yes.
3       Q   Was Mr. Richard doing anything that
4   he was not supposed to be doing at the time
5   that he was injured?
6           MR. SALLEY:
7               Objection.  I mean, you just go
8           right back to --
9           THE WITNESS:
10              I don't really know.
11          MR. SALLEY:
12              No.  Don't answer it.  Don't
13          answer it.
14          MR. RHINE:
15              You're instructing the witness
16          not to answer that question?
17          MR. SALLEY:
18              You bet.
19          MR. RHINE:
20              Okay.  Are you going to do this
21          --
22          MR. SALLEY:
23              Because it doesn't have anything
24          to do with a 30(b)(6) deposition,
25          that you requested.

66

1   BY MR. RHINE:
2       Q   Sir, are you going to heed counsel's
3   advice and not respond to that question?
4           MR. SALLEY:
5               He's gonna heed counsel's
6           advice.
7           THE WITNESS:
8               Correct.
9           MR. SALLEY:
10              Go somewhere else.  Either get
11          back on your list questions or --
12          MR. RHINE:
13              Fred, don't tell me how to
14          conduct my deposition.
15          MR. SALLEY:
16              I will tell you whether or not
17          you will proceed with a
18          representative deposition under
19          30(b)(6).
20          MR. RHINE:
21              Again, Fred, do you want to keep
22          objecting and have speaking
23          objections?  Either call it off, or
24          let's proceed.
25          MR. SALLEY:

67

1               No.  I'm --
2           MR. RHINE:
3               But I'm not gonna sit here while
4           you keep doing this.
5           MR. SALLEY:
6               I'm going to continue -- well, I
7           mean, the door is right there.  Do
8           you want me to open it for you?
9           MR. RHINE:
10              I'm gonna keep asking questions.
11          Take it up with the Court.
12          MR. SALLEY:
13              That's what I thought you would
14          want to do.
15          MR. RHINE:
16              Well, Fred, I flew in from
17          Houston for this.
18          MR. SALLEY:
19              Well --
20          MR. RHINE:
21              Obviously, I want to keep asking
22          questions.
23          MR. SALLEY:
24              It doesn't matter if you live in
25          Houston and flew from there.  I came

68

1           all the way from Covington,
2           Louisiana.  And that's a long way,
3           too.
4           MR. RHINE:
5               Well, congrats.
6           MR. SALLEY:
7               And there's no airplane.
8           MR. RHINE:
9               Thank you for that.
10  BY MR. RHINE:
11      Q   Was there a safety meeting that was
12  conducted on the vessel the date of the
13  incident?
14      A   I'm not aware.
15      Q   Okay.  Who would be aware of that?
16      A   Brian Harris.
17      Q   And you did not visit with Mr. Harris
18  regarding that prior to your testimony here
19  today?
20      A   Correct.
21      Q   What is REC Marine's policy regarding
22  safety meetings?  Are they required to be held
23  every day?
24      A   We require them to have them if
25  they're doing a task that's not considered

**69**

1 done daily. So tieing off a -- tieing off a
2 vessel with a rope is a daily -- a more than
3 one occurrence. So it probably wouldn't be a
4 safety meeting conducted to tie off a vessel.
5   Q   Had Mr. Richard ever tied off a
6 vessel before?
7   A   No idea.
8   Q   Does REC Marine have any knowledge
9 regarding that?
10   A   No. We don't keep tallies of who
11 ties up vessels or not.
12   Q   Is that somebody's phone, or is that
13 a car outside?
14   A   I think it's a car outside.
15   Q   All right. Sir, do you know if a JSA
16 was done for the work that was being performed
17 by Mr. Richard?
18   A   Not aware. Same thing. It would --
19 for a task that's done every day like that,
20 there wouldn't be a JSA for tieing off a
21 vessel.
22   Q   What's a JSA stand for?
23   A   Job safety analysis.
24   Q   Tell the ladies and gentlemen of the
25 jury what the purpose of a JSA is.

**70**

1   A   Give a brief description of the tasks
2 that's gonna be performed, any issues that may
3 arise that could cause an incident or personal
4 injury and proper steps to do things.
5   Q   Okay. And REC Marine's testimony is
6 that it wouldn't be required for the work that
7 was being performed on the date of the
8 incident; is that correct?
9   A   They may have done one, but it's not
10 required.
11   Q   All right. Do you know if one was
12 done?
13   A   No, I don't.
14   Q   Who would know?
15   A   Brian Harris.
16   Q   Sir, we've gone, like, an hour. Do
17 you need a break? Are you ready to keep
18 going?
19   A   I'm good. Keep rolling.
20   Q   All right.
21     MR. SALLEY:
22       Do either of you ladies need a
23     break?
24 (WHEREUPON, THE VIDEOGRAPHER AND COURT
25 REPORTER RESPONDED IN THE NEGATIVE.)

**71**

1 BY MR. RHINE:
2   Q   How many Exhibits do we have, two, in
3 front of you?
4   A   I've got -- that's correct.
5   Q   All right. I'm gonna hand to your
6 counsel what I've marked as Exhibit 3. Then,
7 I'm gonna ask you some questions regarding
8 that.
9   A   Okay.
10   Q   Have you seen this document before?
11   A   Not to my knowledge, no.
12   Q   Did anyone at REC Marine review the
13 document before it was filed by your attorney?
14   A   No.
15   Q   Why did REC Marine have this document
16 filed?
17     MR. SALLEY:
18       Objection. Counsel filed the
19     document.
20     THE WITNESS:
21       Like I said, I have no clue.
22 BY MR. RHINE:
23   Q   What was REC Marine trying to achieve
24 by filing a declaratory judgment action?
25     MR. SALLEY:

**72**

1       Objection.
2     THE WITNESS:
3       I'm not an attorney. I don't
4     know what a lot of this stuff means.
5     MR. SALLEY:
6       In fact, counsel, your 30(b)(6)
7     doesn't discuss anything about filing
8     the declaratory relief action.
9     MR. RHINE:
10       Cool.
11     MR. SALLEY:
12       Which is strictly legal.
13 BY MR. RHINE:
14   Q   Can you look at the exhibit that's in
15 front of you, Exhibit 2, and Exhibit A to
16 Exhibit 2, the areas asked to give testimony,
17 for me?
18   A   Uh-huh. (Affirmative response.)
19   Q   And do you see number eight there?
20   A   Yes.
21   Q   "All allegations of the complaint for
22 declaratory relief counter claim and answering
23 defenses in the counter claim." That's what
24 I'm asking you about now, okay, just to be
25 clear.

**73**

1    MR. SALLEY:
2        Objection.  It doesn't fit into
3    that category, and it was filed by
4    counsel as a legal matter.
5  BY MR. RHINE:
6    Q   Okay.  Was REC Marine even aware that
7  its attorney was going to file that lawsuit?
8    A   Was I aware that this was gonna be
9  filed?
10   Q   Was REC Marine aware that it was
11 going to be filed?
12   A   I've not had a conversation with it.
13   Q   Who, at REC Marine, would know if REC
14 Marine had any knowledge that this document
15 was gonna be filed?
16   A   He.  Fred handled the legal stuff for
17 that.  So I'm not aware.
18   Q   Does --
19   A   I wouldn't have been involved, no.
20   Q   Does Fred work for REC Marine?
21   MR. SALLEY:
22       I am their counsel on the
23   record.
24   THE WITNESS:
25       I mean, in that respect, he

**74**

1  does.
2  BY MR. RHINE:
3    Q   He's not an employee for REC Marine?
4    A   Correct.
5    Q   Do you know if anyone at REC Marine
6  approved the filing of this suit?
7    A   Not to my knowledge.
8    Q   Okay.  Did REC Marine confirm that
9  all of the information that was alleged within
10 Exhibit 3 was accurate?
11   MR. SALLEY:
12       Are you asking him now to go
13   through it and see if he can confirm
14   it?
15   MR. RHINE:
16       If he needs to review it, he
17   can.
18   THE WITNESS:
19       Yeah.  I --
20   MR. SALLEY:
21       That was not the question, an
22   early objection.
23   MR. RHINE:
24       Oh, my.  Can you go back to my
25   question, please?

**75**

1    MR. SALLEY:
2        The witness does not do the
3    legal work for R-E-C.
4    MR. RHINE:
5        We'll stipulate to that, Fred.
6    Can you go back to my question,
7    please.
8    MR. SALLEY:
9        Do you have any idea of --
10   MR. RHINE:
11       Fred, don't ask questions during
12   my deposition.
13   MR. SALLEY:
14       This is my representative
15   witness.
16   MR. RHINE:
17       Fred, it's my deposition.  It's
18   not your turn.
19   MR. SALLEY:
20       I will -- no.  It is my turn --
21   MR. RHINE:
22       Fred, it's not your turn.
23   MR. SALLEY:
24       -- because he is presented as a
25   30(b)(6) witness for my client.  I

**76**

1  have every right to -- to confer with
2  him.
3  THE WITNESS:
4      Yeah.  Again, I'm not aware of
5  this.
6  MR. RHINE:
7      Go back to my question, please.
8  (WHEREUPON, THE COURT REPORTER READS BACK THE
9  PREVIOUS QUESTION.)
10 BY MR. RHINE:
11   Q   Prior to the first --
12   MR. SALLEY:
13       To which, there was an
14   objection.
15 BY MR. RHINE:
16   Q   Prior to that suit being filed, did
17 REC Marine confirm that all of the information
18 contained within it was accurate?
19   A   No, I did not.
20   Q   Did anyone at REC Marine?
21   A   Not to my knowledge.
22   Q   Okay.  Let's look at the first page.
23   A   First page of Exhibit 3?
24   Q   Yes, sir.
25   A   Okay.

77

1    Q   Paragraph three is what I'll go to,
2  first. Can you read -- I'll read it, just to
3  make it quicker. "Defendant Richard, pursuant
4  to the general maritime law, has pursued a
5  demand for maintenance and cure from
6  plaintiff, as his employer, under the Jones
7  Act." Do you see that sentence?
8    A   Yes.
9    Q   Okay. Did I read that correctly?
10   A   Correct.
11   Q   All right. And in this instance,
12 "plaintiff" refers to "REC Marine". Do you
13 understand that?
14   A   Uh-huh. (Affirmative response.)
15   Q   Okay. Is that statement accurate?
16   A   I wouldn't receive it. I -- I'm
17 guessing he would. Everybody does that sues
18 us.
19       MR. SALLEY:
20          Don't -- don't guess. You're
21       here as a fact witness under oath.
22       THE WITNESS:
23          Okay. I don't know.
24 BY MR. RHINE:
25   Q   All right. Prior to June 11, 2019,

78

1  is REC Marine aware of a maintenance and cure
2  claim being brought by Dequincy Richard?
3       MR. SALLEY:
4          Let me object. This is not an
5       issue you've raised. He's not here
6       to answer that. That's answered by
7       counsel, as a legal matter.
8       THE WITNESS:
9          You weren't reading that off of
10      here? What you just asked me, that
11      wasn't read anywhere.
12      MR. RHINE:
13         No. No.
14      THE WITNESS:
15         Okay. Well, I'm sorry. What
16      was your question? I was trying to
17      follow along. I'm sorry.
18 BY MR. RHINE:
19   Q   All right. This lawsuit was filed on
20 June 11th, 2019.
21   A   Okay.
22      MR. SALLEY:
23         Where is -- where is there any
24      indication you're going to query the
25      witness about legal matters relating

79

1        to a declaratory judgment action
2        filed by counsel? Show me which one.
3        Show me which of these 35 numbers.
4        MR. RHINE:
5           It relates to the allegations
6        that are within this document.
7        MR. SALLEY:
8           Where is that?
9        MR. RHINE:
10          It's topic eight. Look.
11       MR. SALLEY:
12          That's a little broad. So I
13       object.
14       MR. RHINE:
15          Well, you should have objected
16       prior to the deposition.
17       MR. SALLEY:
18          Don't answer to the question.
19       MR. RHINE:
20          You should have objected prior
21       to the deposition.
22       MR. SALLEY:
23          No. I don't have to object
24       prior to the deposition. It's
25       invalid notice, anyway.

80

1        MR. RHINE:
2           We'll take it up with the Court.
3        MR. SALLEY:
4           You are pleased to do that, if
5        and when you wish.
6  BY MR. RHINE:
7    Q   Prior to June 11, 2019, are you aware
8  of Mr. Richard making a demand for maintenance
9  and cure?
10       MR. SALLEY:
11          Do you mean him, personally?
12       MR. RHINE:
13          I mean, REC Marine, Fred. Every
14       time I say "you", I mean REC Marine,
15       just so we're clear, sir.
16       MR. SALLEY:
17          All right. Sir, unless you are
18       clear that you know that --
19       MR. RHINE:
20          Stop coaching the witness,
21       please.
22       MR. SALLEY:
23          -- just decline to answer.
24       MR. RHINE:
25          Stop coaching the witness.

**20 (Pages 77 to 80)**

**81**

1    MR. SALLEY:
2        He's my witness under a
3    30(b)(6).  I'm entitled to
4    communicate with my representative
5    witness.
6    MR. RHINE:
7        You believe the Federal Rules of
8    Civil Procedure give you the
9    authority to interrupt my deposition
10   and coach your witness as to how you
11   want him to respond.
12   MR. SALLEY:
13       I certainly do, because it's a
14   30(b)(6) deposition.
15   MR. RHINE:
16       All right.  We'll take that up
17   with the Court.
18   MR. SALLEY:
19       You are pleased to do so.  You
20   want to ran over there now?  I mean,
21   we'll stop this.  And you can go to
22   the Court now.
23   MR. RHINE:
24       I'm just gonna have to redepose
25   your witness, Fred.

**82**

1    MR. SALLEY:
2        That's unlikely.
3    MR. RHINE:
4        As a result of your conduct.
5    MR. SALLEY:
6        That's unlikely, and you may as
7    well forget about that hope.
8    MR. RHINE:
9        We will let the Court decide.
10   MR. SALLEY:
11       You can't try to reinterpret
12   your late filed Exhibit A to cover
13   everything in the world.  This
14   witness is here as a representative
15   of REC Marine.  I've produced him.
16   He's my client, and --
17   MR. RHINE:
18       And the problem is you produced
19   --
20   MR. SALLEY:
21       -- we're gonna stick with the
22   notice.
23   MR. RHINE:
24       The problem is you've produced a
25   witness who is not prepared here to

**83**

1    testify, based on all of the
2    information that REC Marine holds.
3    MR. SALLEY:
4        I -- I would beg to differ with
5    you, counsel.  30(b)(6) depositions
6    are provided by either one witness or
7    a stream of witnesses as necessary to
8    the extent of the knowledge of the
9    corporation.  Read your rule.
10   MR. RHINE:
11       I'm well familiar with it, Fred.
12   Thank you.
13   MR. SALLEY:
14       You may -- you may be familiar
15   with it somewhere, but not here.
16   MR. RHINE:
17       Again, can you please stop
18   interrupting by deposition, sir.
19   MR. SALLEY:
20       It's not a deposition.  I mean,
21   that would be the poorest description
22   of it that I can think of.
23   MR. RHINE:
24       I know.  If you would allow this
25   man to testify and not keep coaching

**84**

1    him and interrupting.
2    MR. SALLEY:
3        You're not gonna make -- you're
4    not going to ask my client about
5    legal issues and legal matters.
6    They're not lawyers.
7    MR. RHINE:
8        We're gonna take a break.
9    THE VIDEOGRAPHER:
10       We're off the record 11:22.
11       (SHORT RECESS)
12   THE VIDEOGRAPHER:
13       We're back on the record at
14   11:25.
15   BY MR. RHINE:
16   Q    All right.  Back to paragraph three,
17   sir.  On the third line, it states, in part,
18   "Richard did not have an injury on nor fall
19   ill in the service of the vessel."  As the
20   corporate representative of REC Marine, is
21   that statement correct?
22   MR. SALLEY:
23       Or do you know?
24   THE WITNESS:
25       I don't.  I don't know.  My

85

```
 1        attorney, I mean, attorneys stated
 2    that.  I haven't taken any -- any
 3    statements from any crew or anybody
 4    on the boat.  To my knowledge, this
 5    is what -- the way it is.
 6  BY MR. RHINE:
 7    Q   Okay.  Can you identify, sitting for
 8  me here today, all of the documents which
 9  support the allegation that Richard did not
10  have an injury on or fall ill in the service
11  of the vessel?
12    A   I'm sorry, what's that?
13    Q   Sitting here today --
14    A   Okay.
15    Q   -- can you identify for me all the
16  documents that support REC Marine's allegation
17  that Richard did not have an injury on nor
18  fall ill in the service of the vessel?
19      MR. SALLEY:
20        All right.  Counsel, I want you
21      to tell me which number on Exhibit A
22      that falls under.
23      MR. RHINE:
24        It's number eight.
25      MR. SALLEY:
```

86

```
 1        To which, I respond, counsel and
 2    not a witness has knowledge of that.
 3    So I object.  It's not a proper
 4    question.
 5      MR. RHINE:
 6        Are you instructing the witness
 7      not to answer?
 8      MR. SALLEY:
 9        I am, because that's a legal
10      matter.
11  BY MR. RHINE:
12    Q   Sir, can you identify for me all of
13  the information that's available to REC Marine
14  that supports REC Marine's allegation that
15  Richard did not have an injury on nor fall ill
16  in the service of the vessel?
17      MR. SALLEY:
18        Objection.  It's a matter of
19      legal knowledge, and I'm instructing
20      him not to try to answer that.
21      MR. RHINE:
22        You're instructing the witness
23      not to identify both documents and
24      factual information that supports the
25      allegations contained within the
```

87

```
 1    complaint for declaratory relief; is
 2    that correct?
 3      MR. SALLEY:
 4        That's correct.  Because that
 5      was based on a matter investigated
 6      and prepared and carried forward by
 7      counsel, and REC Marine is not
 8      responsible and is not familiar with
 9      it but approved it.
10  BY MR. RHINE:
11    Q   Okay.  Sir, can you identify for me
12  the person at REC Marine who approved all of
13  the allegations contained within this
14  complaint for declaratory relief?
15      MR. SALLEY:
16        Do you know?
17      THE WITNESS:
18        No.
19  BY MR. RHINE:
20    Q   Who, at REC Marine, would know?
21    A   Nobody involved with REC Marine would
22  know.
23    Q   Moving on.  REC Marine, if you see in
24  paragraph three, has stated, quote, "It
25  appears that he fabricated the event," end of
```

88

```
 1  quote.  Do you see that allegation?
 2    A   Yes.
 3    Q   Okay.  Can you identify for me,
 4  sitting here today, any documents which
 5  support that allegation contained within this
 6  complaint for declaratory relief?
 7      MR. SALLEY:
 8        Other than legal opinions?  I
 9      assume you're excluding legal
10      opinions?
11  BY MR. RHINE:
12    Q   Sir, you can answer my question.
13    A   I don't see anything that says he was
14  hurt, either, other than him saying a story
15  and other than our people saying a story.
16  There's nothing to defend or say that he
17  proves that he was hurt or not hurt on the
18  vessel.
19    Q   All right.  We're gonna ask my
20  question again, sir.  Can you identify for me
21  all of the documents which support REC
22  Marine's allegation that it appears that
23  Richard fabricated the event?
24      MR. SALLEY:
25        Objection.
```

89

```
1         THE WITNESS:
2         I mean, there's nothing to prove
3    that.  And my knowledge, I mean, I --
4    I have a doctor's report showing that
5    he can return to work full duty.  And
6    then -- then, by him declining --
7    disappearing the next day, after we
8    tried to follow up with the medicals,
9    that this is a staged event.  The day
10   after, he goes and gets an attorney
11   after this alleged incident leads me
12   to believe that he staged the
13   incident.
14   BY MR. RHINE:
15   Q    Okay.  That's REC Marine's testimony?
16   A    That's my testimony.
17   Q    Well, sir, you're here to testify for
18   REC Marine.  Respectfully --
19        MR. SALLEY:
20        You haven't asked many questions
21   that you thought REC Marine could or
22   would answer.  You've asked mostly
23   for things off the wall that you
24   think you might get out of this
25   witness.  So either stay with your
```

