UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| REC MARINE LOGISTICS, LLC | § | C.A. NO. 2:19-cv-11149-LMA-DMD |
| | § | |
| V. | § | |
| | § | |
| DEQUINCY R. RICHARD | § | SEC.  "I"        MAG.  (3) |
| | § | |
| V. | § | |
| | § | |
| REC MARINE LOGISTICS, LLC, | § | |
| GULF OFFSHORE LOGISTICS LLC and | § | |
| OFFSHORE TRANSPORT SERVICES, LLC | § | |

## RICHARD'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW INTO COURT, through undersigned counsel, comes Defendant/Counter/Third-Party Plaintiff DeQuincy Richard ("Richard"), and respectfully moves this Honorable Court for a partial summary judgment on liability, as set forth below.

# TABLE OF CONTENTS

I.  Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  Summary Judgment Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  Argument & Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.  REC Marine was negligent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.  REC Marine failed to provide its seaman with
           a reasonably safe place to work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.  REC Marine's negligence was the cause
           of Richard's injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.  REC Marine has admitted both negligence
           and causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  At the time of the incident, Offshore Transport's vessel
       was unseaworthy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1.  The stairs at the port side jump deck were unreasonably fit
           for their intended purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        2.  The unseaworthy condition played a substantial part
           in bringing about or actually causing the injury . . . . . . . . . . . . . . . . . . . 21

        3.  Offshore Transport has admitted both unseaworthiness
           and causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## CASES

*Alverez v. J. Ray McDermott & Co.*
674 F.2d 1037, 1043 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Amburgey v. Corhart Refractories Corp.*
936 F.2d 805, 809 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*American Auto Ass'n v. AAA Legal Clinic*
930 F.2d 1117, 1119 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*Brister v. A.W.I., Inc.*
946 F.2d at 350, 354 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Chisholm v. Sabine Towing & Transp. Co., Inc.*
679 F.2d 60, 62 (5th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Colburn v. Bunge Towing, Inc.*
883 F.2d 372, 374 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*DIRECTV, Inc. v. Robson*
420 F.3d 532, 536 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dukes v. South Carolina Ins. Co.*
770 F.2d 545, 548-49 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*Gautreaux v. Scurlock Marine Inc.*
107 F.3d 331, 335, 339 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hulsey v. Texas*
929 F.2d 168, 171 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*In re Carney*
258 F.3d 415, 419 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Int'l Shortstop, Inc. v. Rally's, Inc.*
939 F.2d 1257, 1263-64 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ionian Steamship Co. v. United Distillery*
236 F.2d 78, 80 (5th Cir. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lambert v. Diamond M Drilling Co.*
688 F.2d 1023, 1024 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Landry v. Two R. Drilling Co.*
511 F.2d 138, 142 (5th Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Little v. Liquid Air Corp.*
37 F.3d 1069, 1075 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Littlefield v. Forney Indep. Sch. Dist.*
268 F.3d 275, 282 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mitchell v. Trawler Racer, Inc.*
362 U.S. 539, 550, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Park v. Stockstill Boat Rentals, Inc.*
492 F.3d 600, 604 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Turner v. Inland Tugs Co.*
689 F.Supp. 612, 619 (E.D.La.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Usner v. Luckenbach Overseas Corp.*
400 U.S. 494, 499, 500 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

## OTHER AUTHORITY

Fed. R. Civ. P. 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

Fed. R. Civ. P. 36(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

Fed. R. Civ. P. 36(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

FED. R. CIV. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18, 21

FED. R. CIV. P. 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Grant Gilmore & Charles Black, The Law of Admiralty § 6–36 (1957) . . . . . . . . . . . . . . . . . . 15

Thomas J. Schoenbaum, 1 Admiralty and Mar. Law § 6-21 (5th ed.) . . . . . . . . . . . . . . . . . . . 14

iii

## I.  SUMMARY OF ARGUMENT

(1) REC Marine was negligent as a result of its failure to adequately train Richard, failure to perform a JSA with Richard before the incident, failure to inspect and maintain the vessel, and failure to provide a safe work place on board the vessel it operated, and (2) the vessel was unseaworthy on the date of the incident as a result of the defective step on the stairs located at the port-side jump deck.

## II.  STATEMENT OF FACTS

Plaintiff/Counter Defendant REC Marine Logistics, LLC ("REC Marine") was the operator of the *Dustin Danos* ("vessel"), and the employer of Richard.[1]  Offshore Transport Services, LLC ("Offshore Transport") was the owner of the *Dustin Danos*.[2]  Despite REC Marine operating the Offshore Transport vessel, there were no contracts or agreements between the parties.[3]

On the date of the incident, REC Marine was the employer of the Captain on the vessel, Sam McCain, as well as the remainder of the crew.[4]  The crew was comprised of four members: two captains, one engineer, and one deckhand.[5]  On November 16, 2018, the vessel was performing a job for W&T Offshore at Ship Shoal 214.[6]  Richard first joined the vessel's crew the day prior to the

---

[1]  Ex. 1, Deposition of Blaine Russell ("Russell Depo"), pp 40:21 to 41:1; 43:17-19; Ex. 2, Richard's First Request for Admission to REC Marine (deemed admitted pursuant Magistrate Douglas' Order dated March 9, 2020, Rec. Doc. 79) ("RFA1") at Admissions 2, 3, 4, 5, 11.