90

```
1    30(b)(6), or we will go to a fact
2    deposition which would be over very
3    quickly.
4         MR. RHINE:
5         Can you please reread my
6    question?
7         THE WITNESS:
8         It was passed onto our attorney,
9    Fred Salley, who has taken this from
10   there.
11        MR. RHINE:
12        All right.  Let's go off the
13   record.
14        THE VIDEOGRAPHER:
15        We are off the record at 11:31.
16   (OFF-THE-RECORD DISCUSSION)
17        THE VIDEOGRAPHER:
18        We're back on the record at
19   11:36.
20        MR. RHINE:
21        All right.  Before I continue
22   with questioning, sir, just to note
23   on the record, I've attempted to call
24   Magistrate Douglas to discuss some of
25   the objections and coaching that's
```

91

```
1    occurring during this deposition.
2    It's unclear if the Court is open or
3    not on December 30th, but I've left a
4    voice mail to try and get the
5    magistrate here to assist.
6    BY MR. RHINE:
7    Q    All right.  Sir, back to paragraph
8    three on Exhibit, I think, it's 3.  Is that
9    correct?
10   A    Yes.
11   Q    All right.  Can you identify for me
12   all information that REC Marine has supporting
13   the allegation within this complaint for
14   declaratory relief that Mr. Richard sustained
15   an accident/injury as early as 2007 that's on
16   the last line of that page?
17   A    The only thing I would know we would
18   have is if it would be on the physical.
19   Q    Okay.  Do you believe that the
20   physical or prior medical that occurred --
21   strike that.  Do you believe that the
22   pre-employment physical and medical
23   examination that Mr. Dequincy had indicated
24   that there was a prior injury?
25   A    If he had one, he should have -- he
```

92

```
1    should have noted that on his pre-employment
2    physical paperwork.  So I don't know.  I
3    haven't ever looked at it.
4    Q    Okay.  Who would know that answer?
5    A    It would be --
6         MR. SALLEY:
7         You mean, who of who?
8         THE WITNESS:
9         It would be in his personnel
10   file in Mandy Melancon's office.
11   BY MR. RHINE:
12   Q    Okay.  Is it "Manny" or "Mandy"?
13   A    "Mandy", M-A-N-D-Y.  Correct.
14   Q    Can you identify what Ms. Melancon
15   does?
16   A    She's the personnel manager --
17   Q    For REC Marine?
18   A    -- for the last month.  Correct.  REC
19   Marine Logistics, correct.
20   Q    Is she the individual who replaced
21   Alex Griffin?
22   A    Correct.
23   Q    Was she with REC Marine prior to
24   that?
25   A    For, maybe, two weeks.
```

93

```
 1      Q    Okay.  Flip over to page two.  All
 2   right.  You're already there.  The second
 3   paragraph contained within paragraph or
 4   section three, excuse me, the third line down,
 5   it reads, quote, "Plaintiff contends that it
 6   has conducted a thorough investigation of the
 7   demand for maintenance and cure," end quote.
 8   Can you identify for me REC Marine's
 9   investigation related to maintenance and cure
10   and what it entailed?
11      A    No.  I -- not the my knowledge,
12   anything, other than the assumption.
13      Q    Are you -- sorry.
14      A    No.  I was -- other than the
15   assumptions --
16      Q    I didn't mean to cut you off.  Sorry.
17      A    No.  Other than the assumptions that
18   I told you earlier.
19      Q    Okay.  Sitting here today, as REC
20   Marine's corporate representative, can you
21   identify anything that was done during this
22   investigation?
23      A    To my knowledge, no.
24      Q    Okay.  Sitting here, as the corporate
25   representative for REC Marine, can you
```

94

```
 1   identify any documents that were obtained
 2   during this investigation?
 3      A    Not other than what was in Exhibit 1.
 4      Q    Okay.  Do you believe that the
 5   documents contained within Exhibit 1 were
 6   specifically obtained during the investigation
 7   of Mr. Richard's demand for maintenance and
 8   cure?
 9      A    No.  This is done in an initial
10   incident and doctor's visit.
11      Q    All right.  To be clear, it
12   specifically related to the investigation that
13   apparently occurred related to the demand for
14   maintenance and cure.  Can you identify any
15   documents that were obtained in that?
16      A    No.  To my knowledge, no.
17      Q    Who, at REC Marine, would be able
18   to -- strike that.  What individual, at REC
19   Marine, would have more knowledge than you
20   related to the investigation of the demand for
21   maintenance and cure?
22      A    Fred has done -- I don't want to say
23   "behind the scene", but Fred has done the work
24   as our attorney.  So it would -- he would, I
25   guess, see fit how he needs to respond and
```

95

```
 1   Brian Harris, who works in safety.
 2      Q    Other than your attorney, the only
 3   one that you're identifying, who worked at REC
 4   Marine, who would have been involved in this
 5   investigation, was Brian Harris?
 6      A    Correct.
 7      Q    Okay.  Could you turn to page three
 8   of that exhibit, sir?  I may not need to get a
 9   line by line.  Let me just ask you this.
10   Sitting here today, are you aware of all
11   payments that were made my REC Marine to
12   provide cure to Mr. Richard?
13      A    No.
14      Q    Okay.  Do you know if any payments
15   were made my REC Marine related to
16   Mr. Richard's medical treatment?
17      A    I know we were willing to pay for the
18   initial doctor's visit.  And then, he
19   disappeared on us.  So I don't know what's
20   been paid since that point, if anything.
21      Q    Okay.  Who, at REC Marine, would have
22   that knowledge?
23      A    Olivia Channing.
24      Q    Who is Olivia Channing?
25      A    It's the comptroller for REC Marine
```

96

```
 1   Logistics.  I don't know if Brian Harris would
 2   have any documentation, if he did.
 3      Q    Okay.
 4      A    He would have worked with her on
 5   that.
 6      Q    All right.  Sitting here today, as
 7   REC Marine's corporate representative, can you
 8   identify all maintenance payments that were
 9   made to Mr. Richard?
10      A    To my knowledge, there might have
11   been a couple of days paid for his normal
12   hitch, if he got off before his hitch came up.
13   That would be all I would know.
14      Q    One of the things that your attorney
15   has or REC Marine has requested, maybe,
16   through its attorney, in the pleadings is a
17   demand for attorney fees related to the work
18   that's been performed.  Do you know how much
19   your attorney charged to draft and file this
20   complaint for declaratory relief?
21      A    No.  No.
22      Q    Who would know that, besides your
23   attorney?
24      A    Nobody at REC Marine would pay that
25   bill.  It could be Off, I guess, Offshore
```

**97**

1   Transport Services, owner of the vessel, would
2   receive that invoice, I'm sure.
3       Q   Is it your testimony here today that
4   Offshore Transport Services is the entity that
5   retained Mr. Salley?
6           MR. SALLEY:
7               Objection.  He didn't say that,
8           counsel.
9           THE WITNESS:
10              That, I don't know.  Yeah.
11          That, I don't know.  I didn't.  I did
12          not.
13  BY MR. RHINE:
14      Q   Okay.  What is your attorney charging
15  per hour?
16          MR. SALLEY:
17              Objection.
18          THE WITNESS:
19              That's none of my business, as
20          far as that goes, what the --
21          MR. SALLEY:
22              And, counsel, is that requested
23          in your 30(b)(6)?
24          MR. RHINE:
25              Topic eight, Fred.  It's a

**98**

1               specific allegation that you're
2           seeking within your complaint, his
3           attorney fees.
4           MR. SALLEY:
5               I beg your pardon.  You didn't
6           read the complaint.
7           THE WITNESS:
8               I don't know what -- what his
9           invoices are.
10  BY MR. RHINE:
11      Q   Okay.  Do you know where those
12  invoices are sent?
13      A   To whoever would pay invoices for
14  the, is it, Offshore -- what was the name of
15  the owner of the vessel?
16      Q   Offshore Transport Services.
17      A   Offshore Transport Services.
18      Q   Why do you believe that the owner of
19  the vessel would be the one that those
20  invoices were sent to?
21      A   Because that's who -- who the charges
22  to that vessel would go to that -- to that
23  company.
24      Q   What number were we up to?
25      A   Three.  I've got three in front of

**99**

1   me.
2       Q   Okay.  Sir, I've handed you what's
3   been marked as Exhibit 4, which is the answer
4   to Richard Counterclaim and Third Party
5   Complaint filed by your counsel on
6   August 13th, 2019.
7           MR. SALLEY:
8               To which, I object.  The
9           pleading that you've shown him
10          relates to three defendants, not just
11          to R-E-C.  So I'd ask you to limit --
12          to limit your inquiries to R-E-C, who
13          he represents.
14  BY MR. RHINE:
15      Q   Sir, as I've said multiple times, I'm
16  only seeking the information that R-E-C Marine
17  has.  You're obviously not the corporate rep
18  of the other entities.  The other entities
19  haven't been noticed, yet.  All I'm trying to
20  seek is the information that REC Marine
21  Logistics, LLC has.  Do you understand that?
22      A   I apologize.  I thought you were
23  talking to Fred.  I was reading what you just
24  give me.  I apologize.
25      Q   That's okay.  You understand I'm only

**100**

1   asking you here today about REC Marine?
2       A   Correct.  Seems to be, so far.
3       Q   I'm not asking you to testify on
4   Offshore Transport Services behalf.  I'm not
5   asking you to testify on GOL's behalf.
6       A   Correct.
7       Q   Do you understand that?
8       A   Correct.
9       Q   All right.  All your questions --
10  excuse me.  All your answers that you've given
11  today, they've been testified on behalf of REC
12  Marine?
13      A   Correct.
14      Q   Okay.  Did REC Marine see this
15  document before it was filed?
16      A   Not to my knowledge, no.
17      Q   Do you know if anyone at REC Marine
18  reviewed the information that was contained in
19  this before it was filed?
20      A   No.
21      Q   Did REC Marine confirm that all of
22  the factual allegations contained within this
23  document had evidentiary support?
24      A   No.  I'm not -- unaware of it, no.
25      Q   Can you turn to page three, please?

**25 (Pages 97 to 100)**

**101**

1    Do you see, beginning on the third line, REC
2    Marine alleges, quote, "The damages sustained
3    by the plaintiff -- which, I think, that means
4    Dequincy Richard in this case, even though the
5    plaintiff is REC Marine -- if any, were caused
6    solely by Dequincy R. Richard's own fault,
7    neglect, misconduct, inattention, or breach of
8    duty, without any fault, whatsoever, on the
9    part of REC Marine." Do you see that?
10    A    Yes.
11    Q    Okay.  Do you agree with that claim?
12    A    Yes.
13    Q    Okay.  Please identify for me of all
14    facts that support that claim that was made by
15    REC Marine.
16    A    Just based off the report that I have
17    right here that said he tripped walking down
18    the stairs.
19    Q    Other than the report, which
20    indicates that he tripped while walking down
21    the stairs, is there any other facts that
22    you're gonna rely on, in order to support this
23    allegation?
24         MR. SALLEY:
25             Objection.  Counsel is gonna use

**102**

1    the fact.
2    THE WITNESS:
3         Yeah.  I -- that's his job to
4    do.  I don't have any other stuff,
5    documentation.
6    BY MR. RHINE:
7    Q    REC Marine isn't aware of any other
8    facts, is what you're saying?
9    A    No.  To my knowledge, no.
10    Q    Can you identify all individuals who
11    can provide testimony in support of this
12    allegation?
13    A    I would say that Fred, what he has
14    done.  And I don't know what the crew has said
15    or done.  I'm not aware of what -- what their
16    statements are.  If they've done depositions
17    or testimonies or affidavits, I'm not aware of
18    any.
19    Q    If we go down to the paragraph that's
20    marked fifth defense on page three of Exhibit
21    4 --
22    A    Uh-huh.  (Affirmative response.)
23    Q    -- it states, in part, "The plaintiff
24    failed to mitigate his damages, if any were
25    sustained." Do you agree with that

**103**

1    allegation?
2    A    And the plaintiff in this is REC
3    Marine, or is this --
4    Q    The plaintiff in the suit is REC
5    Marine.
6    A    Correct.
7    Q    I think it's a typo, and it's really
8    referring to Mr. Richard because he did bring
9    his own claims within this suit.  So if you
10    assume for me that this is referring to
11    Mr. Richard and read it as Mr. Richard failed
12    to mitigate his damages, if any were
13    sustained, do you agree with that statement?
14    A    Correct.  I think it's his
15    responsibility to walk up and down the steps,
16    correct.
17    Q    Do you understand what it means to
18    mitigate damages?
19    A    My definition may be different from
20    yours, like they all would be.  But mine is to
21    eliminate any -- any possible hazards.
22    Q    Okay.  Do you understand the legal
23    concept of mitigation of damages after an
24    injury has occurred?
25    A    No.

**104**

1         MR. SALLEY:
2             Objection.  This witness is not
3    a lawyer.
4    MR. RHINE:
5         I know he's not a lawyer, Fred.
6    MR. SALLEY:
7         And I ask that you not ask him
8    legal questions.
9    MR. RHINE:
10         I didn't.
11    THE WITNESS:
12         No.  You can explain it to me.
13    I don't understand what the term
14    would mean.
15    BY MR. RHINE:
16    Q    Okay.  That's all I'm asking is what
17    you do or don't know.
18    A    Yeah.  No, I don't.  I'm sorry.  No,
19    I don't.
20    Q    I'm not gonna ask you about it if you
21    don't know.
22    A    Okay.
23    Q    If you go down to the ninth defense,
24    beginning on page four, continuing over to
25    page five -- I'm not specifically gonna read

**105**

1  you anything.  That's just where I am in the
2  complaint.
3      A   Okay.  On page five, you said?
4      Q   Yeah.
5      A   Okay.
6      Q   You know the value of the DUSTIN
7  DANOS?
8      A   No.
9      Q   Do you know the value of the DUSTIN
10  DANOS on the date of the incident.
11     A   No.
12     Q   Do you know -- I'll ask it again.
13  Although, your counsel wouldn't let you answer
14  it earlier.  What was the ship doing at the
15  time of the incident?
16         MR. SALLEY:
17             Let me object.  Because I don't
18         know that he has any knowledge of
19         that or that anybody in REC Marine
20         would know.  That's a function of the
21         employer, the oil company.
22  BY MR. RHINE:
23     Q   REC Marine employed Mr. Richard,
24  correct, sir?
25     A   Yes.

**106**

1      Q   What is Ms -- what is REC Marine's
2  understanding as to what the vessel that your
3  employee was on was doing on the date of the
4  incident?
5      A   Tieing the vessel off, along with the
6  captain.
7      Q   Okay.  Who was REC Marine performing
8  work for, what entity?
9      A   Talos Energy, maybe.
10     Q   Do you know, or are you guessing?
11         MR. SALLEY:
12             Is it in the logs?
13         MR. RHINE:
14             Fred, it's my depo.  I'll --
15         MR. SALLEY:
16             It's a 30(b)(6) representative
17         deposition, counsel.  Understand what
18         that means.
19         THE WITNESS:
20             I'm wrong.  It says, W&T on
21         here.
22         MR. RHINE:
23             Fred, I would ask you to please
24         stop interrupting my questions and
25         stop --

**107**

1          MR. SALLEY:
2              No.  When there's an appropriate
3          misstatement which is intentional, I
4          intend to call attention to it.  Quit
5          trying to misrepresent.
6  BY MR. RHINE:
7      Q   Let me ask the question again, sir.
8  Do you know what company REC Marine was
9  performing work for on the date of the
10  incident?
11     A   W&T company.
12     Q   Do you know what they were doing for
13  W&T?
14     A   No, I don't.
15     Q   Who would know?
16     A   The vessel crew.
17     Q   Is there a contract with W&T?
18     A   Yeah.  I'm sure they would definitely
19  have an agreement.
20     Q   All right.  Do you know anything
21  about that agreement then?
22     A   No.
23     Q   All right.  Do you know how much REC
24  Marine was being paid to perform the work on
25  the date of the incident?

**108**

1      A   REC Marine was not getting paid to do
2  that.
3      Q   Okay.  Who gets paid to do that?
4      A   I think it goes to GOL, LLC.
5      Q   And do you know how much GOL, LLC was
6  paid?
7      A   No, I do not.
8      Q   Okay.  Is the contract with W&T held
9  my REC Marine?
10     A   No, by GOL, LLC.
11     Q   GOL, LLC would have signed that
12  agreement?
13     A   Correct.
14     Q   Does REC Marine -- I think earlier,
15  you testified that REC Marine doesn't have any
16  contracts with GOL, LLC.  Is that accurate?
17     A   No.  Our vessels work for REC Marine
18  Logistics and invoiced through GOL, LLC.
19     Q   Okay.  When GOL, LLC is paid my one
20  of the companies that REC Marine works for,
21  how does that money make its way to REC
22  Marine?
23         MR. SALLEY:
24             Objection.  Not a requested --
25         but if he knows, I will let him

**27 (Pages 105 to 108)**

**109**

1      answer it.
2          THE WITNESS:
3              It's passed down to the company
4          that owns the vessel.
5      BY MR. RHINE:
6          Q   Okay.  In this case, that company is
7      Offshore Transport Services, I think we've
8      established?
9          A   I think that's what we've discussed,
10     yes.
11         Q   Okay.  When Offshore Transport
12     Services receives money from W&T, which is
13     passed down through GOL, LLC, what happens to
14     it?
15             MR. SALLEY:
16                 Objection.  Don't answer it.
17             MR. RHINE:
18                 Are you instructing the witness
19             not to answer?
20             MR. SALLEY:
21                 I'm instructing the witness not
22             to answer a question that does not
23             relate to REC and is not requested in
24             Exhibit A.
25             MR. RHINE:

**110**

1              Well, Exhibit A includes all of
2          the allegations within the pleadings,
3          Fred.  Let me finish.
4              MR. REMONDET:
5                  Counsel --
6              MR. RHINE:
7                  Let me finish before you
8              interrupt me.
9              MR. SALLEY:
10                 Counselor, he's not gonna
11             answer.  You can put all of the tripe
12             on the record that you want to.
13             MR. RHINE:
14                 All right.  So you would let me
15             finish my response?
16             MR. SALLEY:
17                 If you wish.  You want me to go
18             out and take a hike around the
19             building?  I mean, you're not gonna
20             ask him internal issues concerning
21             other companies, which are not part
22             of his operation.
23         BY MR. RHINE:
24             Q   Are you gonna answer the question,
25         sir?

**111**

1          A   I --
2              MR. SALLEY:
3                  No.  That's up to me, not to
4              him.
5              MR. RHINE:
6                  Fred, I can ask the questions.
7              MR. SALLEY:
8                  He's a representative of a
9              company that's my client.
10         BY MR. RHINE:
11             Q   Okay.  Sir, are you gonna listen to
12         counsel's advice; are you gonna answer the
13         question that was pending?
14             A   I'm gonna listen to what I was
15         instructed to do.
16             Q   How is REC Marine paid in all of
17         this?
18             A   For the vessels that REC Chaddock
19         owns, we receive the money from GOL and to REC
20         Marine.
21             Q   Okay.  Specifically, for the DUSTIN
22         DANOS, on the job that was being performed for
23         W&T Offshore, how was REC Marine paid?
24             MR. SALLEY:
25                 If you know.

**112**

1              MR. RHINE:
2                  You can stop inserting "if you
3              know" every other question, Fred.  He
4              knows -- I think we've established --
5              MR. SALLEY:
6                  Counsel --
7              MR. RHINE:
8                  -- I'm only asking him what he
9              knows.
10             MR. SALLEY:
11                 I'm telling you, I'm gonna do my
12             job for my client.  I suggest you not
13             try to interfere with my operation.
14             THE WITNESS:
15                 We receive an operating fee to
16             operate that vessel.
17         BY MR. RHINE:
18             Q   Who do you receive an operating fee
19         from?
20             A   I don't know where the check comes
21         from.
22             Q   Who, at REC Marine, would know where
23         the check comes from?
24             A   Olivia Channing.
25             Q   She was comptroller?