[2]  Ex. 1, Russell Depo, pp 40:21 to 41:1; Ex. 3, Richard's First Request for Admission to OTS (deemed admitted pursuant Magistrate Douglas' Order dated March 9, 2020, Rec. Doc. 79) ("RFA1") at Admission 1.

[3]  Ex. 1, Russell Depo, pp 43:6-12.

[4]  Ex. 4, Deposition of Sam McCain ("McCain Depo"), pp 11:24 to 12:8; 18:1-3.  Ex. 1, Russell Depo, pp 43:20-23.

[5]  Ex. 4, McCain Depo at p. 41:19-21.

[6]  *Id.* at p. 22:18-23.

1

incident, serving as the deckhand on board.[7]  Richard joined the crew of the vessel at the W&T

Offshore dock at Intracoastal.[8]  REC Marine does not have a safety manual, rather the company relies

on one drafted by GOL, LLC.[9]  GOL, LLC is a company owned by Ronald Chaddock (the owner of

REC Marine), Todd Danos (the owner of Offshore Transport), and a third individual – Joel

Broussard.[10]  The sole safety guidance on the vessel was the safety manual implemented and used

by REC Marine, but drafted by GOL, LLC.[11]

Shortly before noon on November 16, 2018, Captain McCain was in the wheelhouse when

the other Captain on the vessel indicated that Richard had difficulty "catching a line" earlier that

morning.[12]  Captain McCain volunteered to take Richard to the incident location and show him how

to perform that task.[13]  Once McCain joined Richard on the port-side jump deck of the vessel he

showed him how to throw the line.[14]  Captain McCain explained the incident:

> Q.   So you were showing him how to throw it, you successfully got it around
> whatever you were throwing it?
> A.   Right.
> Q.   You then secured it or was it already secured to your vessel?
> A.   It wasn't secured to the vessel, no.
> Q.   Okay.  After you successfully threw it or caught it onto the platform, what did
> you then do?

---

[7] *Id.* at p. 41:12-23.

[8] *Id.* at pp 41:24 to 42:4.

[9] Ex. 1, Russell Depo, pp 43:24 to 44:5; 44:16 to 45:1.

[10] *Id.* at pp 40:9-23; 44:6-14.

[11] *Id.* at pp 47:22 to 48:5.

[12] Ex. 4, McCain Depo, at pp 47:17 to 48:11.

[13] *Id.*

[14] *Id.* at p. 48:14-17.

A.   Well, when he fell, I got him up off the ground.

Q.   Before he fell, did you secure the line?

A.   Okay, let me help you understand this.

Q.   Yeah.

A.   We throw the line from the jump deck, which is -- he was up three stairs -- we turn around, walk down the stairs, and then we go secure the line.  So in between throwing the line and securing the line on the boat is when he fell.

Q.   Okay.  So after -- after you catch it onto the platform, you then carry the line down the steps?

A.   You don't have to carry the line.  The line's already at the bit, you just don't tie it off yet.

Q.   Okay.  So once you got it secured onto the platform, you then turned around?

A.   Right.

Q.   To walk down the steps?

A.   Correct.

Q.   And Mr. Richard had already turned around and had started down the steps when he fell?

A.   Right.

Q.   Did you actually see him fall?

A.   Yes.[15]

Captain McCain's testimony was clear regarding witnessing the accident:

Q.   Okay.  Describe his fall for me, please.

A.   He fell into a pushup position, basically.

Q.   And what does that mean?

A.   Both arms out, down, getting ready to do a pushup.

Q.   So he fell down on his front?

A.   Yes.

Q.   And it looked like he tried to break his fall with his hands out?

A.   Yes.

Q.   Like in a pushup position like you've just described?

A.   Yes.

Q.   So you clearly saw him fall?

A.   Yes.

Q.   And you clearly saw him hit the deck?

A.   Yes.[16]

---

[15] *Id.* at pp 48:21 to 50:3.

[16] *Id.* at pp 50:24 to 51:15.

At the time of the incident, Richard was under instructions to perform the work he was doing.[17]  Richard did not violate any written or oral instruction that was given to him by the Captain or any of the other crew members.[18]  Prior to the injury, Richard's conduct and ability rating aboard the vessel was satisfactory.[19]  Captain McCain reported the incident to the other Captain on board, and then took Richard into the wheelhouse to complete an incident report.[20]  Following all incidents on board vessels, REC Marine requires its Captains to complete an incident report.[21]  Following Richard's fall, Captain McCain visually inspected the steps, but failed to take any photographs of their condition.[22]  The REC Marine Operations Manual requires a witness statement be completed for anyone who witnesses an injury aboard a vessel.[23]  Despite this requirement, McCain does not recall whether or not he wrote a witness statement following the incident.[24]  None has been produced in discovery.[25]  Following the completion of the incident report, the vessel returned to the dock.[26]

---

[17] Ex. 2, Richard's RFA1 to REC Marine, at Admission 14.