**113**

```
 1     A   Correct, comptroller for REC Marine
 2 Logistics.
 3     Q   Are there contracts or agreements in
 4 place that set the operating fee that REC
 5 Marine receives?
 6         MR. SALLEY:
 7             Objection.  You didn't specify
 8         the vessel, the operation or the
 9         contractors.  Subject to the
10         objection, if you can, answer that.
11         THE WITNESS:
12             I've -- I've never physically
13         put my hand or seen them.  I'm pretty
14         sure there are agreements with that.
15 BY MR. RHINE:
16     Q   Do you know what entity those
17 agreements are with?
18         MR. SALLEY:
19             Objection.  At what time,
20         counsel?  Please be specific.
21         THE WITNESS:
22             There is numerous agreements
23         with different vessels --
24         MR. RHINE:
25             Okay.
```

**114**

```
 1         THE WITNESS:
 2             -- for REC Marine.
 3 BY MR. RHINE:
 4     Q   All right.  Specifically for the one
 5 for the DUSTIN DANOS, on the day of incident
 6 --
 7     A   Uh-huh.  (Affirmative response.)
 8     Q   -- do you know who the operating
 9 agreement was with?  And if it's not called
10 the "operating agreement", let me know what
11 you would prefer I call it.
12     A   There would -- there would be an
13 agreement between the vessel company to REC
14 Marine Logistics, LLC.
15     Q   Okay.  So in this instance, for the
16 DUSTIN DANOS, REC Marine would have had an
17 agreement with Offshore Transport Services
18 that would have covered how REC was going to
19 get paid for operating the vessel?
20         MR. SALLEY:
21             Objection.  Only if you know.
22         THE WITNESS:
23             I'm assuming that information,
24         with a monthly fee.
25
```

**115**

```
 1 BY MR. RHINE:
 2     Q   All right.  Who, at REC Marine, would
 3 know that?
 4     A   I guess -- I don't know if Olivia
 5 Channing would have that information.
 6     Q   Who else do you think may have that
 7 information?
 8     A   Maybe, in a file in Olivia Channing's
 9 office.
10     Q   Do you know the name of that file, if
11 I was to request it in discovery?
12     A   No, no idea.
13     Q   Do you know the value of the
14 agreement with W&T?
15     A   No.
16     Q   How much any of the companies we've
17 talked about today were gonna receive,
18 pursuant to either directly to the W&T
19 agreement or to all these operating or
20 sub-agreements?
21     A   Not -- not aware.  I don't know.
22     Q   Okay.  Who, at REC Marine, is most
23 likely to have the most information related to
24 that?
25     A   Monique Dufrene.  Monique.  I drew a
```

**116**

```
 1 blank.  I believe Monique Dufrene.
 2     Q   She's at REC Marine?
 3     A   No.  She would -- she would work for,
 4 what is it, Offshore Marine Transport?
 5     Q   Offshore Transport Services?
 6     A   Offshore Transport Services.
 7     Q   What does she do at offshore
 8 Transport Services?
 9     A   Just bookwork, I guess you would say.
10     Q   Okay.  I'm gonna go back to my
11 original question, as soon as the court
12 reporter can scroll up and let me see it.
13 Who, at REC Marine, would have the most
14 knowledge related to these agreements and how
15 much REC Marine would receive related to,
16 specifically --
17     A   Yes, sir.
18     Q   -- for the work that was being
19 performed on the date of the incident?
20     A   I am assuming that's probably a set
21 fee when we moved up there three and a half
22 years ago.
23     Q   Who, from REC Marine, would have the
24 most information --
25     A   I assume Olivia Channing would have
```

**117**

```
 1   --
 2      Q   Who, specifically at REC Marine,
 3   would have the most information related to
 4   that?
 5      A   I would think Olivia Channing.
 6      Q   Do you know how much your attorney
 7   charges to file this document, draft it?
 8      A   No idea.
 9      Q   Research it?
10      A   No idea.
11      Q   Five?  I'm bad with numbers.
12      A   Oh, I didn't know.  Sorry.  Yes.
13   This will be number five.
14      Q   All right.  After I show it to your
15   counsel and he glances at it, I'm handing you
16   what I've marked as Exhibit 5 to REC Marine's
17   deposition.  It's the Compulsory Counterclaim
18   and Third Party Complaints of Gulf Offshore
19   Logistics, LLC and REC Marine Logistics, LLC.
20          MR. SALLEY:
21             To which, I object.  That has
22          not been filed.
23          MR. RHINE:
24             Okay.
25          MR. SALLEY:
```

**118**

```
 1             Yet.
 2   BY MR. RHINE:
 3      Q   Okay.  Sir, I'm handing you Exhibit
 4   5.
 5          MR. SALLEY:
 6             To which, I object.  Don't even
 7          bother with it.
 8          MR. RHINE:
 9             I note your objection.
10          MR. SALLEY:
11             We're not gonna -- we're not
12          gonna examine the witness, this
13          witness, on that document.  That's
14          purely legal.
15   BY MR. RHINE:
16      Q   Sir, has REC Marine seen that
17   document before?
18      A   I'm going off --
19          MR. SALLEY:
20             Objection.  Don't answer.
21          THE WITNESS:
22             I'm gonna follow with what my
23          counsel says.
24   BY MR. RHINE:
25      Q   All right.  You won't even -- you
```

**119**

```
 1   won't even respond and say whether or not REC
 2   Marine has seen that document, yet?
 3          MR. SALLEY:
 4             Objection.
 5          THE WITNESS:
 6             No.
 7          MR. RHINE:
 8             Fred, I have to make a --
 9          sometimes, I have to ask the witness
10          if he's going to heed your advice.
11          MR. SALLEY:
12             And sometimes, I have --
13          MR. RHINE:
14             I don't need you to continuously
15          yell during that occasion.
16          MR. SALLEY:
17             Sometimes, I have to object.
18          But you act like you don't listen.
19   BY MR. RHINE:
20      Q   Do you know if anyone at REC Marine
21   reviewed this document before it was filed?
22      A   No idea.  No, I don't.
23          MR. RHINE:
24             You can stop throwing this back
25          at me, Fred.
```

**120**

```
 1          MR. SALLEY:
 2             It was not filed.
 3          MR. RHINE:
 4             This is an exhibit in this
 5          deposition.
 6          MR. SALLEY:
 7             It was not filed.  He knows
 8          nothing about it.
 9          MR. RHINE:
10             Please let the record reflect
11          that Mr. Salley keeps throwing
12          Exhibit 5 back across the table
13          stating it was not field.
14          MR. SALLEY:
15             And you keep throwing it back
16          the other way or to some other
17          direction.  Let's be realistic.
18   BY MR. RHINE:
19      Q   Do you know if the information
20   contained within Exhibit 5 --
21          MR. SALLEY:
22             Objection.
23   BY MR. RHINE:
24      Q   -- was verified with REC Marine?
25          MR. SALLEY:
```

**121**

1    Objection.  Do not answer it.
2    MR. RHINE:
3        Fred, please let me finish my
4    question before you object.
5    MR. SALLEY:
6        Well, I thought you were
7    finished.
8    MR. RHINE:
9        You objected at the point I
10    said, "Do you know if."  So please
11    just let me finish my question.
12    That's all I ask.
13    MR. SALLEY:
14        Well, proceed.
15    THE WITNESS:
16        I've never seen this document
17    before.
18 BY MR. RHINE:
19    Q   Okay.  Do you know if anyone at REC
20 Marine has seen it?
21    A   To my knowledge, no.
22    Q   Do you know if anyone at REC Marine
23 has confirmed all the factual allegations
24 within this document?
25    A   I've never seen it.  I don't know.

**122**

1    MR. SALLEY:
2        Let me see that document.
3    THE WITNESS:
4        This one?
5    MR. SALLEY:
6        Yeah.  The one he just handed
7    you.
8 BY MR. RHINE:
9    Q   Do you know anything about the prior
10 lawsuit that Mr. Richard filed against REC
11 Marine and Gulf Offshore Logistics in federal
12 court in Galveston?
13    A   No, I do not.
14    Q   Okay.  Who, at REC Marine, would have
15 the most information related to that lawsuit?
16    A   My attorney.
17    Q   Okay.  I didn't ask about your
18 attorney, sir.
19    A   Yeah.
20    Q   Who, at REC Marine, would have the
21 most information related to that?
22    A   For something like that, I would.
23 I've never seen it before, don't know a thing
24 about it.
25    Q   You're unaware, of one way or the

**123**

1 other, anything about the prior lawsuit that's
2 filed?
3    A   No.
4    Q   Okay.  Can you testify for me here
5 today, under oath as the corporate
6 representative for REC Marine, about any
7 damages that REC Marine sustained as a result
8 of the filing of the prior lawsuit?
9    A   Damages?
10    Q   Correct.
11    A   Can you explain what you mean by
12 damages?  I mean, I --
13    Q   What do you consider damages, sir?
14    A   If a tree fell on this roof right
15 here.
16    Q   Okay.
17    A   That's what I'm saying.  I don't know
18 what you -- that's what I'm saying.  I don't
19 know what you mean my "damages".
20    Q   Let me rephrase it.
21    A   No.  I -- I don't know specifically.
22 But when lawsuits are filed against us, they
23 are brought to my attention.  But I don't
24 recall receiving one or seeing one.
25    Q   Sitting here today, as the corporate

**124**

1 representative for REC Marine, are you aware
2 of any financial loss that REC Marine suffered
3 as a result of the prior lawsuit filed by
4 Dequincy Richard?
5    A   I know at one time -- I don't know if
6 it was your law firm or somebody involved --
7 filed a case to -- to hold money or to
8 something along those lines so we can get paid
9 by a customer.
10    Q   Okay.
11    A   But the exact extent of that, the
12 attorneys would handle that, not me.
13    Q   Do you have any first -- any
14 information for REC as to how much money
15 you're alleging was withheld?
16    A   No.
17    Q   Was any money ever actually withheld
18 by your customer?
19    A   That, I don't know.  I know we wasn't
20 getting paid for awhile.  But was it due to
21 that, I'm not privy of that information.  I
22 don't know.
23    Q   Who, at REC Marine, would have that
24 information?
25    A   I don't -- maybe, the owner.  I don't

**125**

1  know.
2    Q    Okay.  Do you know who REC Marine
3  hired, in order to defend that action?
4    A    No.
5    Q    Do you have any information,
6  testifying on behalf of REC Marine, as to how
7  much in attorney fees were expended in
8  handling --
9    A    No.
10    Q    -- the defense of that litigation?
11    A    No.
12    Q    Was REC Marine aware that your
13  attorney has attempted to file this document
14  eight separate times?
15        MR. SALLEY:
16            Objection.  Counsel, that's just
17        a total misstatement.
18        THE WITNESS:
19            I don't know what document
20        you're referring to.
21  BY MR. RHINE:
22    Q    Exhibit 5?
23    A    No, I have no idea.
24        MR. SALLEY:
25            Let me object because that

**126**

1        statement is so blatantly false.
2        MR. RHINE:
3            Are you finished, Fred.
4        MR. SALLEY:
5            For the moment.
6  BY MR. RHINE:
7    Q    Okay.  Did REC Marine authorize each
8  and every attempt that was made, in order to
9  file Exhibit 5?
10        MR. SALLEY:
11            Counsel, let -- let me stop you
12        right there.  There's been one filing
13        of that document, and it will be
14        filed eventually.  But I don't know
15        when.  So quit mischaracterizing the
16        physical activities that it involves.
17        THE WITNESS:
18            I'm not aware.
19  BY MR. RHINE:
20    Q    Okay.  Did you know that your
21  attorney was attempting to sue me, personally
22  --
23        MR. SALLEY:
24            Objection.
25

**127**

1  BY MR. RHINE:
2    Q    -- in this case?
3        MR. SALLEY:
4            Objection.  You deserved to be
5        sued.
6        THE WITNESS:
7            No.
8  BY MR. RHINE:
9    Q    Did anyone at REC Marine authorize
10  your counsel to bring the attempted claims
11  against me, personally?
12    A    No.
13    Q    I'm not sure if I asked it, and I
14  apologize if I'm repeating it.  Did -- do you
15  know how much your attorney charged to
16  research, draft, file the Compulsory Counter
17  Claim and Third Party Complaint of Gulf
18  Offshore Logistics, LLC, and REC Marine
19  Logistics, LLC?
20        MR. SALLEY:
21            Objection.
22        THE WITNESS:
23            No.
24        MR. SALLEY:
25            Do not answer.

**128**

1        MR. RHINE:
2            What's the basis of your
3        instruction to the witness not to
4        answer the question?
5        MR. SALLEY:
6            He doesn't know any response,
7        and it's a legal issue.  I'm the
8        attorney.  I deal with the legal
9        issues.
10        MR. RHINE:
11            You don't believe it's a fact as
12        to how much in attorney fees are in
13        dispute in this litigation?
14        MR. SALLEY:
15            Counsel, he has already
16        indicated he was not aware of it.  He
17        does not know the amount.  Other
18        people do.  REC has a man there
19        that's totally familiar with it --
20  BY MR. RHINE:
21    Q    Sir --
22        MR. SALLEY:
23            -- and authorizes action on it.
24  BY MR. RHINE:
25    Q    -- do you know who, at REC is, quote,

**32 (Pages 125 to 128)**

**129**

1   "totally familiar" with the attorney fees in
2   this case and who authorizes action on it?
3      A   No.  No, I'm not.  I don't deal with
4   Fred a whole lot.  The only other person I
5   know that may have dealt with him was, maybe,
6   Brian Harris.
7      Q   Do you think Brian Harris, the safety
8   representative, would be the one who is both
9   authorizing the attorney's actions and paying
10  his bills?
11     A   I think he would pass the invoices up
12  to where they need to go to be paid.  I don't
13  know if he's the person to approve our
14  attorney's responses.
15     Q   Do you know who that is?
16     A   No.  I think Fred would do that on
17  his own, I'm assuming.
18     Q   I'm gonna hand you what's marked as
19  Exhibit 6 and Exhibit 7 to the deposition of
20  REC Marine, sir.  I'll represent to you that
21  these are both the interrogatories that were
22  asked by my client, Dequincy Richard, as well
23  as the responses and objections of REC Marine
24  Logistics, LLC to those interrogatories.
25  Unfortunately, I have to give you two

**130**

1   documents because they're supposed to have
2   responses within the same document as the
3   answers.  But that was not done by your
4   attorney.  So we'll have to consult Exhibit 7,
5   which is the interrogatories, and then, the
6   responses, which I believe I marked as Exhibit
7   6.  And then, I will visit with you about
8   those discovery responses.  Okay?
9      A   All right.
10     Q   Have you seen these before?
11     A   No.
12     Q   Okay.
13        MR. SALLEY:
14           And, counsel, I would ask you if
15        they appear anywhere on the Exhibit
16        A?  I think not, and I object to it.
17        But you can ask him.
18  BY MR. RHINE:
19     Q   Sir, can you go back to Exhibit 2?
20     A   Okay.
21     Q   Exhibit 2 is the Notice of Deposition
22  that you were given by, I believe, your
23  counsel?
24     A   Yes, sir.
25     Q   And you understood that pursuant to

**131**

1   that notice, REC Marine was required under the
2   Federal Rules of Civil Procedure to designate
3   someone to testimony on its behalf related to
4   all of these?
5      A   Uh-huh.  (Affirmative response.)
6   Okay.
7      Q   Okay.  Are you here today to testify
8   regarding all of the topics that were listed
9   on that notice?
10        MR. SALLEY:
11           Counsel, objection.  He doesn't
12        know that.  I don't know that, yet,
13        either.  It depends on what he knows.
14        But you did not ask for somebody to
15        review anybody's pleadings and
16        certainly, not answers to
17        interrogatories.
18     MR. RHINE:
19        Okay.
20     MR. SALLEY:
21        Then, you did not --
22     MR. RHINE:
23        To correct -- to correct your
24     misrepresentation --
25     MR. SALLEY:

**132**

1        You did not include --
2     MR. RHINE:
3        -- number eight deals with the
4     pleadings.  Number twenty-four, on
5     this notice, deals with the answers
6     to discovery.
7     MR. SALLEY:
8        Counsel, your request on Exhibit
9     8 are so nonspecific as to be
10    objectionable.  And I do object, and
11    I have objected.  I did not delay
12    your taking of this deposition
13    because I thought you might use it
14    for something useful, other than just
15    nonsensical arguments.
16    MR. RHINE:
17       Are you finished, Fred?
18    MR. SALLEY:
19       I am not finished.
20    MR. RHINE:
21       Okay.  Go on.  Finish your
22    objection so we can proceed.
23    MR. SALLEY:
24       No.  I'm finished for the
25    moment.  You may proceed, but you

**133**

```
 1        haven't done anything with regard to
 2   a 30(b)(6) deposition that I've been
 3   able to determine.
 4        MR. RHINE:
 5        Are you finished now?
 6        MR. SALLEY:
 7        For the moment.
 8   BY MR. RHINE:
 9   Q    Okay.  Sir, do you see topic number
10   twenty-four on the Notice of Deposition;
11   wherein, REC Marine Logistics was requested to
12   designate someone regarding its answers and
13   responses to Richard's discovery?
14   A    I'm sorry, where are you at?
15   Q    Topic twenty-four on Exhibit 2.
16        MR. SALLEY:
17        To which, counsel, that is just
18        simply too vague.  And it's
19        objectionable.
20        THE WITNESS:
21        Your answers and responses to
22        Richard's discovery to you?
23   BY MR. RHINE:
24   Q    Yes, sir.  You've been designated to
25   testify regarding this topic.  Is that
```

**134**

```
 1   accurate?
 2        MR. SALLEY:
 3        Counsel, he has been designated
 4        as a witness to respond to a
 5        30(b)(6).
 6        MR. RHINE:
 7        Okay.  Identify every topic on
 8        that exhibit that this witness is
 9        testifying about.
10        MR. SALLEY:
11        I don't have to.  You filed it
12        with too short a notice.  I would
13        have filed a written objection, but I
14        wanted to proceed.  And you seemed to
15        want to go ahead with it.
16        MR. RHINE:
17        Okay.  For the record, what
18        specific Federal Rule of Civil
19        Procedure gives you the authority to
20        refuse to identify what topic this
21        witness is testifying about?
22        MR. SALLEY:
23        Your failure to file it with
24        timely notice.
25        MR. RHINE:
```

**135**

```
 1        Okay.  Fred, I again ask you
 2   what specific Federal Rule of Civil
 3   Procedure was violated and gives you
 4   the authority to refuse to identify
 5   which of the topics this witness is
 6   testifying about?
 7        MR. SALLEY:
 8        You didn't go through the
 9   topics.  You just went here, there,
10   and everywhere.  And it's not a
11   timely notice, but I'm trying to
12   facilitate it.  If you want to quit,
13   we'll go home.
14        MR. RHINE:
15        So you're still not answering my
16   question?
17        MR. SALLEY:
18        No.  You don't get to ask the
19   questions here.  Do you realize that?
20   You're neither a judge, nor jury, nor
21   anything else.
22        MR. RHINE:
23        Okay.
24        MR. SALLEY:
25        But you have --
```

**136**

```
 1        MR. RHINE:
 2        You've made this --
 3        MR. SALLEY:
 4        -- to try to get ten times more
 5   than you're entitled to out of very
 6   vague materials.
 7        MR. RHINE:
 8        You believe, during the
 9   deposition of REC Marine's corporate
10   representative, that Mr. Richard's
11   counsel here is not entitled to ask
12   questions?
13        MR. SALLEY:
14        You've been entitled to ask a
15   lot, but many would have been purely
16   objectionable because they're too
17   vague and inspecific.
18        MR. RHINE:
19        Okay.
20        MR. SALLEY:
21        On a 30(b)(6) deposition, the
22   party to whom they are directed is
23   entitled to certainty and clarity.
24   And you have provided neither.
25        Now, if you want to ask
```