[18] *Id.* at Admission 24.

[19] *Id.* at Admission 8.

[20] Ex. 4, McCain Depo at pp 53:20 to 54:10; Ex. 5, Personal Incident/Illness Report.

[21] Ex. 4, McCain Depo at pp 32:20 to 33:5; 36:11-13.

[22] *Id.* at pp 56:12-23.

[23] *Id.* at p. 69:9-15

[24] *Id.* at pp 69:25 to 70:16.

[25] Ex. 6, Affidavit of Eric J. Rhine ("Rhine Aff.")

[26] Ex. 4, McCain Depo at pp 60:20 to 61:2.

Richard performed no further work on the vessel due to his injuries.[27]  Once at the dock, Richard was taken to receive medical treatment for his injuries.[28]

After the incident occurred, while Richard received initial medical care on the vessel, he spoke with other crew members regarding the condition of the steps.[29]  Richard was told that it was known by the other members of the crew that the steps he was descending needed to be repaired.[30]  It was also known by the Port Supervisor for the company that repairs were needed, however none were made before the *Dustin Danos* left the W&T dock.[31]

On the day of the incident, no JSA was completed with Richard regarding the task that he was performing at the time of the incident – catching a line in order to tie off the vessel to a platform.[32]  As acknowledged by REC Marine's corporate representative, the purpose of a JSA is to provide a seaman with "a brief description of the tasks that's gonna be performed, any issues that may arise that could cause an incident or personal injury and proper steps to do things."[33]  The Company's Health, Safety and Environmental Manual acknowledges the importance:

> Job safety analysis is a careful study and record of each step of a job, focusing on the identification of existing or potential hazards to workers' health and safety. By describing hazards in detail, it enables those concerned to devise methods and procedures that can reduce or eliminate these hazards. It is especially well suited to the discovery of hidden dangers, thus achieving one of the principal objectives of any

---

[27] *Id.* at pp 63:25 to 64:9.

[28] *Id.* at p. 64:10-23.

[29] Ex. 7, Declaration of DeQuincy Richard ("Richard Dec.") at par. 8.

[30] *Id.*

[31] *Id.*

[32] *Id.* at par. 4, 6.

[33] Ex. 1, Russell Depo, pp 69:22 to 70:4.

comprehensive audit. Hidden dangers are the most insidious because they threaten us without our knowing it and keep us from taking appropriate precautions.

The identification of hazards is a crucial component of any successful safety program, and requires careful attention. This program will help you to devise a practical and reliable hazard identification system, from detailed, single-job safety analyses to comprehensive company wide audits.[34]

Prior to the incident, Richard had never assisted with tying off the line in order to secure a vessel to a platform.[35]   Richard was an inexperienced deckhand at the time he was hired, with minimal experience working offshore.[36]   When he was hired by REC Marine, Richard received no training in how to secure a vessel to a platform via a line.[37]   Nor was Richard ever asked during onshore orientation if he had experience performing this task.[38]   When Richard joined the vessel as a member of its crew, he received no orientation or walk-through on the ship regarding various hazards he may encounter as a deckhand.[39]   He was never warned that one of the steps on the port side jump deck was loose.[40]   Neither Captain on the vessel asked him if he had experience or training regarding

---

[34] Ex. 8, Health, Safety and Environmental Manual, p. 100.

[35] Ex. 7, Richard Dec. at par. 4.

[36] *Id.* at par. 2.

[37] *Id.* at par. 5.

[38] *Id.*

[39] *Id.* at par. 3.

[40] *Id.*

throwing a line on the day of the incident.[41]  Although it failed to do so with Richard, REC Marine's safety policy required Richard to receive training from the company.[42]

The time that Captain McCain assisted Richard was the second time the task had to be performed by Richard on the date of the incident.[43]  During his first attempt, Richard had difficulty understanding the steps required in order to accomplish the task.[44]  No JSA was completed, nor were specific instructions provided to Richard before he attempted to throw the line/tie off the vessel the first time that morning.[45]  The REC Marine HSE Manual requires a JSA to be performed **BEFORE** a new employee like Richard performs a task.[46]  Despite the difficulty encountered by Richard the first time he attempted this task, and REC Marine's policies and procedures requiring a JSA be performed, none was done prior to the second attempt.[47]  Based on Richard's inexperience

---

[41] *Id.* at par 5.

[42]  Ex. 8, Health, Safety and Environmental Manual, p. 24 ("[Management] [m]ust pro-actively participate...to ensure employees are properly trained to perform assignments utilizing safe work practices and procedure."); p. 64 ("Training will be conducted on the vessel when applicable and will be conducted by the licensed officer."); p. 64 ("[REC Marine] will ensure that each employee involved in any operation requiring specific training has or will be scheduled to receive the necessary training/certification."); p. 65 ("Maintaining worker competency will be reinforced daily through informal and formal inhouse training sessions..."); p. 66 ("Pre-Job Safety Instructions: (JSA) - This training is given to employees when they are assigned to do hazardous and infrequently performed jobs. This line supervisor provided training involves specific job instructions regarding the task to be performed."); p. 155 ("Any necessary training or instruction is given to workers to ensure that they understand the Permit to Work System and procedures in general and specific precautions required for their particular job.")