137

```
1        questions, proceed.  Otherwise, let's
2    go home.
3    BY MR. RHINE:
4      Q   All right.  Sir, are you prepared to
5    testify about REC Marine's answers and
6    responses to Richard's discovery?
7          MR. SALLEY:
8            Objection.  That's up to me.
9          Ask him a question.
10         MR. RHINE:
11           I just asked him a question,
12         Fred.
13         MR. SALLEY:
14           To which, I objected.  Ask him
15         another, a different question.
16         MR. RHINE:
17           You are not going to allow this
18         witness to answer whether or not he's
19         going to testify on this topic?
20         MR. SALLEY:
21           He doesn't control that,
22         counsel, and you know that.  Let's
23         don't be idiotic about the whole
24         thing.
25
```

138

```
1    BY MR. RHINE:
2      Q   Sir, are you here to testify
3    regarding topic twenty-four?
4          MR. SALLEY:
5            He doesn't determine that.  I
6          determine that.
7          THE WITNESS:
8            I'm gonna listen to my attorney
9          on it.
10   BY MR. RHINE:
11     Q   Sir, you're not gonna answer whether
12   or not you're -- you're to provide --
13         MR. SALLEY:
14           He's not.  He is not.
15         MR. RHINE:
16           Fred, I again ask you not to
17         interrupt my questions.
18         MR. SALLEY:
19           You can ask.  But when they're
20         purely objectionable and obnoxious, I
21         am gonna respond.  And you know that.
22         MR. RHINE:
23           So you're gonna continue to
24         interrupt my questions of this
25         witness?
```

139

```
1          MR. SALLEY:
2            If necessary.
3    BY MR. RHINE:
4      Q   Sir, I go back --
5          MR. SALLEY:
6            If you continue -- if you
7          continue to do purely objectionable
8          things, I'm going to object.
9    BY MR. RHINE:
10     Q   Sir, I go back to my question.
11   You're gonna refuse to answer whether or not
12   you're prepared to testify regarding topic
13   twenty-four?
14         MR. SALLEY:
15           I -- I -- I've told him.  Go to
16         something else.
17   BY MR. RHINE:
18     Q   Sir, are you gonna refuse to answer
19   that question?
20     A   And based off my legal counsels, yes.
21     Q   Have you ever seen Exhibit 6 before?
22     A   No.
23     Q   Have you ever seen Exhibit 7 before?
24     A   No.
25     Q   Who, at REC Marine, answered the
```

140

```
1    interrogatories that were served?
2      A   I'm not aware.  I don't know.
3      Q   Okay.  Do you know if anyone at REC
4    Marine answered them?
5      A   No, I'm not aware.
6      Q   Who, at REC Marine, would know that?
7      A   I'm not aware.  Normally, I would see
8    something like this.
9      Q   I think earlier, you talked about
10   some of your involvement in other lawsuits,
11   how you would receive discovery requests,
12   items related to that.
13     A   Uh-huh.  (Affirmative response.)
14     Q   Normally, during your earlier --
15   well, during -- strike that.  That's one of
16   the things you do, I guess, as the operations
17   manager, is you facilitate responding to that
18   discovery?
19     A   Correct.
20     Q   All right.  Was this discovery ever
21   given to you to facilitate responding to?
22     A   No.
23     Q   Is there ever an instance when
24   discovery that was answered by REC Marine
25   would be given to someone else, instead of
```

**141**

1  you?
2  A   No.
3  Q   Do you know why they're not verified?
4  A   I'm sorry, can you explain it?
5  Q   Do you understand what it means to
6  include a verification with interrogatory
7  responses?
8  A   No.
9  Q   I'll move on.  Sitting here today,
10 can you tell me what REC Marine did, in order
11 to ensure that all of the information
12 contained within its interrogatory responses
13 was correct?
14 A   I've had no dealings with it.
15 Q   Sir, we're gonna go through and ask
16 you some questions related to these
17 interrogatories and the responses that were
18 previously given.  I understand your testimony
19 is that you don't know that anyone at REC has
20 ever responded to these or provided
21 information related to it.  Is that accurate?
22 A   Agreed.
23 Q   Okay.  Now, I'm going to go through
24 and have to get REC to answer the
25 interrogatories that were served on them

**142**

1  initially.  If you go to Exhibit 7 --
2     MR. SALLEY:
3        Objection to that comment.  I
4  don't think you will, counsel.  Don't
5  make any -- such a threatening
6  statement like that again in this
7  deposition, or it will be over.
8     MR. RHINE:
9        I've no idea what you're talking
10 about, Fred.
11    MR. SALLEY:
12       I'm sure you don't.
13 BY MR. RHINE:
14 Q   Can you go to Exhibit 7 for me, sir.
15 Is the proper legal name of the plaintiff "REC
16 Marine Logistics, LLC"?
17 A   Correct.
18 Q   I think you testified earlier, it
19 hasn't ever gone by any other names?
20    MR. SALLEY:
21       And what is that question for?
22 Objection.
23    THE WITNESS:
24       I work for REC Marine Logistics
25 since I've worked for Ronald

**143**

1        Chaddock.  It's always been REC
2        Marine Logistics, to my knowledge.
3  BY MR. RHINE:
4  Q   That's all I was trying to clarify,
5  sir.  Can you look at interrogatory number
6  four, "Please identify any and all persons
7  known to you to have knowledge of the relevant
8  facts upon which this lawsuit is based."
9  A   Where you at, sir?  Where you at?
10 Q   On Exhibit 7, number four.
11 A   "Can you identify a tangible thing"?
12 Q   No.
13 A   Am I wrong?
14 Q   Just keep going.  Sorry.  Keep going.
15 A   Okay.  Go ahead.
16 Q   "Please identify any and all persons
17 known to you to have knowledge of the relevant
18 facts upon which this lawsuit is based."  Can
19 you answer that question for REC Marine?
20    MR. SALLEY:
21       Objection.  It's been asked.
22 It's been answered.  And for him to
23 be asked to reanswer it, I don't
24 think is proper.  I object.
25       Do you know anything about the

**144**

1  response?
2     MR. RHINE:
3        Stop coaching your witness.
4     MR. SALLEY:
5        No.  Do you know any facts with
6  which to respond?
7  BY MR. RHINE:
8  Q   Can you please answer interrogatory
9  number four on behalf of REC Marine, sir?
10    MR. SALLEY:
11       Objection.
12    THE WITNESS:
13       On -- number seven, "State when
14 and where and under what
15 circumstances you first became aware
16 that Richard --
17 (WHEREUPON, THE COURT REPORTER REQUESTED THE
18 DEPONENT TO READ SLOWER.)
19    THE WITNESS:
20       I'm just always trying to do it
21 real fast to go through it.
22    MR. SALLEY:
23       Just one word at a time.
24    THE WITNESS:
25       Number seven, "State when, where

**145**

1       and under what circumstances you
2       first became aware that Richard was
3       claiming to have sustained injuries
4       made the basis of this lawsuit."
5       That's the question you were asking
6       me?
7    BY MR. RHINE:
8       Q   No, sir.  Go to number four.  "Please
9    identify any and all persons known to you to
10   have knowledge of the relevant facts upon
11   which this lawsuit is based."  Can you do that
12   for me?
13      A   I would say Brian Harris.
14          MR. SALLEY:
15             Objection.
16   BY MR. RHINE:
17      Q   Anyone else?
18      A   Obviously, our attorney.
19      Q   Anyone else employed by REC Marine?
20      A   No.
21      Q   Okay.  Who would I ask at REC Marine
22   to determine if that answer represents the
23   full amount of information available to the
24   company?
25      A   Repeat your question, again.

**146**

1       Q   Who would I ask at REC Marine to
2    determine if that answer of Brian Harris
3    represents the complete knowledge of REC
4    Marine related to individuals involved in this
5    incident who may have knowledge of facts?
6       A   Brian Harris would be -- besides
7    myself, Brian Harris.  And everything has gone
8    through our attorney.
9       Q   All right.  Okay.  Can you turn to
10   question number five?
11      A   On the interrogatory?
12      Q   Yes, sir.
13      A   Okay.
14      Q   Can you read that to yourself?
15      A   My understanding, he fell or tripped
16   by walking down the steps.
17      Q   Okay.
18      A   There is a handrail for him to hold
19   onto.  And if I might be mistaken, there might
20   be a handrail on both sides.  Sometimes, there
21   are on the vessel.  I don't know the specifics
22   of that vessel.  The vessel was tied off,
23   obviously, since that's what they went to do.
24   So the vessel should have been steady.  So by
25   him walking on the stairs -- they had this

**147**

1    witness.  She walked up the stairs right there
2    and didn't trip.  So I would say it's -- if
3    you would have fallen, that would have been
4    your own fault, not Laris Buildings.  That's
5    kind of what I would base that off.
6       Q   Did REC Marine ever conduct an
7    investigation into the incident?
8       A   To my knowledge, no.
9       Q   Has REC Marine ever requested a
10   deposition occur in this lawsuit?
11      A   To my knowledge, no.
12      Q   Okay.  Let's go to question seven,
13   please, of the interrogatories.  And I'm sorry
14   my phone keeps going on, sir.  But, as
15   you were --
16      A   That means you're busy.
17      Q   -- aware, we called the Court.  So I
18   don't want to have it silenced --
19      A   Understand.
20      Q   -- in case the Court calls us back.
21      A   Not a problem.
22      Q   All right.  "State when and where --
23   excuse me.  "State when, where, and under what
24   circumstances you first became aware that
25   Richard was claiming to have sustained the

**148**

1    injuries made the basis of this lawsuit"?
2    When was REC Marine first informed by
3    Mr. Richard related to the incident.
4          MR. SALLEY:
5             Objection.  That question is not
6          understandable.  You're trying to ask
7          two at one time.  I ask you to repeat
8          the question.
9    BY MR. RHINE:
10      Q   Do you see interrogatory number
11   seven, sir?
12      A   Yes, I do.
13      Q   I'm gonna ask you some questions --
14          MR. SALLEY:
15             That's not the objection.
16   BY MR. RHINE:
17      Q   -- related to that.  Okay?
18          MR. SALLEY:
19             That's not the objection.  Did
20          we take the last incomplete improper
21          question off?  If not, let's go
22          clarify that.
23          MR. RHINE:
24             Fred, please stop.
25          MR. SALLEY:

**149**

1    I've made an objection.  Now,
2  either --
3  MR. RHINE:
4      Fred, please stop.  I've moved
5  on.  Does that make you happy?
6  MR. SALLEY:
7      Do you withdraw the question?
8  MR. RHINE:
9      I've moved on.  I just said it.
10  I've moved on.  Is that adequate for
11  you, Fred?  I'm asking a different
12  question of this witness.
13  MR. SALLEY:
14      I'm not the one that decides.
15  MR. RHINE:
16      Or are you gonna keep with
17  speaking objections that are
18  improper.
19  MR. SALLEY:
20      I'm not the one that decides
21  those things.  The Court does.
22  BY MR. RHINE:
23    Q   Sir, I'm going to ask you some
24  questions related to interrogatory seven.  I'm
25  sorry.  I've attempted --

**150**

1  (WHEREUPON, THE COURT REPORTER ASKS FOR A
2  BRIEF PAUSE TO CATCH UP.)
3  BY MR. RHINE:
4    Q   Sir, I'm going to ask you some
5  questions related to interrogatory number
6  seven.
7    A   Uh-huh.  (Affirmative response.)
8    Q   Do you understand that?
9    A   Yes.
10    Q   Okay.  When was REC first informed by
11  Mr. Richard about the incident?
12    A   I don't know the exact time or date.
13  Just based off what we do is, I'm sure, the
14  captain of the vessel called our office and
15  spoke to Brian Harris.  Brian would have
16  probably came in and verbally told me.
17    Q   Do you know what the captain said to
18  Brian Harris?
19    A   No, I sure don't.
20    Q   Are you aware that the captain was
21  deposed, I think, last week?
22    A   No.
23    Q   Okay.  During the captain's
24  deposition, he indicated that he was present
25  when the incident occurred.  Does REC Marine

**151**

1  dispute that, at all?
2    A   I'm -- I didn't -- I have -- really
3  have no part in this incident.  So I really
4  don't know, not aware.
5    Q   What happened, once the captain
6  called and alerted your safety officer, Brian
7  Harris, that an incident had occurred?
8    A   We make it a point to -- to get them
9  off the vessel.  We get them treatment, as
10  fast as we can get them there.
11    Q   Do you know where the vessel was
12  located at the time of the incident?
13    A   No.
14    Q   Okay.  Do you know how Mr. Richard
15  was taken off the vessel?
16    A   No.
17    Q   Do you know if he was taken my boat
18  or by helicopter?
19    A   No.  I -- he wouldn't be brought by
20  boat or helicopter.  That's a major -- that I
21  would be involved with.
22    Q   What happened after Mr. Harris was
23  notified about it?
24    A   To my knowledge, he -- they picked
25  him up on the first opportunity and brought

**152**

1  him to, I believe, it's Occupational Medical
2  Services and had him checked out.
3    Q   Okay.
4    A   And based off of what they saw, he
5  was released to return to full duty.
6    Q   Okay.  When a captain calls to shore
7  --
8    A   Uh-huh.  (Affirmative response.)
9    Q   -- in order to report an incident,
10  what documents are generated by Brian Harris
11  related to that?
12    A   Maybe, an e-mail, depending on the
13  time that it would have happened after hours.
14  But he would just receive his Vessel Report.
15    Q   How does the captain call?  Does he
16  do it on his radio?
17    A   He might do it either the vessel
18  phone or his cell phone.  I don't know how it
19  was done this particular time, no idea.
20    Q   Are all the calls that are received
21  by Brian Harris logged in some way just to
22  keep records?
23    A   No.  No.
24    Q   Are calls that are specifically
25  incident related logged in any manner?

**153**

1    A   No.
2    Q   Okay.  Other than an e-mail that may
3  or may not have been sent from Mr. Harris --
4    A   Uh-huh.  (Affirmative response.)
5    Q   -- are there any other documents or
6  notes or papers that would be generated
7  related to a call from a vessel that an
8  incident had occurred?
9    A   No.
10   Q   Do you know if Mr. Richard received
11  any treatment while he was onboard the DUSTIN
12  DANOS?
13   A   No.
14   Q   You don't know, or he did not receive
15  treatment?
16   A   I don't know if he did or not.
17   Q   If Mr. Richard had received treatment
18  onboard the vessel, what records would be
19  generated related to that?
20   A   None, other than, you know, it could
21  be verbal from the captain stating, you know,
22  put ice on it, ask them to rest, took Aleve,
23  whatever it may be.  It would be something
24  basic and simple but probably verbal.
25   Q   Okay.  Sitting here today, though,

**154**

1  you don't know what, if any, of that medical
2  treatment onboard the boat occurred for
3  Mr. Richard after the incident?
4    A   No.  I'm not aware of any.
5    Q   What is REC's policy related to what
6  a captain is supposed to do after an incident
7  occurs?  What is the captain supposed to do
8  afterwards?
9    A   Make sure, I mean, to make sure the
10  alleged incident, person with the incident, is
11  comfortable, call the office immediately to
12  report anything, and to write a report.  Or
13  the injured party, if they want to, they can
14  write the report, themselves.
15   Q   How long is the -- is it a standard
16  form that the captain has to fill out for --
17   A   Yes.  A vessel incident here on this
18  report.
19   Q   How many pages is that?
20   A   Just one page, unless there's more to
21  the story and somebody needs to use a --
22  normally, it's just a regular sheet of
23  looseleaf paper out of a tablet.
24   Q   Okay.  I assume everything we've
25  discussed related to what the captain is

**155**

1  supposed to do after the accident is contained
2  within the GOL, LLC safety manual?
3    A   Correct.
4    Q   Are there other policies that REC
5  Marine has in place that govern the captain or
6  any of the crews' actions in what's supposed
7  to occur after an incident?
8    A   No.  What we just discussed is what
9  would be -- be in the manual.
10   Q   Are witness statements supposed to be
11  taken?
12   A   They can be, if requested by the
13  safety department.
14   Q   Okay.  Following an incident, then,
15  during the completion of the Incident Report,
16  does the captain or is the captain supposed to
17  have, I guess, dialogue with the safety
18  department?
19   A   I would imagine they spoke on the
20  phone about this.
21   Q   Okay.
22   A   But if they took any witness
23  statements or not, I'm unaware.
24   Q   Do you know who, the four crew
25  members of the DUSTIN DANOS crew members were

**156**

1  at the time of the incident?
2    A   No.
3    Q   Is that correct, though, that there
4  should have been four crew members?
5    A   Should be two captains and two
6  deckhands.  That would include Dequincy
7  Richard.
8    Q   We're gonna look at the boat logs
9  later.
10   A   Uh-huh.  (Affirmative response.)
11   Q   I think that the crew members are
12  identified on the boat logs.  Is that
13  accurate?
14   A   Should be.
15   Q   Okay.  Can you go to interrogatory
16  number thirteen, please.  If you can, just
17  review that interrogatory for me.  Then, I'm
18  gonna ask some questions related to it.
19   A   No.  I'm not aware of any work --
20   Q   Okay.
21   A   -- being done to the vessel.
22   Q   Since the date of the incident, there
23  have been no repairs to the stairs involved?
24   A   Not to my knowledge, no.
25   Q   Prior to coming down here to testify,

**157**

1  what information did you review to make sure
2  that that answer was correct?
3     A   None.
4     Q   Do y'all have an engineering
5  department at REC Marine?
6     A   We have port captains.
7     Q   Port captains?
8     A   Correct.
9     Q   I think your port captain that would
10 have been over the DUSTIN DANOS was Casey
11 Curole?
12    A   Correct.
13    Q   All right.  Did you call Casey Curole
14 before this deposition to discuss any repairs
15 which may or may not have been done to the
16 steps onboard the vessel?
17    A   No, I did not.
18    Q   Besides Casey Curole, who else, at
19 REC Marine, would have knowledge as to whether
20 or not repairs were done in the incident
21 location?
22    A   He would be the one person.
23    Q   Okay.  When repairs or modifications
24 are done on the vessel, what documents are
25 generated?

**158**

1     A   Depends on what it is.  Something
2  simple, probably no report.
3     Q   Okay.
4     A   A tire's got to be rehung, the chain
5  might have broke, something simple.  If it's
6  an engine, you know, something that's a major
7  problem with the vessel, it would be
8  documented by an e-mail.
9     Q   Would repair work to the steps,
10 specifically, those involved in the incident,
11 rise to the level that various documents would
12 need to be generated, such as e-mails,
13 documenting it or not?
14    A   The vessel, we would always keep our
15 vessels seaworthy.  So we wouldn't have a
16 problem with the vessel.  Something like that,
17 a vessel going offshore, we wouldn't have a
18 problem with the steps.  It would have been
19 addressed before the vessel left the dock.
20    Q   And again, if repairs were needed to
21 be made to the steps, would it rise to the
22 level that a document would be generated?
23    A   I would highly doubt it.
24    Q   If repairs were done at port before
25 it went offshore, in order to ensure that the

**159**

1  vessel remained seaworthy --
2     A   Uh-huh.  (Affirmative response.)
3     Q   -- it would have been done by Casey
4  Curole?
5        MR. SALLEY:  Let me ask you to
6        set a time.  At what time?
7        set a time.  At what time?
8  BY MR. RHINE:
9     Q   At any time since the incident, sir?
10    A   To my knowledge, no.  Maybe -- let me
11 ask you to repeat the question.
12    Q   Let's fair.  Let me rephrase.
13    A   Yeah.
14    Q   Maybe, that can help us out here.
15    A   All right.
16    Q   You testified earlier that, you know,
17 REC Marine's intent, obviously, is to keep all
18 their ships seaworthy?
19    A   Correct.
20    Q   You're not gonna let them go
21 offshore, if they're not seaworthy.  Correct?
22    A   Correct.
23    Q   And as part of that, there's probably
24 regular inspections that occur?
25    A   Correct.