[43]  Ex. 7, Richard Dec. at par. 6.

[44] *Id.*; Ex. 4, McCain Depo at pp 47:17 to 48:11.

[45]  Ex. 7, Richard Dec. at par. 4.

[46]  Ex. 8, Health, Safety and Environmental Manual, p. 104. ("There are many advantages in using Job Safety Analysis. JSA provides training to new employees on safety rules and how the rules are applied to their work. **This training is provided before the new employees perform the job task(s).**" (Emphasis added).

[47]  Ex. 7, Richard Dec. at par. 6.

performing this task, a JSA should have been done before the task was attempted.[48]  The failure to complete a JSA violated numerous provisions of REC Marine's Safety Manual.[49]  A proper JSA for the task should have included the risk of slipping while descending the stairs at the port side jump deck, a hidden danger involved with this task.[50]  The Job Safety Analysis is an accident prevention technique used in many successful safety programs.[51]

If repair work is done on the vessel that requires third party contractors, REC Marine sends an invoice/receipt to Offshore Transport, covering work performed.[52]  During discovery in this lawsuit, REC Marine produced no invoices/receipts indicating third party work was performed on the steps.[53]  Similarly, Offshore Transport has produced no invoices/receipts received from REC Marine indicating third party work performed on the steps.[54]  Since the date of the incident, REC Marine is aware of no repairs having been made to the steps where Richard's incident occurred.[55]

---

[48] *See* FN 42; Ex. 8, Health, Safety and Environmental Manual, p. 38 ("In addition, when the crew is about to undertake a new type of operation or perform hazardous work, a JSA shall be conducted to review safety procedures and identify potentially unsafe conditions. Crew members shall, at all times, be given the opportunity to ask questions and/or make suggestions."); p. 59 ("Prior to beginning an unfamiliar, hazardous, or major project, all participants involved shall have a safety meeting. Step-by-step procedures (JSA) should be analyzed and agreed on. **Under no circumstances should work begin before a safety meeting has been held.**") (Emphasis added); p. 66 ("Pre-Job Safety Instructions: (JSA) This training is given to employees when they are assigned to do hazardous and infrequently performed jobs."); p. 100 ("JSA's must be conducted before the job begins.").

[49] *Id.*

[50] Ex. 8, Health, Safety and Environmental Manual, p. 100. ("It is especially well suited to the discovery of hidden dangers, thus achieving one of the principal objectives of any comprehensive audit. Hidden dangers are the most insidious because they threaten us without our knowing it and keep us from taking appropriate precautions.")

[51] *Id.* at p. 104; p. 157 ("The Pre-Job safety meeting (JSA) is one of the most valuable tools available in accident prevention.").

[52] Ex. 1, Russell Depo, pp 196:22 to 197:4.

[53] Ex. 6, Rhine Aff.

[54] *Id.*

[55] Ex. 1, Russell Depo at p. 197:5-16.

If any maintenance work was performed by the vessel's crew, then it would be included within either maintenance logs or repair logs kept by the company.[56]   During discovery in this lawsuit, REC Marine has produced no maintenance or repair logs indicating work performed on the steps where the incident occurred.[57]   Accordingly, at the time that Richard's liability expert, Mr. Robert Borison, performed an inspection of the *Dustin Danos*, the steps remained in the same condition as on the date of the incident.

Richard's liability expert Robert Borison ("Borison"), President of Total Safety Services, Inc., performed an inspection of the vessel on January 29, 2020.[58]   As noted in his report, based on industry standard, and his education, training and experience, the stairs leading up to the port jump-deck were defective because the fiberglass grating treads on some of the stair's steps were not properly affixed to the original stair treads.[59]   The fiberglass grating treads were bolted onto the original stair-treads using bolts and grating clamps.[60]   Borison took a picture of the steps where Richard fell during his inspection of the vessel:

---

[56] Ex. 4, McCain Depo, pp 27:14 to 28:4 ("Q.   Okay.   So if there's any maintenance to be done aboard the vessel, it's kept aboard -- it's kept in the engineer's log? A.   Yes.   Q.   And it's kept by the engineer? A.   Yes. Q.   Do you know what is done with those logs?   Do they remain aboard the vessel – A.   They remain aboard the vessel. Q. -- or do they get sent to the company? A.   They remain on the boat. Q.   What about repair logs? A.   Repair logs, we can keep them in a file cabinet and send a copy to the office. Q.   So that's a file cabinet aboard the vessel? A. Yes.")

[57] Ex. 6, Rhine Aff.

[58] Ex. 9, Declaration of Robert Borison ("Borison Dec.") at par. 9.