**160**

1     Q   Both in port and while the ship is in
2  the Gulf?
3     A   Correct.  I would -- I would assume,
4  sure, they do them when they're offshore.
5  Correct.
6     Q   For instance, one of the inspections
7  that will occur is, when the ship is in port,
8  to see if there is any minor repair work that
9  needs to done before it goes offshore?
10    A   Correct.
11    Q   And during that, obviously, you know,
12 if -- if a step needed to be fixed, it would
13 be done prior to the ship going offshore?
14    A   Correct.
15    Q   If, at any point since the incident
16 occurred, a repair was made while the ship was
17 in port, would it have been Casey Curole, who
18 was present during that, or other people?
19    A   The crew, maybe.  But Kasey -- Kasey
20 would make a phone call to somebody to go,
21 weld, or whomever it may be, to go repair any
22 kind of welding work, if it be needed.
23    Q   Okay.  Sitting here today, other than
24 noting that y'all always try to keep the
25 vessels seaworthy, you don't know specifically

**161**

1 what may or may not have happened since the
2 incident date --
3    A   No.  No.
4    Q   Okay.
5    A   No.
6    Q   And to figure out if repairs had been
7 made, we would either need to visit with Casey
8 Curole, who probably has the most knowledge;
9 but crew members may know, as well.  Is that
10 correct?
11   A   Correct.
12   Q   Sitting here today, can you identify
13 the specific instructions that were given to
14 Mr. Richard by Captain McCain related --
15   A   No.
16   Q   -- to the work he was doing?
17   A   No.
18       MR. SALLEY:
19          Objection.  Has nothing to do
20       with 30(b)(6).
21 BY MR. RHINE:
22   Q   I think you testified earlier, but I
23 just want to verify that REC Marine has no
24 information or knowledge about whether or not
25 Richard had done this type of work previously?

**162**

1       MR. SALLEY:
2          Objection.
3       THE WITNESS:
4          It would be on the application,
5       but I -- I'm not -- I don't look at
6       the applications.  I have not looked
7       at the application.
8 BY MR. RHINE:
9    Q   Does REC Marine believe that
10 Mr. Richard made up this incident?
11   A   Yes.
12   Q   Does REC Marine think that the entire
13 incident was staged?
14   A   Yes.
15   Q   Okay.  Does REC Marine dispute
16 Captain McCain's testimony that he was present
17 during and witnessed the incident?
18       MR. SALLEY:
19          Objection.
20       THE WITNESS:
21          I'm not aware of that.  But as a
22       staged accident, you can witness me
23       falling on the stairs out here.  I
24       can fake an injury.  I mean,
25       that's -- witnesses, you know --

**163**

1 BY MR. RHINE:
2    Q   So let me clarify, then.
3    A   Okay.
4    Q   I didn't mean to cut you off --
5    A   No.  No.  No.
6    Q   -- if you're still answering.
7    A   I understand.
8    Q   REC Marine, while acknowledging that
9 Mr. Richard fell down the step on the vessel,
10 believes that that fall, itself, was staged?
11       MR. SALLEY:
12          Objection.
13 BY MR. RHINE:
14   Q   Is that accurate?
15       MR. SALLEY:
16          Objection.
17       THE WITNESS:
18          From -- from my understanding.
19 BY MR. RHINE:
20   Q   Okay.  What is your understanding
21 based on?
22   A   I mean, whether it was staged or not,
23 he walked down the stairs and -- and fell.  He
24 worked, my understanding, he worked for about
25 a day and a half for us.  And the next day, he

**164**

1 disappears.  And then, we receive a -- a
2 lawsuit. I'm assuming that's from yourself.
3 So he must have had some knowledge of what he
4 wanted to do by coming to work for us.
5    Q   So the -- the entirety of the factual
6 background, which supports REC Marine's
7 defense that the fall sustained by Mr. Richard
8 was staged, is that he walked down the steps
9 and fell.  He then, disappears after the
10 incident and after his initial medical
11 treatment?
12   A   Uh-huh.  (Affirmative response.)
13   Q   And then, REC Marine is sued?
14       MR. SALLEY:
15          Objection, counsel.
16 BY MR. RHINE:
17   Q   Are there any other facts that
18 support that belief that REC Marine apparently
19 has that the incident was staged?
20       MR. SALLEY:
21          Objection, couple.  There's no
22       way that you could ask a question
23       like that on a 30(b)(6) deposition of
24       a witness.
25

**165**

```
1   BY MR. RHINE:
2      Q   You can answer the question, sir.
3      A   Don't you think our assumption is
4   correct?
5      A   I obviously don't, or else I wouldn't
6   have brought the lawsuit.
7      A   I'm -- I'm gonna stick --
8      Q   I'm just trying to identify what
9   facts y'all have.
10     A   I understand.  No, I understand.
11  That's -- that's my personal opinion.
12     Q   Okay.  Your personal opinion, being
13  REC Marine?
14         MR. SALLEY:
15             He said, his personal opinion.
16  BY MR. RHINE:
17     Q   Okay.  Is it REC Marine's opinion
18  that the incident was staged?
19     A   I'd have to say yes.
20     Q   Okay.  Is REC Marine aware of
21  anything which you didn't already identify to
22  the ladies and gentlemen of the jury to
23  provide factual support for that claim?
24         MR. SALLEY:
25             Objection.  We're here on a
```

**166**

```
1      30(b)(6), and he doesn't have all of
2      these hypothetical arguments that
3      he's obliged to make here.
4   BY MR. RHINE:
5      Q   You can answer the question, sir.
6      A   I think it was a faked injury.
7      Q   Okay.  And all I'm trying to
8   identify -- I get -- I get that REC Marine
9   thinks it was fake.
10     A   I understand.
11     Q   I just need to know what supports
12  that.
13     A   Right.
14     Q   So that's what I'm asking.  And
15  you've identified he walked down the steps and
16  fell.  You've identified that he disappears
17  after the incident.  Y'all can't find him.
18  And then, REC Marine is sued.
19     A   And he worked for us a day and a half
20  before.  And I think that's how long he worked
21  for us on the vessel.
22     Q   And the short -- the short period of
23  time that --
24     A   Correct.
25     Q   -- he worked for y'all?
```

**167**

```
1      A   Correct.
2      Q   Anything else you can think of,
3   sitting here as the corporate representative
4   for REC Marine, that supports the belief that
5   the incident was staged?
6      A   To the total involvement I've had in
7   this case, yes.  I believe that it was -- REC
8   Marine Logistics believes that.
9      Q   Okay.  And I'm just trying to
10  identify any other facts that exist which
11  support that belief.
12     A   Yeah.  I mean, we -- like I said, we
13  didn't hear from him after the day it
14  happened.  He went to his, obviously, y'all's
15  doctor and got all these treatments or planned
16  medicals that were done my y'all's doctor, not
17  by our doctor.
18     Q   Anything else?
19     A   No.
20     Q   If you turn to 18, please, of the
21  interrogatories.
22     A   Okay.
23     Q   Do you see that, "Identify the
24  individuals who ordered, supervised or
25  participated in the work performed by Richard
```

**168**

```
1   at the time of accident."  Did I read that
2   correctly?
3      A   Correct.
4      Q   All right.  I want you to turn and
5   look at Exhibit 6, which I believe is under
6   your elbow.  Oh, maybe not.  And turn to
7   wherever the answer for number 18 is.
8      A   (Witness complies.)
9      Q   Actually, hold off on that.  Let me
10  just ask you some questions.
11     A   All right.
12         MR. SALLEY:
13             Are you withdrawing the previous
14             --
15         MR. RHINE:
16             There wasn't a question pending,
17             Fred.
18         MR. SALLEY:
19             Well, you directed him to a
20             specific location which presupposes
21             there was a question about that
22             number.
23         MR. RHINE:
24             Thank you.  Thank you for your
25             clarification, Fred.
```

**169**

```
1       MR. SALLEY:
2        Is that withdrawn?
3       MR. RHINE:
4        I'm glad -- I'm glad you're
5    trying to clarify for the record.
6       MR. SALLEY:
7        Is that withdrawn?
8       MR. RHINE:
9        I'm glad your trying to clarify.
10       MR. SALLEY:
11        Is that withdrawn?
12       MR. RHINE:
13        Sir, there wasn't a question
14    pending, Fred.  This isn't rocket
15    science.  Please stop deliberately
16    interrupting this deposition
17    inserting yourself in an
18    unprofessional manner and making this
19    entire thing ridiculous.
20       MR. SALLEY:
21        Counsel, we may have different
22    views about --
23       MR. RHINE:
24        You're being unprofessional,
25    Fred.
```

**170**

```
1       MR. SALLEY:
2        I'm representing a client, and
3    you're going all over the place.
4       MR. RHINE:
5        You're being be unprofessional,
6    Fred.
7       MR. SALLEY:
8        Can I assume that you've
9    withdrawn anything with regard to
10    what you've told him to look at?
11       MR. RHINE:
12        I've already stated I did.
13    There was no question pending.
14       MR. SALLEY:
15        That's all you had to say.
16       MR. RHINE:
17        I'd appreciate if the
18    professionalism or lack, thereof,
19    would stop.  Thank you, sir.
20    BY MR. RHINE:
21    Q   All right.  I think earlier, when we
22    were talking about the incident, you stated
23    that Mr. Richard was attempting to catch a
24    line and had some issues doing so.  Is that
25    accurate?
```

**171**

```
1    A   Not to my knowledge, no.
2    Q   Okay.  What was he doing at the time
3    that he was hurt?
4    A   Seems to me, that with the captain
5    and himself, tied the vessel up.
6    Q   Was he doing that pursuant to the
7    captain's instructions?
8    A   To, I would say, normal job duties.
9    Q   Okay.  Was he on the steps at his
10    discretion, or was it something that was
11    required?
12    A   It was his -- it's your job duties as
13    a deckhand to tie the vessel up.
14    Q   Okay.
15    A   And I'm guessing the captain was out
16    there, being he hadn't worked but one day, the
17    captain was out there instructing him, showing
18    him what he needs to be -- to do for his job.
19    Safely, I might add.
20    Q   Was he required to be on those steps
21    or that platform at the back of the vessel, in
22    order the tie off.
23    A   I'm guessing it was.
24    Q   Okay.
25    A   Don't know for sure.
```

**172**

```
1    Q   Do you -- does REC Marine have any
2    information that he was not supposed to be in
3    that location at the time --
4    A   No.
5    Q   -- that he was tieing off the vessel?
6    A   No.
7    Q   Okay.  Let's look in the answer for
8    number 18 that was given by, apparently, not
9    REC Marine.  When --
10       MR. SALLEY:
11        Objection.  Objection to the
12    form and the question.
13    BY MR. RHINE:
14    Q   When in discovery, REC Marine was
15    asked to identify the individuals who ordered,
16    supervised or participated in the work
17    performed by Richard at the time of the
18    accident, REC Marine answered, quote, "No one.
19    Richard was on the stairs at his discretion
20    and was not performing any duties."  Sir, you
21    will agree with me that that answer is
22    incorrect?
23       MR. SALLEY:
24        Objection.
25       THE WITNESS:
```

**173**

1    I was not there.  So I can't
2    answer that correctly one way or the
3    other.
4    BY MR. RHINE:
5    Q   Okay.
6    A   All I can do is go off what's written
7    on the accident report that he filled out.
8    Q   And at the time he was hurt, he was
9    working with the captain to tie off the
10   vessel.  Right?
11   A   That's what's in the Incident Report.
12       MR. SALLEY:
13           Objection.
14   BY MR. RHINE:
15   Q   That was one of the --
16       MR. SALLEY:
17           I made an objection.  Counsel --
18       MR. RHINE:
19           You can wait until I --
20       MR. SALLEY:
21           Your question --
22       MR. RHINE:
23           Fred, it's ridiculous.
24       MR. SALLEY:
25           The question was over, and I'm

**174**

1    objecting to what you've last asked.
2    And that's a matter of assumption.
3    Counsel assumed it that he was
4    through because of the events.
5        MR. RHINE:
6            Anything else, Fred?
7        MR. SALLEY:
8            No.  You can proceed, but I'll
9    let you know the next time that you
10   try to head off in a totally
11   incorrect direction.
12       MR. RHINE:
13           It's unprofessional, Fred.
14   You're being entirely unprofessional.
15       MR. SALLEY:
16           Well, you may think that.
17       MR. RHINE:
18           You're violating the ethics,
19   what you're supposed to do --
20       MR. SALLEY:
21           Would you -- would you like me
22   to --
23       MR. RHINE:
24           -- professionalism that's
25   required under our Federal Rules of

**175**

1    Civil Procedure.
2        MR. SALLEY:
3            At this point -- at this point,
4    would you like for me to leave and
5    take the witness?
6        MR. RHINE:
7            I'm gonna keep making my record,
8    and we're gonna take it up with the
9    Court.
10       MR. SALLEY:
11           You're not making any record.
12       MR. RHINE:
13           I know.  It's two-thirds of you
14   with speaking objections and coaching
15   the witness in the middle of
16   questions, isn't it?
17       MR. SALLEY:
18           But if you have a usable
19   question that's not objectionable,
20   proceed.  That's why I came down here
21   today.
22   BY MR. RHINE:
23   Q   Sir, at the time he was on the
24   platform attempting to tie off the vessel, was
25   Mr. Richard performing the duties he was

**176**

1    supposed to?
2    A   Correct.  Seems to be, yes.
3    Q   So stating that he was not performing
4    any duties at that time would be incorrect?
5    A   I mean, based off of his job duties
6    were done, he was walking down the stairs.  So
7    his tasks were over.
8    Q   Is REC Marine currently paying
9    maintenance and cure benefits to my client?
10   A   I -- I -- I'm not aware.  I don't
11   know.
12   Q   Okay.  Who would have that
13   information that I can visit with?
14   A   Brian Harris.
15   Q   And you didn't visit with Mr. Harris
16   related specifically to maintenance and cure
17   before this deposition?
18   A   No.  To my -- to my knowledge, we're
19   not.  But I'm not 100 percent correct.
20   Q   Okay.  Can you identify the factual
21   basis for REC Marine's refusal to pay
22   maintenance and cure?
23   A   Instructed by attorney.
24   Q   Instructed by your attorney not to
25   pay?

**44 (Pages 173 to 176)**

**177**

1    A   If we're not paying it, that's who
2  would tell us.
3    Q   Sitting here today, other than
4  identifying that your attorney may have
5  instructed you not to pay, can you identify
6  any of the facts that REC Marine relies on in
7  its refusal to pay for maintenance and cure?
8    A   Repeat the question. I'm sorry.
9       MR. RHINE:
10         Can you read that back to him?
11  (WHEREUPON, THE COURT REPORTER READS BACK THE
12  PREVIOUS QUESTION.)
13       THE WITNESS:
14         No, other than was instructed.
15  BY MR. RHINE:
16    Q   You have used a couple of times the
17  word "disappeared" in what happened after the
18  incident. Can you explain what you mean by
19  that?
20    A   We were unable to reach him, unable
21  to have any contact with him. The phone was
22  disconnected or it was not in service. I
23  think Brian maybe had gone to his address, the
24  residence he has on his application, and had
25  no answer there. And if somebody is injured,

**178**

1  we try to take care of them to make sure
2  they're, you know, brought back to MMI so they
3  can go back to work for us. And he's never
4  responded, never had any contact with him.
5    Q   Do you know how many times REC Marine
6  attempted to call my client?
7    A   I'd say more than a dozen.
8    Q   What is that based on?
9    A   Phone calls and going to his house
10  and knocking on the door.
11    Q   Okay. Who made those phone calls?
12    A   Brian Harris.
13    Q   Okay. Have you spoken with Brian
14  Harris and asked him how many times he
15  attempted to reach out to Dequincy Richard?
16    A   Back when the -- all this took place,
17  I'm sure we did numerous times.
18    Q   Okay. Prior to being deposed here
19  today, did you ask Mr. Harris how many times
20  he attempted to call my client?
21    A   No.
22    Q   Okay. Prior to giving your testimony
23  today, as REC Marine's corporate
24  representative, did you ask Brian if he went
25  to what was believed to be Mr. Richard's home

**179**

1  address?
2    A   Oh, I know he did when he first --
3  the first happened. I know he did because we
4  knew where it was going.
5    Q   How do you -- how do you know he did?
6    A   He was instructed to me.
7    Q   Okay. Do you know how many times he
8  went to Mr. Richard's address?
9    A   One, for sure.
10    Q   Okay. The one time when he went to
11  Mr. Richard's address, do you know what date
12  that occurred?
13    A   No.
14    Q   Was it a day after the incident, two
15  weeks?
16    A   Excuse me. I'm sure it was within a
17  few days afterwards.
18    Q   Do you know one way or the other if
19  Mr. Richard lived at that address?
20    A   He just started a day and a half
21  before that and put it on the application. So
22  he was on the boat, otherwise. So, yeah, he
23  should have been there. That should have been
24  his address.
25       MR. RHINE:

**180**

1         Does anybody need a break?
2       THE WITNESS:
3         I could use the restroom real
4  fast.
5       MR. RHINE:
6         Okay. Let's go off the record.
7       THE VIDEOGRAPHER:
8         We're off the error at 1:01.
9         (SHORT RECESS)
10       THE VIDEOGRAPHER:
11         We're back on the record at
12  1:14.
13  BY MR. RHINE:
14    Q   Sir, I'm gonna hand you what's -- I'm
15  gonna hand to your counsel to, hopefully, hand
16  you what's marked as Exhibit A.
17       MR. SALLEY:
18         I saw it. You can go ahead. I
19  know it by its color.
20       THE WITNESS:
21         Yep.
22  BY MR. RHINE:
23    Q   Do you recognize that document?
24    A   Correct.
25    Q   Can you identify that for the ladies

**181**

1   and gentlemen of the jury?
2       A    Yeah, Basic Personal Incident or
3   Illness Report.
4       Q    Okay.  And just so the record's
5   clear, this has a sticker on it that says,
6   "Exhibit 2" because it was previously the
7   subject of something that I filed.  And this
8   was the copy I printed dollar accidentally.
9   But this is actually Exhibit A to the
10  deposition.  Does REC Marine still have the
11  original Incident Report?
12      A    I'm sure we do.
13      Q    Does the original report look like
14  this?
15      A    I'm sure it does.
16      Q    Is it this difficult to read?
17      A    I wouldn't think so.
18      Q    Okay.  Do you -- were you involved,
19  at all, in the production of documents related
20  to discovery request in this lawsuit?
21      A    No.
22      Q    Do you know who was, at REC Marine,
23  involved in that?
24      A    I would have been Brian Harris.
25      Q    So anything related to documents that

**182**

1   either were or were not produced for my
2   questions related to them, is Brian Harris the
3   person I should really be visiting with?
4       A    If you're regarding details of the
5   incident or whatever it may be, probably, he
6   would be more knowledgeable than I would.
7       Q    Okay.  Can you -- can you read this
8   Incident Report?  I mean, like, can you read
9   the description that I --
10      A    No.  I tried to.  No, I can't.
11      Q    Okay.  How difficult would it be for
12  REC Marine to go into its file and pull out
13  the original version that's, hopefully,
14  readable?
15      A    That's easy.  Yeah, that's easy.
16      Q    Can you do that for me and give a
17  clean --
18      A    Sure.
19      Q    -- copy to your attorney?
20      A    I'll -- I'll send it to Fred.  That's
21  not a problem.
22      Q    Okay.
23          MR. SALLEY:
24          Just so you know, the copy I
25      received early on looks exactly like

**183**

1       that one.
2           MR. RHINE:
3           Okay.
4           MR. SALLEY:
5           And I -- I suspect it may have
6       been faxed from the boat.
7           THE WITNESS:
8           Well, this was probably was sent
9       -- it was probably scanned and sent
10      to you.  And if you don't -- if you
11      don't scan or if you don't make a
12      good copy and then, scan it, it'll
13      show up dark like this.  So that's my
14      guess, it was just scanned dark.
15  BY MR. RHINE:
16      Q    If the -- if the original version is
17  on the boat, could you ask them to try and --
18      A    Sure.
19      Q    -- send a cleaner copy --
20      A    Sure.
21      Q    -- just so we can --
22      A    We should have the original, though,
23  at the office.
24          MR. SALLEY:
25          So if you can improve the copy,

**184**

1           it would be nice.
2   BY MR. RHINE:
3       Q    If why you look in the top left-hand
4   corner, it appears to be the logo of Gulf
5   Offshore Logistics.
6       A    It says, "GOL."
7       Q    But is that "GOL" logo, the logo that
8   was used --
9       A    It's the exact same.
10      Q    -- by Gulf Offshore --
11      A    Correct.  Correct.
12      Q    Why is Gulf Offshore Logistics' logo
13  contained on this --
14      A    That's GOL, not Gulf Offshore
15  Logistics.  That's a GOL logo.
16      Q    Okay.  GOL and Gulf Offshore used the
17  same logo?
18      A    Correct.  We just removed the "Gulf
19  Offshore Logistics" that's at the bottom.
20      Q    Is that because this form is
21  contained within GOL, LLC's safety manual,
22  that we talked about earlier?
23      A    Correct.  Correct.
24      Q    Do you know if REC Marine ever
25  notified the Coast Guard regarding the

**185**

1  incident?
2     A  I would imagine we didn't.
3     Q  Do you know why REC Marine did not?
4     A  He didn't need to be medically
5  evacuated.  The guy did not seem injured.
6  There was no need to contact the Coast Guard
7  on something so simple as this.
8     Q  Do you know the specific requirements
9  for when the Coast Guard is required to be
10 contacted regarding an incident?
11    A  No.
12    Q  Who, at REC Marine, would be aware of
13 that?
14    A  I'm sure my safety people do.
15    Q  Okay.  Did you ask your safety people
16 about any sort of requirements like that
17 before this deposition?
18    A  No.
19    Q  Okay.  As part of the incident
20 investigation that occurs following an
21 incident, just in general --
22    A  Uh-huh.  (Affirmative response.)
23    Q  -- are captains or crew members
24 instructed to take photographs of the incident
25 location?