[59] Ex. 9, Borison Dec., Report at pp 6-7,

[60] *Id.*



The bolts were affixed to the original stair-tread by drilling and tapping the original stair treads and then screwing the bolts into the original stair-treads.[61]  No physical means of locking the bolts into the original stair-treads were used to secure the fiberglass grating.[62]  Borison's inspection discovered that the fiberglass treads (the yellow grating in the above photograph) on the jump-deck stairs were loose:

> During my inspection of the vessel, I observed a loose fiberglass grating tread on the second step to the bottom. It was loose because the bolt holding the fiberglass clip had backed out. This loose clip allowed the fiberglass tread to move back and forth under the clamp. The inspection of the starboard stairs uncovered another loose fiberglass grating tread on the second to bottom step. It was also loose because the bolt holding the fiberglass grating tread down had backed out.[63]

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

10

During his inspection, Borison documented the defective nature of the step, taking video footage of both (1) the loose clip on the second step from the bottom[64], and (2) the movement of the step that was allowed as a result.[65]   The shifting of the step that Richard stepped on when he lost his footing is what produced an unsafe stairway.[66]

The Captain of the vessel at the time of the incident had a number of responsibilities pursuant to the REC Marine Operations Manual.[67]   The Captain was responsible to ensure the seaworthiness of the *Dustin Danos*.[68]   He had the "authority to take whatever action he considers appropriate relevant to his responsibilities."[69]   In order to remain "seaworthy, safe and efficient throughout operational life" the vessel had to be properly maintained.[70]   The Captain had primary responsibility for all vessel maintenance on the *Dustin Danos*.[71]   Captain McCain had "ultimate responsibility for ensuring defects are properly reported and repaired in accordance with company procedures."[72] Regular inspections were required to be carried out in order to discovery damage on board, including

---

[64] Ex. 10, Video of loose clip taken by Robert Borison on January 29, 2020.

[65] Ex. 11, Video of movement of step taken by Robert Borison on January 29, 2020.

[66] Ex. 9, Borison Dec., Report at 6-7; Ex. 7, Richard Dec. at par. 9.

[67] *See* Ex. 12, Operations Manual.

[68] *Id.* at p. 14 ("The Master is responsible for: Ensuring seaworthiness of vessel..."); p. 15 ("Prior to sailing, the Master ensures the following: Vessel's seaworthiness.")

[69] *Id.*

[70] *Id.* at p. 100.

[71] *Id.*

[72] *Id.* at p. 117.

11

when joining a vessel, before entering port, on completion of cargo or anchor handling operations, and after completion of cleaning cargo tanks or holds.[73]

As a result of REC Marine's and Offshore Transport's failure to respond to validly served Requests for Admission, Magistrate Douglas ordered that the requests for admission sent to both entities were deemed admitted.[74]   As a result, REC Marine has admitted the following regarding negligence and causation:

- You were negligent in causing the injuries sustained by Richard on the date in question.[75]

- Richard was not contributorily negligent at the time of his accident on the *Dustin Danos*.[76]

- Your actions proximately caused the injuries sustained by Richard on the date in question based on the occurrence made the basis of this lawsuit.[77]

Offshore Transport has admitted the following regarding negligence and causation:

- The *Dustin Danos* was unseaworthy at the time of incident herein.[78]

- Your actions proximately caused the injuries sustained by Richard on the date in question based on the occurrence made the basis of this lawsuit.[79]

### III.  SUMMARY JUDGMENT EVIDENCE

In support of his motion, Richard relies on the following evidence, attached hereto and incorporated by reference as if set out herein:

---

[73] *Id.* at pp 117-118.

[74] Rec. Doc. 79.

[75]  Ex. 2, Richard's RFA1 to REC Marine, at Admission 9.

[76] *Id.* at Admission 10.

[77] *Id.* at Admission 18.

[78] Ex. 3, Richard's RFA1 to OTS, at Admission 17.

[79] *Id.* at 18.

Ex. 1           Deposition of Blaine Russell, Corporate Representative for REC Marine

Ex. 2           Richard's First Request for Admission to REC Marine

Ex. 3           Richard's First Request for Admission to Offshore Transport Services

Ex. 4           Deposition of Sam McCain, Captain of the *Dustin Danos*

Ex. 5           Personal Incident/Illness Report

Ex. 6           Affidavit of Eric J. Rhine

Ex. 7           Declaration of DeQuincy Richard

Ex. 8           Health, Safety and Environmental Manual

Ex. 9           Declaration of Robert Borison and attachments thereto (Report and CV)

Ex. 10          Video of Loose Clip taken by Robert Borison on January 29, 2020

Ex. 11          Video of Movement of Step taken by Robert Borison on January 29, 2020

Ex. 12          Operations Manual

## IV.  ARGUMENT & AUTHORITY

The summary judgment procedure is designed to eliminate useless trials on undisputed issues of fact. Fed. R. Civ. Proc. 56(e). Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. Proc. 56(c).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, such as an affirmative defense, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991). If the moving party meets the initial burden

13

of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).