**186**

1     A  No.  Not immediately, no.
2     Q  Why not?
3     A  There's -- there's not a need to,
4  unless there's something major that happened.
5  You know, the captain made a -- made a basic
6  -- basic report, which we ask them to do.  If
7  something needs more attention to it, then,
8  we'll address it from that.
9     Q  Okay.  Do you know if the captain was
10 ever asked to take photographs by Mr. Harris?
11    A  To my knowledge, no.
12    Q  Okay.  Do you know if anyone at REC
13 Marine ever asked Captain McCain to take a
14 photograph of the steps?
15    A  To my knowledge, no.
16    Q  The failure to take photographs,
17 would that violate any of the
18 policies within --
19    A  Not --
20    Q  -- the safety manual?
21    A  Not at all, if they weren't
22 instructed to.
23    Q  Do you know if Dequincy Richard has
24 ever been interviewed my anyone at REC Marine?
25    A  To my knowledge, no.  He disappeared.

**187**

1     Q  Do you know if Drew Aucoin
2  interviewed Mr. Richard?
3     A  I don't know.  They said he
4  disappeared.  So I don't know how he could
5  have.
6     Q  Okay.  I asked you earlier if you
7  were involved in the -- strike that.  I'm not
8  sure if I asked on the record or not.  So let
9  me just redo it.  Were you involved in the
10 production of documents responsive to the
11 request for production that was served in this
12 lawsuit?
13    A  No.
14    Q  Prior to today's deposition, did you
15 prepare yourself to testify regarding those
16 responses?
17    A  I looked at what was e-mailed on this
18 Exhibit A --
19    Q  Okay.
20    A  -- just quickly glanced over it.
21    Q  Does REC Marine have insurance
22 that --
23    A  Sure.
24    Q  -- covers the claims brought in this
25 suit?

**188**

1     A  Sure.
2     Q  Okay.  Do you know if a copy of that
3  insurance has been provided to your attorney?
4     A  I'm not aware, no.
5     Q  Okay.  Who, at REC Marine, would be
6  aware of that?
7     A  I don't know if he's had -- Fred has
8  -- had communication with Brian.  So, to my
9  knowledge, I don't know if they had -- they
10 had -- he has it or not.  I don't know.
11    Q  Okay.  Does REC Marine have a policy
12 of procedure just internally about who, at the
13 company, handles discovery requests and
14 obtaining information related to those?
15    A  Most the time, if it's a REC Marine
16 Logistics vessel, I handle all of that.
17    Q  Okay.  When you say "REC Marine
18 Logistics vessel", you mean one of the vessels
19 that REC Marine Logistics operates?
20    A  Correct.
21    Q  Okay.  Such as the DUSTIN DANOS in
22 this case?
23    A  I -- I'm sorry.  Vessels that REC
24 Marine owns, that REC -- REC Logistics owns.
25    Q  Okay.  REC Marine has a policy where,

**47 (Pages 185 to 188)**

189

1  either written or unofficial, where for
2  vessels that REC Marine, itself, owns, for
3  discovery issues requests, responses related
4  to that, you serve as the point of contact?
5     A   Correct.
6     Q   Okay.  What about for other vessels?
7     A   I would say, it's -- Brian handles
8  most of those.
9     Q   Okay.  Did you visit with Mr. Harris
10 prior to today's deposition regarding the
11 discovery, both answers, objections --
12    A   No.
13    Q   -- responses?
14    A   No.  No, just -- I just went over the
15 safety -- I mean -- I'm sorry, the Incident
16 Report --
17    Q   Okay.
18    A   -- and the medicals from that one
19 visit.
20    Q   Okay.  So if I was trying to
21 determine if the insurance policy existed and
22 if it had been produced to counsel, I would
23 need to talk with Mr. Harris?
24    A   I -- I normally deal with insurance
25 here at Laris.  So --

190

1     Q   Uh-huh.  (Affirmative response.)
2     A   -- I mean, I -- I deal -- Brian --
3  Brian does that, also.  So either one of us is
4  fine.
5     Q   Okay.  And we're actually taking the
6  deposition here today at your insurance
7  agent's office?
8     A   Correct.
9     Q   And that's Laris?
10    A   Correct.
11    Q   And Laris -- my understanding from
12 it, although, I haven't received insurance, is
13 that Laris contacted Houston-based Trident
14 Marine Services in order to shop around for
15 insurance coverage.  And Trident located and
16 obtained the policy issued by British Marine.
17 Do you --
18        MR. SALLEY:
19           Let me --
20 BY MR. RHINE:
21    Q   -- have any information on that?
22        MR. SALLEY:
23           Let me object and instruct him
24        not to answer those questions because
25        it doesn't relate to REC.

191

1  BY MR. RHINE:
2     Q   Well, it specifically relates to your
3  insurance, sir.  So do you have the ability to
4  answer that question?
5     A   No, I -- I don't.
6        MR. SALLEY:
7           I objected and instructed him
8        not to answer because that doesn't
9        relate to REC.
10 BY MR. RHINE:
11    Q   Are you gonna listen to your
12 counsel's instruction and refuse to answer the
13 question?
14        MR. SALLEY:
15           He is.
16        MR. RHINE:
17           I need him to say that, Fred,
18        for my record.
19 BY MR. RHINE:
20    Q   Are you going to refuse to answer?
21        MR. SALLEY:
22           No, you don't.
23        THE WITNESS:
24           I'm gonna listen to Fred.
25        MR. SALLEY:

192

1           He doesn't have to --
2        MR. RHINE:
3           Thank you.
4        MR. SALLEY:
5           -- put together your records.
6        You do.
7  BY MR. RHINE:
8     Q   Okay.  Do you know how much insurance
9  coverage REC Marine has in place --
10    A   No.
11    Q   -- that covers the incident?
12    A   No.
13    Q   Do you know what insurance company
14 issued the policy?
15    A   No.
16    Q   Do you know if any of the contracts
17 or agreements between the various parties that
18 we talked about earlier have been produced to
19 your counsel?
20        MR. SALLEY:
21           Objection.
22        THE WITNESS:
23           I'm not aware.
24 BY MR. RHINE:
25    Q   Okay.  Is that a question that I need

**193**

1  to ask Brian Harris about?
2     A   I don't know if he would have that
3  answer or not.
4     Q   Okay.  Who, at REC Marine, has the
5  most information about what contracts and
6  agreements have been provided to your attorney
7  in response to discovery?
8     A   Brian Harris is probably in more
9  contact with Fred than myself.
10    Q   Okay.  But we already know -- we
11 already know that you didn't provide any
12 documents --
13    A   Correct.
14    Q   -- at all in response, right?
15    A   Correct.
16    Q   So sitting here as the designee by
17 REC Marine, it's REC Marine's belief that the
18 person that has the most information would be
19 Brian Harris, related to what documents were
20 given to your counsel?
21       MR. SALLEY:
22          Objection.
23       THE WITNESS:
24          Based off the incident, I don't
25       know what's been sent.  I don't know.

**194**

1          So I'm guessing Brian -- Brian sent
2       more than I have, if he has this.  I
3       have not sent him that.
4  BY MR. RHINE:
5     Q   Do you know -- I mean, if you weren't
6  involved, do you know what steps were gone
7  through by Mr. Harris, or anyone else at REC
8  Marine, in order to ensure that all responsive
9  documents have been produced in this lawsuit?
10       MR. SALLEY:
11          Objection.
12       THE WITNESS:
13          I don't know.
14 BY MR. RHINE:
15    Q   Okay.  Do you know who would be able
16 to answer that question?
17    A   Well, Brian, he would -- if requested
18 by Fred, Brian would be the one that would --
19 would produce the documents that Fred asked
20 for.
21    Q   Okay.  Have any photographs been
22 taken on the vessel since January 1st, 2018?
23    A   Not to my knowledge.
24    Q   Do you know if any safety meetings
25 were held on the vessel at the time that

**195**

1  Mr. Richard was on it?
2     A   You had asked that earlier.  Not to
3  my knowledge.
4     Q   When the port captain becomes aware
5  that repairs need to be made -- be made on the
6  vessel, I think earlier you testified that
7  either he or the crew will attempt, then, if
8  there is something basic.  Is that accurate?
9     A   Correct.
10    Q   But sometimes, obviously, you need to
11 call in other people to assist?
12    A   Sure.
13    Q   Okay.  Whose the welding company that
14 REC Marine utilizes to repair vessels?
15    A   We have vessels all over.  It -- the
16 Gulf of Mexico.  It varies.  And on location,
17 if they got somebody available.  So that
18 varies.  There might be 15 welding companies
19 that we use.
20    Q   What port does the DUSTIN DANOS go in
21 and out of?
22    A   Fourchon.
23    Q   Is there a specific welding company
24 that's utilized by Casey Curole in Fourchon?
25    A   No, not -- it just varies.

**196**

1     Q   Does he use different ones, or do you
2  not know?
3     A   I don't know who he uses.  But I'm
4  sure it's more than one, just based off of
5  availability.  You can't put all your eggs in
6  one basket when you're dealing with that kind
7  of stuff.
8     Q   Okay.  When Casey Curole calls out,
9  hires, whatever language you want to use, a
10 welder to perform repair work on the vessel,
11 what party gets billed for that work?
12       MR. SALLEY:
13          Objection.  Vague.
14       THE WITNESS:
15          The -- the company that the
16       vessel's owned by.
17 BY MR. RHINE:
18    Q   Okay.  Your port captain is an
19 employee of REC Marine?
20    A   He gets paid by REC Marine Logistics,
21 yes.
22    Q   But, for instance, in this instance,
23 if repair work was done on the DUSTIN DANOS
24 that required outside contractors, parts --
25    A   Uh-huh.  (Affirmative response.)

**197**

```
 1      Q   -- whatever it is, the contractor
 2  would be instructed by Mr. Curole to bill
 3  Offshore Transport Services?
 4      A   Correct.
 5      Q   Okay.  As the representative of REC
 6  Marine -- you may not know, and that's fine.
 7  But do you know whether or not there are any
 8  invoices, receipts, bills that have been sent
 9  by outside contractors to Offshore Transport
10  Services for the work that was performed on
11  the vessel?
12          MR. SALLEY:
13              Objection.  That's awfully
14  vague.
15          THE WITNESS:
16              Not aware.
17          MR. SALLEY:
18              Can you specify?
19  BY MR. RHINE:
20      Q   Are you aware of any, sir?
21      A   Any -- any time repairs are done,
22  that's where the invoices should be sent to.
23      Q   Okay.  But do you know one way or the
24  other -- strike that.  Do you know one way or
25  the other if a safety manual, the -- strike
```

**198**

```
 1  that.  Do you know if a copy of the GOL, LLC
 2  safety manual has been provided to your
 3  attorney?
 4      A   Not aware.
 5      Q   Okay.  Is that a question that I, I
 6  guess, need to ask Brian Harris about?
 7      A   Correct.
 8      Q   But otherwise, earlier, you testified
 9  REC Marine does have a copy of that manual
10  available at its office?
11      A   Correct.
12      Q   Okay.  Is it a long manual?  I think
13  it's, like, 500 pages?
14      A   Yeah, it's long.
15      Q   Separate from the safety manual, what
16  other manuals exist?
17      A   The operations manual.
18      Q   Who is the operations manual issued
19  by?
20      A   Safety does all that.
21      Q   Safety within REC Marine?
22      A   Correct.
23      Q   Okay.  So there is a, somewhere, a
24  REC Marine issued operations manual that was
25  in effect at the time of this incident?
```

**199**

```
 1      A   No.  It would have been a GOL --
 2      Q   Okay.
 3      A   -- LLC manual.  Safety and operations
 4  manual.
 5      Q   Okay.  It would have been a
 6  operations manual that applied for all REC
 7  employees in operations.  But it was issued
 8  from this third party company, the same one
 9  that issued the safety manual?
10      A   Yeah, our safety department.
11      Q   Okay.  You consider GOL, LLC your
12  safety department?  Or is your safety
13  department part of REC Marine?
14      A   They're under the same roof.
15      Q   Okay.
16      A   Brian Harris gets paid by REC Marine
17  Logistics.  I want to say, the other -- our --
18  our safety manager is employed by GOL, LLC, I
19  believe.
20      Q   Does -- did Brian Harris contribute
21  to the safety manual that was issued by GOL,
22  LLC?
23      A   That was done before I got there.  I
24  don't know.
25      Q   Okay.  Do you know if Brian Harris
```

**200**

```
 1  wrote part of the operations manual?
 2      A   I wouldn't -- I don't know.  It was
 3  all done before I got there.  So I wouldn't
 4  think so.
 5      Q   Okay.  All right.  Separate from an
 6  operations manual, are there any other manuals
 7  that you can identify for me?
 8      A   No.
 9      Q   Any sort of --
10          MR. SALLEY:
11              Objection.
12  BY MR. RHINE:
13      Q   -- employment handbook?
14      A   To my knowledge, no.
15      Q   Does REC Marine keep an employee or
16  personnel file for everyone in that --
17      A   Yes.  Sure.
18      Q   So they keep a personnel file for the
19  various captains who work on ships?
20      A   Sure.
21      Q   So somewhere at REC Marine, there
22  exists a copy of Captain McCain's personnel
23  file?
24      A   Uh-huh.  (Affirmative response.)
25      Q   Is that a "yes"?
```

**201**

1    A   Yes.  I'm sorry.
2    Q   Just keeping the record clear.
3    A   I understand.  No.  That was my
4 fault.
5    Q   What information is typically
6 contained within a personnel file?
7    A   Application, all of the agreements
8 that they make, as far as, you know, drug and
9 alcohol, firearms, the other little agreements
10 that they have, they agree to when they're
11 hired on.
12    Q   Would it show various trainings that
13 the captain has received?
14    A   Correct.  Their licenses, that would
15 be correct, driver's license, boat license,
16 all that stuff.
17    Q   Would the file show various
18 reprimands that a captain may have received?
19    A   If they have any, yes.
20    Q   Okay.  It might show commendations
21 for excellent work?
22    A   Yes.
23    Q   Anything else you can think of that's
24 typically contained within the personnel file?
25    A   No.

**202**

1    Q   Are you aware of any law that forbids
2 the personnel file from being produced?
3    A   No.
4       MR. SALLEY:
5          He doesn't have to be.  That's
6       why he has counsel.
7       MR. RHINE:
8          No need to speak to an
9       objection, Fred.
10 BY MR. RHINE:
11    Q   Do you know if the DUSTIN DANOS has
12 been surveyed since the accident?
13    A   It would have been by Coast Guard for
14 regular annual inspection.
15    Q   Has it undergone any sort of third
16 party surveys --
17    A   No.
18    Q   -- to determine the value of the
19 vessel.
20    A   No.
21    Q   Does REC Marine have any excess
22 insurance?
23    A   I'm sure we do.
24    Q   Do you have any information about it,
25 who it's placed with, firm, amounts?

**203**

1    A   I don't know.  It would be on the
2 COI, the Certificate of Insurance.  I don't
3 know offhand.
4    Q   If I were to request a Certificate of
5 Insurance for any excess policies, you'd know
6 what I was looking for related to that?
7    A   Yeah.  I would -- I would call over
8 here, and they would give me everything I
9 need.
10    Q   Do you know who Drew Aucoin is?
11    A   Sure.
12    Q   Who's Drew Aucoin?
13    A   He handles claims for us.
14    Q   Who's Drew employed by, do you know?
15    A   Aucoin Claim Services.
16    Q   Okay.  Did REC Marine receive any
17 documents from Mr. Aucoin related to
18 Mr. Richard?
19    A   Not to my knowledge, no.
20    Q   Okay.  Was Mr. Aucoin given any
21 documents by REC Marine related to
22 Mr. Richard?
23    A   He might have been given a accident
24 report and a medical from when he -- the guy
25 went to the doctor the night of the accident

**204**

1 when he got in.
2    Q   Okay.  Is REC Marine aware of any
3 surveillance video or photographs of my
4 client?
5    A   I'm not, no.
6    Q   Are you aware of any other incidents
7 onboard the DUSTIN DANOS since Mr. Richard's?
8    A   No.
9    Q   Who, at REC Marine, would have that
10 information?
11    A   Brian keeps all that.
12    Q   So any information related to other
13 individuals who've been hurt onboard the
14 DUSTIN DANOS, I should visit with Brian,
15 related to it?
16    A   Yeah.  I don't know why you'd need it
17 for this.  Yeah, he would have that
18 information.
19    Q   Okay.  Is there a policy at REC
20 Marine related to how long Incident Reports
21 are kept?
22    A   I mean, that's kept pretty much going
23 back always.  I don't think we ever get rid of
24 that.
25    Q   Okay.  So that the -- whether

**205**

1  official or unofficial, the policy of REC
2  Marine is to keep Incident Reports --
3     A   Correct.
4     Q   -- around for -- where do y'all keep
5  them, just at your home office?
6     A   Yeah.  We got a file in the file
7  room, file cabinets.
8     Q   Okay.  Does the company ever
9  conduct -- conduct safety or hazard audits?
10     A   Sure.  Our department does, sure.
11     Q   How often do those occur onboard the
12  vessels?
13     A   We do vessel -- the crews do turn in
14  safety audits.  You know, if we have an --
15  have an incident, we may send out an alert if
16  something is deemed enough credible to send
17  out to other vessels, things like that.
18     Q   Okay.  Was any safety alerts sent out
19  as a result of this incident?
20     A   No.  The guy fell on his own down the
21  stairs.  So no.
22     Q   You don't think there's anything that
23  can be learned from this incident that you can
24  impart to the other crew members of REC Marine
25  out there in the fleet?