"An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).  A party cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## A.    REC Marine was negligent

Under the Jones Act, employers of seamen have a duty to provide their seaman employees with a reasonably safe place to work. *Gautreaux v. Scurlock Marine Inc.*, 107 F.3d 331, 339 (5th Cir. 1997) (en banc); *see also* Thomas J. Schoenbaum, 1 Admiralty and Mar. Law § 6-21 (5th ed.) An employer breaches that duty if it fails to exercise ordinary prudence and is thereby negligent. *Gautreaux*, 107 F.3d at 339. In other words, an employer breaches its duty if it disregards a danger that it "'knew or should have known.' " *Colburn*, 883 F.2d at 374 (*quoting Turner v. Inland Tugs Co.*, 689 F.Supp. 612, 619 (E.D.La.1988)).

Apart from negligence, a plaintiff seeking relief under the Jones Act must show causation. "A seaman is entitled to recovery under the Jones Act if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux*, 107 F.3d at 335. The Fifth Circuit has observed that this

14

is a "liberal causation requirement," *Brister*, 946 F.2d at 354, one that places a " 'featherweight' "

burden on the plaintiff, *Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142 (5th Cir.1975) (quoting

Grant Gilmore & Charles Black, The Law of Admiralty § 6–36 (1957)). Indeed, "[i]f the defendant's

negligence played any part, however small, in producing the seaman's injury, it results in liability."

*Brister*, 946 F.2d at 354; *accord Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60, 62

(5th Cir.1982) ("Defendant must bear responsibility if his negligence played any part, even the

slightest, in producing the injury.").

### 1.    REC Marine failed to provide its seaman with a reasonably safe place to work

The summary judgment evidence presented this Honorable Court establishes that REC

Marine sent an inexperienced,[80] untrained seaman[81] to perform tasks he was unfamiliar with.[82]

Having had difficulty performing the task on the first occasion, the company attempted to have

Richard perform the same task a second time.[83]   Although one of the Captains at least attempted to

provide guidance to Richard, no JSA was completed prior to the task.[84]   Had a JSA been completed,

as required by REC Marine's policies and procedures, it should have identified all risks and hazards

associated with the task, which would include associated risks involved in descending the set of

jump-deck stairs.[85]   Unfortunately for Richard, and in violation of the Company's own HSE manual,

---

[80] Ex. 7, Richard Dec. at par. 2.

[81] *Id.* at par. 5.

[82] *Id.* at par. 4.

[83] Ex. 4, McCain Depo, at pp 47:17 to 48:11; Ex. 7, Richard Dec. at par. 6.

[84] Ex. 7, Richard Dec. at par. 4, 6.

[85] Ex. 1, Russell Depo, pp 69:22 to 70:4; Ex. 8, Health, Safety and Environmental Manual, p. 100. ("It is especially well suited to the discovery of hidden dangers, thus achieving one of the principal objectives of any comprehensive audit. Hidden dangers are the most insidious because they threaten us without our knowing it and

the two Captains on the vessel failed to perform any JSA with Richard before the incident.[86]   The failure to perform a JSA identifying hazards for the untrained seaman by itself is significant evidence of the negligence of REC Marine on the date of the incident.   The company apparently believed it could send inexperienced workers to perform tasks in unfamiliar environments without providing them with the knowledge to safely accomplish the work.

REC Marine also failed to provide any training to Richard before the incident regarding the specific task he was performing.[87]   The onshore orientation that he received did not address this task, or provide any guidance to Richard regarding the dangers involved in it.[88]   Upon his arrival on the ship, he received no orientation or walk-through regarding hazards he may encounter during his work as deckhand.[89]

In addition to REC Marine's negligent failure to perform a JSA or provide any training to Richard before the incident, the company failed to inspect and/or repair the defective step before its Jones Act seaman was hurt on it.   One of the captain's responsibilities was to ensure the vessel was seaworthy at all times.[90]   He was the ultimate person responsible for both inspections and

---

keep us from taking appropriate precautions.")

[86] Ex. 7, Richard Dec. at par. 6.

[87] *Id.* at par. 5.

[88] *Id.*

[89] *Id.* at par. 3.

[90] Ex. 12, Operations Manual at p. 14 ("The Master is responsible for: Ensuring seaworthiness of vessel..."); p. 15 ("Prior to sailing, the Master ensures the following: Vessel's seaworthiness.")

maintenance to ensure safety for the crew members.[91]  The failure to inspect the step, and repair it to eliminate the defective condition was negligent.

Richard has presented this Honorable Court with numerous examples of the negligence of REC Marine leading up to and at the time of the incident.  The facts in this case are not in dispute, and there are not material issues of fact regarding the acts and omissions described above.  Such acts and omissions are the very definition of negligence, and respectfully this Court should grant partial summary judgment against REC Marine on liability.