**206**

1     A   No.  I mean, as -- we -- we've sent
2  stuff out before for tripping hazards and so
3  forth, I'm sure, in the past.  But the guy's
4  casually going down the stairs.  I think they
5  have three points of contact, holding the
6  handrail, et cetera.  So that would be --
7     Q   All right.  So following this
8  incident, though, you didn't reissue or send
9  out anything related to three points of
10  contact?
11     A   To my knowledge, no.
12     Q   Looking where you were stepping,
13  anything like that?
14     A   No.
15     Q   Okay.  If I wanted to get a copy of
16  all the housing audits you've previously sent
17  out related to those topics, what do I need to
18  ask for?
19     A   Brian and them would have that on
20  file.
21     Q   I mean, what are those documents
22  called, so I know what to --
23     A   Oh, a safety alert.
24     Q   Okay.  Sorry for the dead time.  I'm
25  trying not to ask you stuff that, based on

**207**

1  your earlier testimony, I don't think you may
2  be prepared to talk about.  All right.  Let me
3  ask you this.  Do you remember signing an
4  affidavit --
5     A   Yes.
6     Q   -- in this lawsuit?
7     A   Yes.
8     Q   Okay.  How many affidavits were you
9  asked to sign?
10     A   Just one, that I remember.
11     Q   Okay.  At only one point -- and I'm
12  referring to Blaine Russell, right?
13     A   Yes.
14     Q   I know that there was an affidavit
15  that you executed that was attached to a
16  pleading in this case.  You were only -- how
17  many times were you given that affidavit?
18     A   Oh, I don't know.
19     Q   Did you sign one multiple times?
20     A   I know I signed one that said that I
21  worked fork REC Marine Logistics.
22     MR. SALLEY:
23        Do you want to show it to him?
24     THE WITNESS:
25        It was a one-page, I think, a

**208**

1        little one-page deal?
2  BY MR. RHINE:
3     Q   What number am I up to, sir?  What
4  was the Incident Report?
5     A   Eight.
6     Q   All right.  I hand you Exhibit 9,
7  which is --
8     MR. RHINE:
9        Do you need to see it, Fred?
10     MR. SALLEY:
11        Unh-unh.  (Negative response.)
12  BY MR. RHINE:
13     Q   -- a document entitled, "Memorandum
14  in Response/Opposition to Plaintiff's
15  Discovery Motion.  It is record document 31
16  within the Court filings in this case.  And
17  attached to this was an affidavit of Blaine
18  Russell that begins on page four.  Do you see
19  that?
20     A   Correct.
21     Q   All right.  And to be frank with you,
22  this one is not signed my you.
23     A   Right.
24     Q   Okay.  And I'm just trying to
25  determine how many times an affidavit that

**209**

1  contained this information was given to you to
2  execute.
3       MR. SALLEY:
4           He didn't sign that one?
5       THE WITNESS:
6           I mean, I don't know.  I got
7       the -- the one that I got, I got and
8       signed it.
9  BY MR. RHINE:
10    Q   Okay.  Do you know when you signed
11  that affidavit?  I mean, do you have any
12  independent memory?
13    A   No, I do not.
14      MR. SALLEY:
15          He didn't sign this one, I
16      thought you said.
17      THE WITNESS:
18          No.  I got it and signed it and
19      had it -- went to a notary and signed
20      it from a notary.  When I received
21      it, I don't know when or what day.  I
22      don't know.
23      MR. SALLEY:
24          Hold on just a second.  You --
25      you -- you're not the signer of that

**210**

1  document?
2  THE WITNESS:
3       Not this particular one, no.
4  But I did sign this at one other
5  time.  I did sign this --
6  MR. RHINE:
7       Fred.  I object to counsel
8  interrupting and asking his own
9  questions during my deposition of his
10  witness to get another attempt --
11  MR. SALLEY:
12      Counsel, can it or we'll get up
13  and walk.
14  MR. RHINE:
15      I don't know what you mean by
16  "can it", Fred.  I'm just noting my
17  objection for the record.
18  MR. SALLEY:
19      Hush.  I'm entitled to ask about
20  the document that you've got before
21  my witness.
22  MR. RHINE:
23      Which I offered to hand you, and
24  you turned down it.  You're welcome
25  to look at it now.

**211**

1       MR. SALLEY:
2           What you handed me was not that.
3       MR. RHINE:
4           Fred, I don't need you to tell
5       me to "hush".  And I'm not going to
6       "hush".
7       MR. SALLEY:
8           Here, let's go.
9       MR. RHINE:
10          You're stopping the deposition?
11      MR. SALLEY:
12          If you don't quit the nonsense,
13      we will walk out.
14      MR. RHINE:
15          Fred, I'm just trying to ask
16      questions of the witness.
17      MR. SALLEY:
18          No, you're not.  You're trying
19      to harass and annoy, and I object to
20      it.
21      MR. RHINE:
22          Okay.  Can I continue, Fred, or
23      are you leaving?
24      MR. SALLEY:
25          For clarification, do you not

**212**

1  have an affidavit signed by Blaine
2  Russel?
3  MR. RHINE:
4       For clarification, initially,
5  you, Fred Salley, responded to the
6  document that's identified "Exhibit
7  9" in response to plaintiff's motion
8  to compel.  As part of Exhibit 9, you
9  included two affidavits which were
10  not executed.  You later, in a motion
11  for leave that you filed with the
12  Court, represented within it, quote,
13  "Two witness affidavits intended for
14  filing his exhibits in support of
15  defendant's opposition to plaintiff's
16  discovery motion --
17  MR. SALLEY:
18      All right.  So you --
19  MR. RHINE:
20      -- have gone missing," end
21  quote.  I'm just specifically asking
22  him --
23  MR. SALLEY:
24      So you're asking --
25  MR. RHINE:

**213**

```
 1        -- details related to that.
 2    MR. SALLEY:
 3        You're asking about the
 4    replacements that were provided to
 5    the Court?  I'm just trying to find
 6    out what your angle is here.
 7    MR. RHINE:
 8        If you'll let me ask questions,
 9    you'll find out, Fred.
10    MR. SALLEY:
11        That's not the way we do it.
12    MR. RHINE:
13        That is how we do it.  It's
14    called a deposition.
15    MR. SALLEY:
16        We find out where you're going,
17    and we object, if needed.  We don't
18    let you commit crimes and then,
19    object.
20    MR. RHINE:
21        Please identify for the Court
22    what crime I have committed during
23    this deposition.
24    MR. SALLEY:
25        I'll -- I'll do that later.
```

**214**

```
 1    MR. RHINE:
 2        I will take your response as an
 3    inability to identify said crime, and
 4    I --
 5    MR. REMONDET:
 6        No.  You don't need to take my
 7    response as an inability to do
 8    anything.  I'm plenty capable, and
 9    you know that.
10    MR. RHINE:
11        Can I go on, Fred?
12    MR. SALLEY:
13        But what is the point is that --
14    is that --
15    MR. RHINE:
16        Can I go on, Fred?
17    MR. SALLEY:
18        -- initially, the blank document
19    was filed and -- and a signed
20    document was subsequently provided.
21    Is that unusual?
22    MR. RHINE:
23        That's what I'm trying to
24    question about, Fred.
25    MR. SALLEY:
```

**215**

```
 1        Well, you need to question me,
 2    if you could.  And that's not gonna
 3    work.
 4    MR. RHINE:
 5        Okay.
 6    MR. SALLEY:
 7        You can ask him what he did, and
 8    that's it.
 9    MR. RHINE:
10        You're not gonna direct what I
11    do and don't ask.  It's my
12    deposition, Fred.
13    MR. SALLEY:
14        Well, I can certainly direct the
15    witness not to answer.
16    MR. RHINE:
17        Can I get back to questioning
18    the witness?  Will that be okay with
19    you, Fred?
20    MR. SALLEY:
21        It depends on what you ask.  But
22    you seem to be heading off in a very
23    dangerous direction.  But you can
24    try.
25
```

**216**

```
 1    BY MR. RHINE:
 2     Q   Sir, you testified earlier that you
 3    signed an -- signed an affidavit at one point
 4    and took it to a notary?
 5     A   I took it to the notary and signed it
 6    in front of the notary, yes.
 7     Q   Okay.  Where is the notary located?
 8     A   Right up the road in Raceland,
 9    Louisiana.
10     Q   Okay.
11     A   Right there.  (Indicating.)  I don't
12    recall her name.  I don't know the name of it.
13     Q   That's fine.  I -- I can look that up
14    if I need.  I'm just trying to figure out what
15    you remember.
16     A   Okay.
17     Q   You received, I guess, the affidavit.
18    And you had to get in your car and go sign it
19    in front of the notary?
20     A   Correct.
21     Q   How often does that happen for you?
22     A   Once every six months.
23     Q   Okay.  Do you remember this one time
24    where you had to sign and execute this
25    affidavit in front of the notary, correct?
```

## 217

1  A   I remember the -- I remember this.
2  Q   Do you remember another time where
3  you went and had to execute this affidavit in
4  front of a notary?
5  A   I just did it one treatment.
6  Q   Okay.  That's all I was trying to get
7  at.
8  A   Yeah.  Okay.
9  Q   Who is Monique, Monique Dufrene?
10  A   She handles the, like I said, the, I
11  guess, the comptroller, I guess, for the owner
12  of the DUSTIN DANOS, which is -- who'd you
13  say?  I don't remember who it is.  Offshore
14  Marine Transport, is that the owner?
15      MR. RHINE:
16          I can't read your shorthand.
17      What did he answer?  What was his
18      answer?  Can you read it back to me?
19  (WHEREUPON, THE COURT REPORTER READS BACK THE
20  PREVIOUS ANSWER.)
21  BY MR. RHINE:
22  Q   Do you know who she works for?
23  A   Offshore Marine Transport.  Is that
24  what you was talking about, the company?
25  Q   Yeah.  I'm just trying to get

## 218

1  information about it.
2  A   Yeah, she -- there's a few companies,
3  I believe, that she works -- does work for.
4  Q   Does she do any work for REC Marine?
5  A   She handles payroll, and that's it.
6  Q   Is she employed by REC Marine?
7  A   No.  She might get a few dollars for
8  doing payroll, but not employed by REC Marine
9  --
10  Q   Okay.
11  A   -- if that makes sense.  That's all
12  for me?
13  Q   I skipped a good portion of it
14  because you said you didn't participate in the
15  production of any documents.
16  A   Right.
17  Q   Ten?
18  A   Eight, six.
19  Q   Yeah.  I think it's -- I think it's
20  ten.
21  A   Yeah.  I might have skipped -- ten.
22  Now, can I kind of stack these others up?
23  Q   Yes.  Please do.
24  A   Okay.
25      MR. RHINE:

## 219

1      Fred, do you need to see these?
2      MR. SALLEY:
3          I have no idea what it is.
4      THE WITNESS:
5          They need to cut that AC off.
6      It's chilly.
7  BY MR. RHINE:
8  Q   If it bothers you, we can try and
9  find somewhere for you to --
10  A   No.  I'm good.
11  Q   Can you identify this document for
12  the ladies and gentlemen of the jury?
13  A   Sure.  It's an invoice from GOL.
14  Q   All right.  And what do the pages
15  following that represent?
16  A   Daily logs for the vessel.
17      MR. SALLEY:
18          Do you recognize the lead sheet?
19      THE WITNESS:
20          I know what an invoice looks
21      like.  I don't see -- it's not
22      something I see or deal with --
23      MR. SALLEY:
24          You're not familiar with this
25      one?

## 220

1      MR. RHINE:
2          Fred, can you stop?
3      MR. SALLEY:
4          Did you --
5      MR. RHINE:
6          Don't put your hand up at me.
7      Can you stop interrupting my
8      deposition?
9      MR. REMONDET:
10          Did you produce -- did you
11      produce this document in this
12      deposition?
13      THE WITNESS:
14          No.
15      MR. RHINE:
16          Sir, can you stop interrupting
17      my deposition so I can question the
18      witness.
19      MR. SALLEY:
20          When I have to object, I object.
21      MR. RHINE:
22          That wasn't your objection,
23      Fred.  You were inserting questions
24      into the deposition.
25      MR. SALLEY:

**221**

```
 1          I'm trying to find out what it
 2   is.  I'm gonna object to it because
 3   it's not something that he was asked
 4   to produce in a 30(b)(6) deposition.
 5        MR. RHINE:
 6          Okay.  Just for the record,
 7   topic 24, REC Marine's answers and
 8   responses to Richard's discovery to
 9   you.  The documents within Exhibit 10
10   were provided by counsel --
11        MR. SALLEY:
12          But it doesn't relate to the --
13        MR. RHINE:
14          -- in response to discovery.
15        MR. SALLEY:
16          But it doesn't relate to the
17   items requested for 30(b)(6).
18        MR. RHINE:
19          Fred, I just read the topic.
20        MR. SALLEY:
21          It doesn't relate.
22        MR. RHINE:
23          You can explain that to the
24   Court, if you want.
25        MR. SALLEY:
```

**222**

```
 1          And it's -- it's vague.  It's
 2   vague.  And I would have objected to
 3   it, and you know that.
 4        MR. RHINE:
 5          You can explain it to the Court.
 6   Move on.
 7        MR. SALLEY:
 8          Well, we'll be glad to.
 9   BY MR. RHINE:
10   Q   Sir, do you know what the first page
11   of this document is?
12   A   An invoice issued by GOL.
13   Q   Okay.  Have you seen these before?
14   A   Not as much, the GOL ones, the REC
15   Marine's.  But I understand what it is.
16   Q   Okay.  What is it?
17   A   It's an invoice to the customer from
18   GOL, LLC.
19   Q   Okay.  All right.
20        MR. SALLEY:
21          Is that a document --
22        MR. RHINE:
23          Fred, please stop.
24        MR. SALLEY:
25          Is that a document produced at
```

**223**

```
 1   any time by REC Marine?
 2        THE WITNESS:
 3          No.
 4        MR. SALLEY:
 5          I object.
 6        MR. RHINE:
 7          Fred, you produced this
 8   document.  This is beyond ridiculous.
 9        MR. SALLEY:
10          I produced this document for a
11   different party, counsel.  And you
12   know that.
13        MR. RHINE:
14          I don't know that because none
15   of your discovery is clear because
16   you don't fully respond.
17          Can I question the witness as to
18   what he knows or doesn't know about
19   this document.
20        MR. SALLEY:
21          Not about that document.
22        MR. RHINE:
23          You're not gonna let the
24   witness --
25        MR. SALLEY:
```

**224**

```
 1          It's a document by some other
 2   party that he has nothing to do with,
 3   not part of a 30(b)(6).
 4        MR. RHINE:
 5          Can you please let me finish my
 6   sentence before you interrupt me?
 7        MR. SALLEY:
 8          Probably not.
 9        MR. RHINE:
10          It's disrespectful, and it's
11   unprofessional.
12        MR. SALLEY:
13          Well, you may think so.  And I
14   think most of what you've done today
15   has been really disrespectful.
16        MR. RHINE:
17          Okay.  May I --
18        MR. SALLEY:
19          And speaking --
20        MR. RHINE:
21          -- continue questioning the
22   witness?
23        MR. SALLEY:
24          No.  Not on that -- not on that
25   subject.
```

225

1  BY MR. RHINE:
2     Q   Sir, who's identified at the top left
3  of that document?
4         MR. SALLEY:
5            Don't answer it.
6         MR. RHINE:
7            Fred --
8         THE WITNESS:
9            I'll go with counsel and -- I'm
10  gonna have to listen to my counsel
11  and not answer.
12         MR. RHINE:
13            Fred, you're gonna instruct the
14  witness not to discuss the invoice
15  related to the work performed by the
16  DUSTIN DANOS on the date of the
17  incident?
18         MR. SALLEY:
19            Not -- not based on the header.
20         MR. RHINE:
21            All right.  We'll take it up
22  with the Court.
23         MR. SALLEY:
24            You already -- you already have
25  that.  Counsel, that's been provided.

226

1            And it's been on the table for three
2  hours.
3         MR. RHINE:
4            Yeah.  And you're not letting me
5  question the witness about it?
6         MR. SALLEY:
7            No.  You can question him about
8  that, about the one that's on the
9  table and has been for over three
10  hours.
11         MR. RHINE:
12            Right.  The exact same document
13  that's in front of him.
14         MR. SALLEY:
15            But not -- but not -- but not a
16  document from some other company to a
17  totally third party company.
18         MR. RHINE:
19            Just so the record is clear for
20  the Court when it gets taken up with
21  the magistrate or the district judge,
22  the exact same document has been
23  provided today the witness that's
24  been setting in front of him.  It's
25  just a clean copy that was provided

227

1  by counsel in this case.  We will
2  address it with the Court at a later
3  date.
4         MR. SALLEY:
5            This is a --
6         MR. RHINE:
7            Stop interrupting me.
8         MR. SALLEY:
9            This is -- I'll interrupt you
10  any time that I need to.  I mean, who
11  do you think you are to tell me that.
12         MR. RHINE:
13            Mr. Russel, I'm sorry you have
14  to sit through this.
15         THE WITNESS:
16            Okay.
17         MR. RHINE:
18            I am.
19         MR. SALLEY:
20            Want to leave?  You're ready to
21  leave?
22         THE WITNESS:
23            You're my attorney.  You direct
24  me what to do.
25         MR. SALLEY:

228

1            I think he listens to me, since
2  I represent his employer.
3         MR. RHINE:
4            Are you finished, Fred?
5         MR. SALLEY:
6            I may or may not be.  I've told
7  you that.
8         MR. RHINE:
9            Me I continue?
10         MR. SALLEY:
11            When it becomes objectionable --
12  when it becomes objectionable, I'm
13  gonna object.
14         MR. RHINE:
15            May I continue questioning the
16  witness, sir?
17         MR. SALLEY:
18            Not about that document.
19  BY MR. RHINE:
20     Q   Okay.  Can you go to the, I think,
21  it's second to last page of that exhibit, sir.
22  Can you didn't identify that --
23         MR. SALLEY:
24            Is that not --
25         MR. RHINE:

**229**

```
 1          Fred, stop interrupting.
 2     MR. SALLEY:
 3          The same document is hearsay.
 4     MR. RHINE:
 5          Fred, stop interrupting.  Can
 6     you please stop interrupting and just
 7     let me get a question out?
 8     MR. SALLEY:
 9          I might.
10     MR. RHINE:
11          Do you understand what
12     professional standards you're held to
13     as an attorney and under the Federal
14     Rules?
15     MR. SALLEY:
16          You don't deserve that under the
17     circumstances here.
18 BY MR. RHINE:
19     Q   Okay.  Can you turn to the second to
20 last page, sir?
21     A   What is the date?  What date's at the
22 top on yours?
23     Q   It's hard to see, but I think it's
24 11/06/18 on the top right.
25     A   Okay.
```

**230**

```
 1     Q   Can you identify that document for
 2 the ladies and gentlemen of the jury, if your
 3 counsel will let you?
 4     A   I mean, it's a log done by the DUSTIN
 5 DANOS.
 6     Q   Okay.  What does this log contain?
 7     A   Daily movement of the vessel.
 8     Q   Okay.  What other information is
 9 included within the daily logs?
10     A   Times, amount of fuel, liquids
11 onboard, locations.
12     Q   Okay.
13     A   And the work they doing, the crew
14 onboard.
15     Q   Okay.  What company's information is
16 provided up there in the header for this
17 document?
18     A   Gulf Offshore Logistics.
19     Q   Okay.  And it is P.O. Box 433, I --
20 can't read that, sir.  Can you tell me, but
21 Louisiana, sir?
22     A   I believe that's -- yeah.  I believe
23 that's gonna be Matthews.  That's -- that's a
24 old log from before they moved to the opposite
25 side of the highway --
```

**231**

```
 1     Q   Okay.
 2     A   -- before the name change.
 3     Q   Okay.  Who does this document
 4 identify as the owner of the vessel, if you
 5 look there, the next line down?
 6     A   Gulf Offshore Logistics.  That's who
 7 owned the company -- owned the vessel before
 8 the company was done and sold to -- to REC
 9 Chaddock.
10     Q   All right.  Does REC Marine have a
11 clearer copy of this boat log?
12     A   They should have the original on
13 file.
14     Q   Is that on the ship or --
15     A   I would think it would be in
16 Lafayette.  That would be back at our office
17 here.  This is e-mailed to us, somebody in
18 Lafayette who works for GOL, LLC.  And she
19 invoices this vessel.
20     Q   Okay.  Would it be possible to get a
21 cleaner copy that is easier to read?
22     A   Sure, the original.
23     MR. SALLEY:
24          Can I see that?
25     THE WITNESS:
```