2.      **REC Marine's negligence was the cause of Richard's injuries**

As previously addressed, numerous acts and omissions of REC Marine constitute negligence on the day of the incident.  All of the acts and omissions played a part in producing Richard's injuries.  Richard lost his footing as he descended the jump-deck stairs, when a grating/step shifted when he stepped on it.[92]The negligence of REC Marine is specifically related both to the task Richard was performing when he was injured, and the condition of the defective step itself.  Under the featherweight causation standard afforded a Jones Act seaman, there is no question that REC Marine's negligence was the cause of Richard's injury.  Richard has presented this Court with evidence both on the negligence of his Jones Act employer, as well as regarding the featherweight causation standard.  Accordingly, summary judgment should be granted, finding REC Marine negligent on the date in question.

---

[91] *Id.* at p. 117.

[92] Ex. 7, Richard Dec. at par. 7.

17

### 3.      REC Marine has admitted both negligence and causation

Under Federal Rule of Civil Procedure 36(a), requests for admissions are deemed admitted if not answered within 30 days. *See Hulsey v. Texas*, 929 F.2d 168, 171 (5th Cir. 1991) ("Under Federal Rule of Civil Procedure 36(a), a matter in a request for admissions is admitted unless the party to whom the request is directed answers or objects to the matter within 30 days.").   "Rule 36 allows litigants to request admissions as to a broad range of matters, including ultimate facts, as well as applications of law to fact." *In re Carney*, 258 F.3d 415, 419 (5th Cir. 2001).  Rule 36(b) provides that any matter admitted is "conclusively established." Fed. R. Civ. P. 36(b).  Federal Rule of Civil Procedure 56(c) specifies that admissions can be an appropriate basis for granting summary judgment. *See* Fed. R. Civ. P. 56(c). Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage by contradictory affidavit testimony or other evidence in the summary judgment record. *Dukes v. South Carolina Ins. Co.*, 770 F.2d 545, 548-49 (5th Cir. 1985); *see also  American Auto Ass'n v. AAA Legal Clinic*, 930 F.2d 1117, 1119 (5th Cir. 1991) (default admissions cannot be overcome by conflicting trial testimony).

Following a discovery conference on March 9, 2020, Magistrate Douglas addressed a number of outstanding discovery-related issues.  As a result of REC Marine's failure to respond to validly served Requests for Admission, Magistrate Douglas ordered that the requests for admission sent to REC Marine were deemed admitted.[93]   As a result, REC Marine has admitted the following regarding negligence and causation:

---

[93] Rec. Doc. 79.

18

- You were negligent in causing the injuries sustained by Richard on the date in question.[94]

- Richard was not contributorily negligent at the time of his accident on the *Dustin Danos*.[95]

- Your actions proximately caused the injuries sustained by Richard on the date in question based on the occurrence made the basis of this lawsuit.[96]

Based on both the acts and omissions of REC Marine as discussed previously, and the deemed admissions on both negligence and causation, this Court should grant summary judgment on liability against REC Marine.

## B.    At the time of the incident, Offshore Transport's vessel was unseaworthy

Independent from a Jones Act claim, a seaman may claim his injuries were caused by the unseaworthiness of a vessel under general maritime law. A vessel is deemed unseaworthy if a condition of the vessel presents an unreasonable risk of harm to the seaman. *Park v. Stockstill Boat Rentals, Inc.*, 492 F.3d 600, 604 (5th Cir. 2007). The elements of an unseaworthiness claim are that the vessel or equipment was unreasonably fit for its intended purpose, and the "unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960). There is no requirement that a plaintiff show negligence in proving his claim for unseaworthiness. *Id.*

"A vessel's condition of unseaworthiness might arise from any number of circumstances." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). For instance, a vessel may have an unfit crew. *Id.* An injured seaman must show something more than an " 'isolated, personal

---

[94]  Ex. 2, Richard's RFA1 to REC Marine, at Admission 9.

[95] *Id.* at Admission 10.

[96] *Id.* at Admission 18.

negligent act' " in order to establish that a vessel was unseaworthy, however. *Lambert v. Diamond M Drilling Co.*, 688 F.2d 1023, 1024 (5th Cir .1982) (*quoting Usner*, 400 U.S. at 500). When a vessel founders or when its machinery fails on an otherwise uneventful voyage and no circumstances such as grounding, collision, or bad weather can explain such failure, a presumption arises that the vessel was unseaworthy at the beginning of the voyage. *Ionian Steamship Co. v. United Distillery*, 236 F.2d 78, 80 (5th Cir. 1956). This "substantial" causation requirement is more stringent than the causation requirement in a Jones Act negligence claim. *Alverez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1043 (5th Cir. 1982).

### 1. The stairs at the port side jump deck were unreasonably fit for their intended purpose

In this case, the shifting grating on the step rendered the vessel unseaworthy. The fiberglass step that was used as Richard descended from the jump-deck shifted as he did so.[97] This condition persisted for a long period of time, as shown by the fact the step remained in similar condition when Borison performed his inspection on board.[98] Numerous crew members were aware of the defective condition, as was the Port Supervisor.[99] According to the safety manual, the captain was required to make periodic inspections of the vessel, including the step in question.[100] This was done to ensure the vessel remained in seaworthy condition.[101] The inspections occurred both at sea, and before the

---

[97] Ex. 7, Richard Dec. at par. 7.