**232**

```
 1          Yeah.  We would have the
 2          original, I'm sure.  If you can send
 3          Fred an e-mail when we're done just
 4          everything that you're asking for.
 5 BY MR. RHINE:
 6     Q   Can I ask you to translate some stuff
 7 for me?
 8     A   The best I can answer.
 9     Q   Because I don't know what the
10 abbreviations mean.
11     A   My eyes are bad, as hell.  So I'll
12 look the best I can.
13     Q   All right.
14     A   Go ahead.
15     Q   All right.  On the left, there's, you
16 know, some time columns --
17     A   Uh-huh.  (Affirmative response.)
18     Q   -- which indicates at what time the
19 vessel was doing these certain tasks; is that
20 correct?
21     A   Correct.
22     Q   Then, if we go to the right, there's
23 two columns which say "from" and "to" which, I
24 guess, indicate when the vessel transits,
25 where it was, where it's headed?
```

**233**

1    A    Uh-huh.  (Affirmative response.)
2  Right.
3    Q    And that corresponds with the times.
4  So we know how long different tasks or
5  movements took; is that correct?
6    A    Yes.
7    Q    Okay.  The next one is -- I think it
8  says "commodity hauled" or "purpose of trip".
9  Is that accurate?
10   A    Correct.
11   Q    And this is, I guess, a very brief
12  description of what was being done?
13   A    Correct.
14   Q    Okay.  It looks like there's some
15  initials used.  There's, maybe, "S" dash
16  something, "T" dash something, "W" dash "T"
17  dash.  What do these initials stand for?
18   A    Every every -- every every vessel,
19  the captain does something different.  But
20  that could be "transiting".  It could be
21  "standing by".  You know, it might have "WOW",
22  "waiting on weather" or something.  So the "S"
23  could be "standby".
24   Q    What are -- if you look at the --
25   A    "T" could be "transport", you know,

**234**

1  "transfer".
2    Q    Okay.  And that's the one I'm looking
3  at is there's one about five lines down that
4  says "T" dash -- I can't --
5    A    "ER", "E" slash "R", "en route to
6  Fourchon"?
7    Q    "E" slash "R"?
8    A    Either "ER" or "E" slash "R".  I
9  can't tell.
10   Q    And that entry is representing that
11  the vessel is heading back from the Ship Shoal
12  field to the Port of Fourchon?
13   A    Correct.
14   Q    Okay.  How long was the vessel
15  supposed to remain offshore on this hitch?
16   A    No idea.
17   Q    Okay.  It's not a ship, though, that
18  would go out offshore and come back to port
19  every night.  Is that correct?
20   A    The customer -- the customer dictates
21  when it comes in and when it goes out,
22  depending on equipment, depending on what they
23  got going on.  If they have something that
24  goes bad out in the field and need equipment
25  to be picked up, they'll send the boat in at

**235**

1  their discretion.  We have no -- you know, we
2  have no -- I don't want to say "authority".  I
3  don't know what the right word, but it's their
4  discretion when the boat goes in and out.
5    Q    Who is it with at REC Marine who
6  would have knowledge as to what this
7  particular customer wanted related to the
8  vessel movements?
9    A    There's nobody that's gonna know that
10  a year -- you know, two days ago.  I mean, and
11  this is from 11/6/18.  Nobody's gonna have --
12  know what the vessel was doing and what's
13  described on here, unless the captain on the
14  vessel could recall it.  But our office deals
15  with a hundred boats, sometimes.
16   Q    Okay.  What was the number on the
17  last exhibit, sir?
18   A    Ten.
19   Q    Do you recognize this document, sir?
20   A    Not at all.
21   Q    This document was produced to us
22  during discovery.  And the, at least, the
23  title of it was that this was the employee
24  file for Mr. Richard.
25   A    Okay.

**236**

1    Q    Have you ever looked through similar
2  employee files?
3    A    Oh, I have.  Yes, sir.  I'm sorry.
4  Yes, sir.
5    Q    Does this contain the type of
6  documents that would typically be found within
7  a personnel file at the company?
8    A    Yeah.  That's what I described to you
9  earlier.
10   Q    Okay.  There's not pages, really,
11  designation on here.  Can I get that exhibit
12  back from you so I can turn to specific pages
13  I want to ask you about.  That might be
14  quicker?
15   A    Sure.
16   Q    There you go, sir.  I handed back to
17  you Exhibit 11.  I'm asking you about a page
18  10 to 12 pages into it.
19   A    Uh-huh.  (Affirmative response.)
20   Q    At the top, it's titled,
21  "Acknowledgment Employee Safety Manual."  Is
22  that correct?
23   A    Yep.  Yep.
24   Q    All right.  This appears to be a page
25  that was signed by Mr. Richard; is that

237

1  correct?
2     A   Correct.
3     Q   I have a question because it starts
4  out, "By my signature below, I," and he's
5  written in "Dequincy Richard" --
6     A   Uh-huh.  (Affirmative response.)
7     Q   -- "do hereby acknowledge that I have
8  received a copy of the Gulf Offshore
9  Logistics, LLC Employee Safety Manual which
10  contains the policies and procedures regarding
11  health, safety, and environmental issues."
12  Did I read that correctly?
13     A   Correct.
14     Q   Okay.  To clarify this document, did
15  Mr. Richard receive a copy of Gulf Offshore
16  Logistics, LLC Safety Manual?
17     A   That would be a question for Alex.
18     Q   Okay.  Was there a Gulf Offshore
19  Logistics, LLC Employee Safety Manual that was
20  in existence on October 26th, 2018?
21     A   There -- there would be GOL, LLC.
22     Q   Okay.  Earlier, when I asked you if a
23  particular -- if a actual copy of the safety
24  manual was provided to Mr. Richard --
25     A   Uh-huh.  (Affirmative response.)

238

1     Q   -- you testified that there's one
2  available for him onboard the vessel.
3     A   Correct.
4     Q   Do you know, one way or the other, if
5  he ever actually got a full copy of this 500
6  plus page manual?
7     A   He signed for it.  He must have.
8     Q   I no he signed for it.  But you, as
9  representing REC Marine here today --
10     A   No.  I can't answers that.
11        MR. SALLEY:
12           Let me object because he's
13           answered, and he can't do anything
14           other than answer it based on the
15           material before him.
16        MR. RHINE:
17           Okay.  Are you done?
18        MR. SALLEY:
19           No.
20        MR. RHINE:
21           All right.  What else would you
22           like to state?
23        MR. SALLEY:
24           But for now.
25        MR. RHINE:

239

1           Okay.  May I continue with my
2        questioning of this witness?
3        MR. SALLEY:
4           Yes.
5        MR. RHINE:
6           Okay.  Thank you.
7  BY MR. RHINE:
8     Q   All right.  Does REC Marine have any
9  information that confirms that Mr. Richard was
10  actually given a copy of this safety manual?
11     A   His signature.
12     Q   Okay.  Other than his signature, is
13  it standard?
14     A   Yeah.  I mean, I said it looks to be.
15     Q   All right.  Is it standard for REC
16  Marine to give out a copy the GOL, LLC safety
17  manual to all of its employees?
18     A   I -- I'm not involved in the
19  day-to-day orientation.  I'm not aware of --
20  if it -- if it is or not.  I don't know.  I
21  can't answer that.
22     Q   Okay.
23     A   I mean, he signed for it.  So I'm --
24  I'm assuming, based off his signature, unless
25  he's -- unless he's not telling the truth

240

1  again.
2     Q   So you're just assuming.  You weren't
3  there.  You don't have firsthand knowledge?
4     A   Correct.  Correct.
5     Q   Do you know who present -- who was
6  present at that date?
7     A   It looks like that's Alex Griffin's
8  signature.
9     Q   Okay.  So Alex Griffin is who I need
10  to ask as to whether or not a safety manual
11  was actually given to my client?
12     A   Yeah.  He would be the person to ask.
13     Q   Okay.  Thank you, sir.  Could you
14  turn to the next page, sir.
15     A   (Witness complies.)
16     Q   And can you read that title to the
17  ladies and gentle men of the jury?
18     A   "Job description of physical
19  requirements."
20     Q   And this lists out various physical
21  requirements for captains, mates, and
22  deckhands.  Correct?
23     A   Correct.
24     Q   And my understanding is Mr. Richard
25  was employed as a deckhand for REC Marine; is

**241**

1  that correct?
2    A   Correct.
3    Q   All right.  The physical requirements
4  for the deckhand included that he was -- had
5  to be able to climb ladders, perform heavy
6  lifting, required to engage in strenuous
7  pulling, able to keep footing in sea
8  conditions.  The position involves frequent
9  standing and that all individuals are required
10  to meet the physical qualifications of a
11  deckhand may not be accommodated.  I don't
12  know what that last statement is.
13    A   Unless, they -- probably, a comma
14  after deckhand.
15    Q   Okay.
16    A   It's probably a comma after deckhand.
17  It might not have shown up in this copy,
18  maybe.
19    Q   Okay.  At the time that -- and sorry
20  about my phone again.  We're seeing if the
21  Court calls back.
22    A   Might be a -- might be a new case.
23    Q   At the time that Mr. Richard was
24  hired, we know that he held all of the
25  physical requirements that REC Marine required

**242**

1  for deckhands.
2    MR. SALLEY:
3      Objection.  That -- that is
4    certainly not a given, not in this
5    case.
6    THE WITNESS:
7      It --
8  BY MR. RHINE:
9    Q   Can you answer my question, sir?
10    A   I don't know if it's in here, if he
11  did his, you know, physical.
12    Q   Uh-huh.  (Affirmative response.)
13    A   We require them to do them in the
14  past, physical.
15    Q   Okay.  We'll get there.
16    A   Okay.
17    Q   But REC Marine wouldn't send someone
18  offshore, unless they passed their physical?
19    A   Correct.
20    Q   And the physical is what confirms
21  that the individual has the physical
22  capabilities to perform these requirements
23  that are listed?
24    A   That's correct.
25    Q   So since we know that Mr. Richard was

**243**

1  sent offshore, you can testify here today that
2  he held these physical capabilities at the
3  time that --
4    MR. SALLEY:
5      Objection.  Objection.  That is
6    not correct, counsel.  And I object
7    to the question.
8  BY MR. RHINE:
9    Q   You can answer my question, sir.
10    A   My assumption is yes.
11    Q   Okay.  Could you turn to the next
12  page and identify this document?
13    A   "Consent to authorize release,
14  disclose, use, and exchange protected health
15  and personal information."
16    Q   What is this document used for?
17    A   In case there is an injury, we're
18  able to get medicals from other places,
19  anything else from, like it says, his school
20  and any other employment records, that he
21  agrees that we're allowed to receive those.
22    Q   Okay.  Do you know if REC Marine
23  attempted to obtain any of Mr. Richard's
24  medical records?
25    A   I'm not aware.  I'm not aware.

**244**

1    Q   All right.  Let's go back to Exhibit
2  2, for me.  I'm almost done, sir.  But let me
3  make sure I covered everything that's on my
4  topic list.  Because I know I asked questions
5  in an order that your counsel doesn't like.
6  Because I don't just go topic by topic.  But
7  I'm not required to.  So now, I'm just making
8  sure I've covered it.  Okay.
9    A   Okay.
10    MR. SALLEY:
11      Let me object to that statement.
12    And I'll prove it later, if you wish.
13    MR. RHINE:
14      Okay.
15  BY MR. RHINE:
16    Q   All right, sir.  What compensation or
17  benefits does a deckhand for REC Marine
18  receive?
19    A   A day's pay.
20    Q   Okay.  What is the standard rate for
21  a deckhand?
22    A   A hundred and -- a hundred dollars to
23  $135, $140.
24    Q   Okay.  Do you know what Mr. Richard
25  received as a deckhand for REC Marine?

245

1  A  No.  No.
2  Q  Who would have that information?
3  A  Personnel.
4  Q  Okay.  Other than the day rate that
5  Mr. Richard would have received, what sort of
6  other benefits does the company provide?
7  A  Other health insurance, eye and
8  dental.
9  Q  Okay.  Do you know if Mr. Richard
10 elected to receive any of those benefits?
11 A  No.
12 Q  Who would know that answer?
13 A  Alex.  It would be on paperwork
14 somewhere.  I'm sure Alex Griffin would be the
15 person that would acknowledge that.
16 Q  Okay.  Are there any sort of
17 retirement benefits that are offered a
18 deckhand?
19 A  No.  No.
20 Q  Okay.  We've gone over the various
21 insurance, the pay.  Is there any other perks
22 that these deckhands receive for your company?
23 A  No.  No.
24    (OFF-THE-RECORD DISCUSSION)
25

246

1  BY MR. RHINE:
2  Q  Does -- does REC Marine require
3  regular inspections of the vessels?
4  A  Our port captains visit the vessels.
5  And the crew will inspect vessels and notify
6  their port captain if there's anything -- any
7  issues they got going on with the vessel.
8  Q  Okay.  Are any documents generated
9  during those regular port captains'
10 inspections?
11 A  We do now.
12 Q  Okay.  What do you -- what is
13 generated now?
14 A  A checklist type inspection.
15 Q  Okay.  Is that something where it
16 lists various things that the port captain
17 needs to either himself check out or verify
18 are in good working order; and then, I guess,
19 he dates and signs it?
20 A  Correct.  That documentation.
21 Q  Okay.  Was that policy in place at
22 the time of this incident?
23 A  No.
24 Q  Okay.  Why did REC Marine change
25 their policy in order to require that

247

1  document?
2  A  We just happened, about the last six
3  months -- we -- we've hired some other people
4  as we've grown.
5  Q  What -- what -- what's the basis for
6  making sure that document gets filled out,
7  though?
8  A  What do you mean, "What's the basis"?
9  What are --
10 Q  Why does REC Marine want it filled
11 out?
12 A  So we can keep the vessels safe and
13 seaworthy.
14 Q  I think you testified earlier that
15 you, on behalf of REC Marine, haven't
16 interviewed anyone regarding the incident that
17 occurred onboard the vessel.  Is that correct?
18 A  No, I have not.
19 Q  Does Offshore Transport Services
20 still own the vessel?
21    MR. SALLEY:
22       Objection.  No indication that
23       he would have any way to know.
24 BY MR. RHINE:
25 Q  All right.  You can answer the

248

1  question, sir.
2  A  To my knowledge, yes.
3  Q  Do you know who the vessel is
4  currently performing work for?
5  A  Talos, T-A-L-O-S.
6  Q  Who is Chris Holcomb?
7  A  Captain on the vessel.
8  Q  Was he the captain opposite
9  Mr. McCain?
10 A  I'm sure he was.  If he was aboard
11 the vessel, yes.
12 Q  Okay.  Who's David Gilbert?
13 A  He would be a deckhand.
14 Q  Okay.  Did you ever ask either
15 Captain Holcomb or Deckhand Gilbert about the
16 condition of the stairs onboard the vessel?
17 A  No.
18 Q  Where is the vessel currently?
19 A  I'm assuming offshore.  I don't -- I
20 don't know.
21 Q  Do you know its schedule as to when
22 it comes in, when it goes out?
23 A  No.  It's just -- it's dictated by
24 the customer.  It can come in any time if they
25 need to come in to get stuff or take on fuel

249

1  or whatever it may be.
2      MR. RHINE:
3          Just for the record, before I
4  finish with you, sir, I'm gonna
5  reserve my right to re-question you
6  regarding some of the topics or a
7  different witness.  I don't believe
8  that the witness was adequately
9  prepared, as required by the Federal
10  Rules of civil Procedure for a
11  corporate representative.  It became
12  obvious at the very beginning of the
13  deposition and continuing throughout
14  that he lacked all information that
15  was held by REC Marine for these
16  topics that he was designated on.  So
17  we will address that with the Court
18  at a later date.
19      Separate from that, sir, I do
20  appreciate your time today taken out
21  from your busy schedule and visiting
22  with me.  I'll pass the witness.
23      MR. SALLEY:
24          And we object to your last
25  gratuitous statement as being very

250

1  carefully considered and intentional.
2  And we have no intension, at all, to
3  further examine this witness.  You've
4  had your chance.  And if you didn't
5  ask the questions, I think you've
6  lost it.
7      MR. RHINE:
8          All right.  We'll address it
9  with the court, Fred.
10      MR. SALLEY:
11          You address everything you want
12  to with the Court.  That's what
13  they're there for.
14      MR. RHINE:
15          Okay.  Do you have any questions
16  of this witness?
17      MR. SALLEY:
18          I'm thinking about it.
19          EXAMINATION
20  BY MR. SALLEY:
21      Q   You were shown a document earlier
22  which was, in fact, the 11/6/18 log report on
23  WT Offshore.
24      A   Yes.
25      Q   Do you see that?

251

1      A   Yes.
2      Q   Do you remember being handed a second
3  document which was not as legible?
4      A   Correct.
5      Q   Is all the information clearly
6  visible on that particular log sheet?
7      A   Yes.
8      Q   Does it change any of your answers
9  with respect to your review of the other
10  unclear log sheet?
11      A   No.
12      MR. RHINE:
13          Why wasn't that provided to us
14  previously?
15      MR. SALLEY:
16          It was.  You've had it the whole
17  time, counsel.
18      MR. RHINE:
19          We have not had a clean version
20  of that.
21      MR. SALLEY:
22          He's had it sitting here all
23  day.
24      MR. RHINE:
25          We have not had a clean version

252

1  of that document until we had it
2  today.
3      MR. SALLEY:
4          You have.  You have because I
5  sent it to you.
6      MR. RHINE:
7          It's a complete
8  misrepresentation, completely
9  inaccurate, Fred.
10      MR. SALLEY:
11          All right.  Let's go.  That's
12  all I'm gonna take from you.
13      MR. RHINE:
14          Fred, you've never given us a
15  clear copy of that.  We've asked
16  multiple times.
17      MR. SALLEY:
18          Counsel, this is a copy of what
19  you were given.
20      MR. RHINE:
21          It is not.
22      MR. SALLEY:
23          It is.  What you did with it, I
24  have no idea.
25      MR. RHINE:

63 (Pages 249 to 252)

**253**

```
 1          I don't know how you're able to
 2   testify as to what I did or didn't
 3   do, Fred.
 4   MR. SALLEY:
 5          Because -- because I'm --
 6   MR. RHINE:
 7          You don't have my knowledge.
 8   MR. SALLEY:
 9          Because I'm --
10   MR. RHINE:
11          You don't clearly know what was
12   given to us, Fred.  You are
13   incorrect.
14   MR. SALLEY:
15          I am clearly capable -- counsel,
16   I copied every sheet and sent every
17   sheet that you have to you.
18   MR. RHINE:
19          Okay.
20   MR. SALLEY:
21          And this one was sent to you
22   ages ago.
23   MR. RHINE:
24          Let the Court do a comparison of
25   them.  Thank you, again, sir, for
```

**254**

```
 1   your time.
 2   THE WITNESS:
 3          Thank you.  No problem.
 4   THE VIDEOGRAPHER:
 5          This concludes the deposition.
 6   We're off the record at 2:20.
 7
 8   (WHEREUPON, THIS DEPOSITION WAS CONCLUDED.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**255**

```
 1          C E R T I F I C A T E
 2
 3          This certification is valid only for
 4   a transcript accompanied by my original
 5   required seal on this page.
 6          I, TRINA M. GRAVES, Certified Court
 7   Reporter, in and for the State of Louisiana,
 8   as the officer before whom this testimony was
 9   taken, do hereby certify that BLAINE RUSSELL,
     to whom oath was administered, after having
10   been duly sworn by me upon authority of
     R.S. 37:2554, did testify as hereinbefore set
11   forth in the foregoing 254 pages; that this
     testimony was reported by me in the stenotype
12   reporting method, was prepared and transcribed
     by me or under my personal direction and
13   supervision, and is a true and correct
     transcript to the best of my ability and
14   understanding; that the transcript has been
     prepared in compliance with transcript format
15   guidelines required by statute or by rules of
     the board, that I have acted in compliance
16   with the prohibition on contractual
     relationships, as defined by Louisiana Code of
17   Civil Procedure Article 1434 and in rules and
     advisory opinions of the board; that I am not
18   related to counsel or to the parties herein,
     nor am I otherwise interested in the outcome
19   of this matter.
20
21
22
23
              _____
24                 TRINA M. GRAVES
                CERTIFIED COURT REPORTER
25
```