[98] Ex. 9, Borison Dec., Report at 6-7; Ex. 10, Video of loose clip taken by Robert Borison on January 29, 2020; Ex. 11, Video of movement of step taken by Robert Borison on January 29, 2020.

[99] Ex. 7, Richard Dec. at par. 8.

[100] Ex. 12, Operations Manual at pp 117-118.

[101] *Id.*

vessel left the port.[102]  Thus, the owner of the vessel knew or should have known of the dangerous condition posed by the loose step.  Furthermore, the steps were not fit for the purpose for which they were intended, namely to permit safe ingress and egress from the jump deck.

### 2.	The unseaworthy condition played a substantial part in bringing about or actually causing the injury

On the date of the incident, Richard was required to use the steps in order to descend from the jump deck.  He was injured when he slipped on the second step from the deck of the vessel, when it shifted under his weight.  The movement of the step under his weight is what caused Richard to lose his balance, and fall onto the deck of the vessel.  He was injured when he impacted the deck, striking his head and shoulder.

### 3.	Offshore Transport has admitted both unseaworthiness and causation.

Under Federal Rule of Civil Procedure 36(a), requests for admissions are deemed admitted if not answered within 30 days. *See Hulsey v. Texas*, 929 F.2d 168, 171 (5th Cir. 1991) ("Under Federal Rule of Civil Procedure 36(a), a matter in a request for admissions is admitted unless the party to whom the request is directed answers or objects to the matter within 30 days.").  "Rule 36 allows litigants to request admissions as to a broad range of matters, including ultimate facts, as well as applications of law to fact." *In re Carney*, 258 F.3d 415, 419 (5th Cir. 2001).  Rule 36(b) provides that any matter admitted is "conclusively established." Fed. R. Civ. Proc. 36(b).  Federal Rule of Civil Procedure 56(c) specifies that admissions can be an appropriate basis for granting summary judgment. *See* Fed. R. Civ. Proc. 56(c). Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage

---

[102] *Id.*

by contradictory affidavit testimony or other evidence in the summary judgment record. *Dukes v. South Carolina Ins. Co.*, 770 F.2d 545, 548-49 (5th Cir. 1985); *see also American Auto Ass'n v. AAA Legal Clinic*, 930 F.2d 1117, 1119 (5th Cir. 1991) (default admissions cannot be overcome by conflicting trial testimony).

Following a discovery conference on March 9, 2020, Magistrate Douglas addressed a number of outstanding discovery-related issues.  As a result of Offshore Transport's failure to respond to validly served Requests for Admission, Magistrate Douglas ordered that the requests for admission sent to Offshore Transport were deemed admitted.[103]  As a result, Offshore Transport has admitted the following regarding negligence and causation:

•       The *Dustin Danos* was unseaworthy at the time of incident herein.[104]

•       Your actions proximately caused the injuries sustained by Richard on the date in question based on the occurrence made the basis of this lawsuit.[105]

Based on both the summary judgment evidence presented this Court regarding the unseaworthiness of the vessel as discussed previously, and the deemed admissions both that the *Dustin Danos* was unseaworthy and that the actions of Offshore Transport caused Richard's injuries, this Court should grant summary judgment against Offshore Transport on Richard's claim for unseaworthiness.

## V.  CONCLUSION

REC Marine sent an inexperienced, untrained seaman to work on the *Dustin Danos*.  In violation of industry standard and numerous provisions of the Company's Health, Safety and Environmental Manual, REC Marine failed to perform a JSA with Richard, failed to train Richard,

---

[103] Rec. Doc. 79.

[104] Ex. 3, Richard's RFA1 to OTS, at Admission 17.

[105] *Id.* at 18.

and failed to inspect and maintain the vessel. REC Marine has even admitted to both negligence and causation during discovery. Additionally, the condition of the vessel was unseaworthy due to the defective condition of the step on the jump-deck stairs, which contributed to cause Richard's injuries. Offshore Transport has admitted to both of these. Because there are no issues of material fact regarding liability, this Court should grant summary judgment against REC Marine and Offshore Transport on liability.

Respectfully submitted,

*/s/ Eric J. Rhine*
Eric J. Rhine (*admitted PHV*)
Texas Bar No. 24060485
erhine@spaglaw.com
SPAGNOLETTI LAW FIRM
401 Louisiana Street, 8th Floor
Houston, Texas 77002
Telephone:     713-653-5600
Facsimile:     713-653-5656

KOCH & SCHMIDT, LLC
R. Joshua Koch, Jr. (Bar Roll No. 7767)
650 Poydras Street, Suite 2660
New Orleans, Louisiana 70130
Telephone: (504) 208-9040
Facsimile: (504) 208-9041

ATTORNEYS FOR RICHARD

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing was automatically accomplished on all counsel of record through CM/ECF Notice of Electronic Filing in accordance with the Federal Rules of Civil Procedure on this 18th day of June, 2020.

*/s/ Eric J. Rhine*
Eric J. Rhine

23